*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No.  14-91565-E-7 |
| RICHARD CARROLL SINCLAIR, | |
| Debtor. | |
| CALIFORNIA EQUITY MANAGEMENT GROUP, INC. and FOX HOLLOW OF TURLOCK OWNERS' ASSOCIATION, | Adv. Proc. No.  15-9008<br>Docket Control No.  HAR-2 |
| Plaintiffs, | |
| v. | |
| RICHARD CARROLL SINCLAIR, | |
| Defendant. | |

**This Memorandum Decision is not appropriate for publication.**
**It may be cited for persuasive value on the matters addressed.**

### MEMORANDUM OPINION AND DECISION
### GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

California Equity Management Group, Inc. ("Plaintiff-CEMG"), one of the two plaintiffs in this Adversary Proceeding, seeks entry of summary judgment determining that the obligation Richard Sinclair ("Defendant-Sinclair") on the District Court judgment Plaintiff-CEMG obtained in the amount of $5,833,175.84 ("RICO Judgment") in *Fox Hollow of Turlock Owners' Association et al v. Mauctrst LLC et al*, United States District Court for the Eastern District of California, Case No. 1:03-cv-05439 AWI (SAB) ("RICO Action") is nondischargeable pursuant to 11 U.S.C.

§ 523(a)(2)(A) [actual fraud] and 11 U.S.C. § 523(a)(6) [willful and malicious injury]. The decision ("RICO Decision") in the RICO Action upon which the RICO Judgment is based has been filed in support of Plaintiff CEMG's Motion for Summary Judgment or in the Alternative, for Summary Adjudication Against Defendant Richard Sinclair ("Motion for Summary Judgment") as Exhibit 11. Request for Judicial Notice, Dckt. 73. Plaintiff-CEMG asserts that the findings and determinations in the RICO Judgment and RICO Decision are given preclusive effect pursuant to the issue preclusion under the doctrine of *res judicata*.

Fox Hollow of Turlock Owners' Association, the other plaintiff named in the Complaint, does not seek relief pursuant to the Motion for Summary Judgment now before this court. Because there remain unadjudicated claims asserted in the Complaint, the court does not enter judgment for just Plaintiff-CEMG at this time. Fed. R. Civ. P. 54 (b) and Fed. R. Bankr. P. 7054.

Upon consideration of the Motion for Summary Judgment, Defendant-Sinclair's Opposition, evidence presented by the Parties, applicable law, the RICO Judgment and RICO Decision, other judgments and appellate decisions (specifically identified below) involving these Parties, and oral arguments presented by the Parties; this court grants the Motion for Summary Judgment.[1]

# PART I

### REVIEW OF MOTION, SUPPORTING PLEADINGS, PLAINTIFF-CEMG'S RESPONSE, AND DEFENDANT-SINCLAIR'S OPPOSITION AND OPPOSITION PLEADINGS

The Motion for Summary Judgment seeks a determination that the obligations of Defendant-Sinclair arising under the RICO Judgment are nondischargeable. Plaintiff-CEMG asserts that the findings and determinations in the RICO Action are subject to the doctrine of issue preclusion, which results in such findings and determinations being binding on the parties in this Adversary Proceeding. In addition, Plaintiff-CEMG asserts that the California Superior Court Final Judgment,

---

[1] The Motion for Summary Judgment has been set for hearing on the notice required by Local Bankruptcy Rule 9014-1(f)(1). The Certificate of Service documents that the Motion for Summary Judgment and supporting pleadings were served on Defendant-Sinclair, Chapter 7 Trustee, and Office of the United States Trustee on May 22, 2017. By this court's calculation, 38 days' notice was provided. Twenty-eight days' notice is required. Written opposition was filed and oral argument presented thereon at the June 29, 2017 hearing. Sufficient and proper notice and service were provided by Plaintiff-CEMG.

California District Court of Appeal Opinions, and California Bar Court Decision listed below also support the granting of summary judgment in this Adversary Proceeding:

A.   California Superior Court Judgment for $1,066,503.52, plus interest, costs, and expenses ("Final State Court Judgment") in *Mauctrst, LLC et al. v. Katakis et al.*, California Superior Court, County of Stanislaus Case No. 332233 ("State Court Action"); Exhibit 15, Dckt. 73.

B.   California Superior Court Statement of Decision ("State Court Decision") of the Superior Court in *Mauctrst, LLC et al. v. Katakis et al.* stating the findings, conclusions and grounds upon which the Final State Court Judgment is based has been filed in support of the Motion for Summary Judgment; Exhibit 13, *Id.*

C.   California District Court of Appeal Decision affirming Final State Court Judgment ("DCA Judgment Opinion"). *Sinclair v. Katakis et al.*, Cal. DCA 5th Cir.  No. F058822, 2013 Cal. App. Unpub. LEXIS 509 (2013);  Exhibit 16, *Id.*

D.   California District Court of Appeal Decision affirming award of attorney's fees and costs as part of Final State Court Judgment.   *Sinclair v. Katakis et al.*, DCA F060497  ("DCA Attys Fee Opinion"); Exhibit 17, *Id.*

E.   *In the matter of Richard Carroll Sinclair*, Member No. 68238, Case Nos. 13-O-10657-PEM, 13-O-11618 (Cons.)   ("State Bar Court Action"), with the Decision and Order of Involuntary Inactive Enrollment ("State Bar Court Decision"), Exhibit 18   Request for Judicial Notice; Exhibit 18, *Id.* The California Supreme Court Order for Disbarment of Defendant-Sinclair is filed as Exhibit 19, *Id.*

This court focuses first on the RICO Judgment, the District Court findings of fact and conclusions of law in the RICO Decision, and whether the RICO Judgment has sufficiently determined the bankruptcy fraud and willful and malicious grounds for nondischargeability.  After that, this court will then consider whether the Final State Court Judgment, the two District Court of Appeal Decisions, and the State Bar Court Decision add to the determination of whether the RICO Judgment is nondischargeable.

Plaintiff-CEMG also directs this court to its Memorandum Opinion and Decision granting a motion for summary judgment for Plaintiff-CEMG determining that the State Court Judgment is nondischargeable pursuant to 11 U.S.C. § 523(a)(6).  *Katakis, California Equity Management Group, Inc., and Fox Hollow of Turlock Owners' Association v. Sinclair (In re Sinclair)*, Bankr. E.D. Cal. Adv. Proc. No. 15-9009, 2017 Bankr. LEXIS 1210 (2017) [Exhibit 21, Dckt. 73].  This court addressed, in detail, in that Memorandum Opinion and Decision many of the same opposition grounds that Defendant-Sinclair now repeats in the Opposition to the current Motion for Summary Judgment.  Judgment was entered in Adversary Proceeding No. 15-9009 on July 14, 2017, with no

1    appeal taken therefrom.

2         Additionally, this court has addressed in several other rulings for which there are now final

3    orders in the Defendant-Sinclair's Chapter 7 Bankruptcy Case ( Bankr. E.D. Cal. 14-91565,

4    referenced in this Decision as "2014 Sinclair Bankruptcy Case") the litigation conduct and strategy

5    of Defendant-Sinclair in his battles with Plaintiff-CEMG, Andrew Katakis, and others concerning

6    the Fox Hollow Property:

7         A.    Bankruptcy Court Memorandum Opinion and Decision granting the motion of the
                Chapter 7 Trustee in Defendant-Sinclair's current bankruptcy case to settle claims
8               and counterclaims of the estate with Katakis Plaintiffs.  2014 Sinclair Bankruptcy
                Case; Dckt. 535.

9
          B.    Bankruptcy Court Memorandum Opinion and Decision sustaining the Chapter 7
10              Trustee's objection to Defendant-Sinclair's claim of a personal injury exemption in
                the "malicious prosecution suit" (term as used by Defendant-Sinclair on Schedules B
11              and C filed under penalty of perjury) against  Katakis Plaintiffs. *In re Sinclair*,
                563 B.R. 554 (2016); 2014 Sinclair Bankruptcy Case, Dckt. 558.
12
          C.    Bankruptcy Court Memorandum Opinion and Decision denying Motion for
13              Reconsideration of Order granting Motion to Approve Settlement and Compromise
                between the Chapter 7 Trustee in the 2014 Sinclair Bankruptcy Case and Andrew
14              Katakis,  Capital Equity Management Group, Inc., formerly known as California
                Equity Management Group, Inc.; and New Century Townhomes of Turlock Owners
15              Associations, formerly known as Fox Hollow of Turlock Owners' Association. *In
                re Sinclair*, 2017 Bankr. LEXIS 1491 (2017); 2014 Sinclair Bankruptcy Case,
16              Dckt. 639.

17        D.    Bankruptcy Court Civil Minutes determining that Defendant-Sinclair was not
                disabled and that he was actively litigating in the 2014 Sinclair Bankruptcy Case.
18              The court findings in the Civil Minutes recount the conduct of Defendant-Sinclair
                which was inconsistent with the professed disability.  2014 Sinclair Bankruptcy
19              Case, Dckt. 337.

20   **Evidence Presented in Support of Motion for Summary Judgment**

21        In support of the Motion for Summary Judgment now before the court, Plaintiff-CEMG

22   presented  the following evidence:

23        A.    Declaration of Greg Durbin. Dckt. 75.

24        B.    Docket for the RICO Action. Exhibit A, Dckt. 76.

25        C.    Proof of Claim 26, as amended on May 3, 2017, filed by Plaintiff-CEMG in the 2014
                Sinclair Bankruptcy Case. Exhibit B, Dckt. 76.
26
          D.    Request for Judicial Notice, Exhibits 1–21. Dckt. 73
27
                1.    Consolidated Amended and Supplemental Complaint for Declaratory and
28                    Injunctive Relief and for Damages – Demand for Jury Trial, filed on July 21,

2010 in the RICO Action as Docket 410 therein.

2.  Order Granting Plaintiffs' Motion to Compel, Order Imposing Monetary Sanctions, filed in the RICO Action on June 3, 2011, as Docket 613 therein.

3.  Reporter's Transcript of Proceedings in the RICO Action on August 8, 2011, filed in the RICO Action on August 16, 2011, as Docket 731 therein.

4.  Orders re: Motion for Reconsideration of Order to Compel; Motion to Dismiss; Motion to File Cross-Complaint; and Motion for Reconsideration of Denial of Disqualification of Plaintiff's Counsel filed in the RICO Action on September 8, 2011, as Docket 763 therein.

5.  Order (Docs. 540, 550, 742, 745, 756, 784, 759 [sic 785], and 799), filed in the RICO Action on September 28, 2012, as Docket 860 therein.

6.  Order re (1) Pending Motion for Order Altering or Amending Order Dismissing Claims Against Mauctrst, LLC and Application for Reconsideration (RICO Action Docket #s 897, 900); and (2) Entry of Default against Mauctrst, LLC, filed in the RICO Action on March 18, 2014, as Docket 1013 therein.

7.  Order (Docs. 901, 905, 911, 921, 932, 943, 973, 997, and 1002), filed in the RICO Action on March 31, 2014, as Docket 1014 therein.

8.  Findings and Recommendations recommending Denying Richard Sinclair's Motion to Amend the Scheduling Order and Stanley Flake's Motion to Amend the Scheduling Order and Granting Plaintiff's Motion for Sanctions, dated August 29, 2014, and filed as Docket 1060 on August 29, 2014, in the RICO Action.

9.  Order Adopting Findings and Recommendations dated September 25, 2014, and filed as Docket 1070 on September 26, 2014, in the RICO Action.

10. Order re: Motion for New Trial filed in the RICO Action on August 24, 2015, as Docket 1184 therein.

11. Findings of Fact and Conclusions of Law, filed in the RICO Action on March 31, 2017, as Docket No. 1238 therein.

12. Judgment entered in the RICO Action on April 10, 2017, Docket No. 1240 therein.

13. State Court Decision filed August 18, 2009.

14. Final State Court Judgment filed August 18, 2009.

15. Final Amended State Court Judgment filed June 21, 2010.

16. DCA Judgment Opinion filed April 29, 2013 therein.

17. DCA Attys Fee Opinion filed March 25, 2013.

18. State Bar Court Decision and Order of Involuntary Inactive Enrollment filed July 28, 2015.

19.     Order of the California Supreme Court disbarring Mr. Sinclair, dated February 7, 2016, *Sinclair on discipline* Cal. Supreme Court No. S230942, 2016 LEXIS 3067 (Fed. 7, 2016).

20.     State Bar of California attorney search results of Richard Carroll Sinclair, dated July 7, 2016, therein.

21.     Memorandum Opinion and Decision, filed in Bankr. E.D. Cal. Adversary Proceeding No. 15-9009, on May 2, 2017, as Dckt. 107 therein.

**Statement of Undisputed Facts by Plaintiff-CEMG**

Plaintiff-CEMG filed a Statement of Undisputed Facts with the Motion for Summary Judgment. Dckt. 74. The Statement of Undisputed Facts provides 195 asserted undisputed facts, the basis for the majority of such facts—193 of the 195—are the prior findings and determinations by: (1) the District Court, (2) the State Court (affirmed by the California District Court of Appeal), (3) the California State Bar Court, and (4) this Bankruptcy Court. In the manner consistent with this court's prior Memorandum Opinion and Decision in granting the motion for summary judgment in Adversary Proceeding No. 15-9009, Plaintiff-CEMG's Statement of Undisputed Facts are quotations from the final decisions of the other courts, not merely paraphrased "facts" by Plaintiff-CEMG. The other two "facts" are from the Declaration of Greg Durbin and a reference to the complaint filed in the RICO Action.

**Plaintiff-CEMG's Response**

Plaintiff-CEMG filed a Response to Defendant-Sinclair's Opposition on June 22, 2017. Dckt. 88. Plaintiff-CEMG asserts that Defendant-Sinclair's assertion of "disputed facts" are attempts to relitigate and collaterally attack the RICO Judgment and Final State Court Judgment. Further, Plaintiff-CEMG asserts that the alleged facts presented by Defendant-Sinclair are hearsay, lack foundation, and make unsupported legal conclusions.

**DEFENDANT-SINCLAIR'S OPPOSITION**

Defendant-Sinclair filed an Opposition on June 16, 2017. Dckt. 78. As discussed below, Defendant-Sinclair also references other documents filed in other adversary proceedings and the 2014 Sinclair Bankruptcy Case in connection with this Opposition, though Defendant-Sinclair did not file them in this Adversary Proceeding as part of the Opposition to this Motion For Summary

Judgment or identify in the Opposition where in the record the court would find such documents. This court's staff has located such documents in the 2014 Sinclair Bankruptcy Case as identified by Defendant-Sinclair at the June 29, 2017 oral argument and such have been considered by this court.

Defendant-Sinclair's Opposition asserts the following legal and factual grounds, which are stated in detail in his "Introduction" and "Points and Authorities" sections of the Opposition:

1. "Andrew Katakis has now lost his appeals and will be sentenced for Criminal Foreclosure Fraud."

2. "In the US District Court, Sacramento, Ca. on September 18, 2017 ((US v. Katakis & US v. Chandler 11 CR 0511)(Ex 1A, 1B) . . . The Judge turned down his Motion for a New Trial saying that Katakis knew what was going on and was a leader of the criminal foreclosure fraud."

3. "The 28 Uncleans [sic] Hands are simply UNTRUE in superior court case No: 332233. Katakis again committed criminal foreclosure fraud foreclose on 4 Conti lots he didn't own and didn't know who owned. (Exhibits 39, 9, 16, 27, 35)."[2]

4. "The Federal Court Case No: 05439 [RICO Action] took away my 5th and 14th amendment rights since I was disabled and took away my answer and Cross Complaint for Katakis harm and damages and ruled without Opposition. No trial was held. The matter was not adjudicated. Only a 60d motion for new trial can be had to provide the truth and justice."[3]

5. "All three suits come from the same cause of action-332233- [State Court Action] as a defense to KATAKIS's criminal foreclosure fraud in foreclosing on 4 notes and deeds of trust he knew he didn't own (Chase v. Butler : 2013 NY Slip Op 51050(U) [40 Misc 3d 1205(A)] Decided on July 5, 2013: Supreme Court, Kings County)."

6. "THE UNTRUTH happened for a number of reasons: both because Andrew Katakis lied and Andrew Kakakis' attorney withheld the truth and mis-characterized what was said, and Sinclair's counsel did not catch it until the appeal. A fraud was committed upon the Court."

[2] This is an example of Defendant-Sinclair's continuing arguments that the final judgments of other courts are not "final" because Defendant-Sinclair now, in 2017, wants to assert that there was fraud committed on the other courts. In the 2014 Sinclair Bankruptcy Case, Defendant-Sinclair first attempted to have this court improperly "vacate" the Final State Court Judgment, two District Court of Appeal decisions, and orders of the District court. 2014 Sinclair Bankruptcy Case; Opposition and Motion to Set Aside Judgment, Dckt. 87, and Civil Minutes, Dckt. 113. See also discussion in this court's Memorandum Opinion and Decision (2014 Sinclair Bankruptcy Case; Dckt. 535 p. 2:18–3:17)

[3] As discussed below, this court held multiple hearings in 2015 in the 2014 Sinclair Bankruptcy case to address Defendant-Sinclair's contention that he was disabled. This court concluded that Defendant-Sinclair was not disabled and that such contentions were merely part of Defendant-Sinclair's litigation strategy to dely, deter, and improperly impede this court's ability to rule on matters when Defendant-Sinclair feared an adverse ruling. 2014 Sinclair Bankruptcy Case; Civil Minutes, Dckt. 337. This conduct of Defendant-Sinclair in misusing the judicial process and making affirmative misrepresentations to the court is consistent with his conduct in perpetrating the Fox Hollow Scheme.

7

7. "The appellate court reviewed the trial court and simply found that the judge did not act in error. They do not allow new evidence to disprove what the judge found."

8. "The attached disproves the 28 Unclean Hands. A motion for new trial for Fraud on the Court is being prepared and filed. There is no statute of limitations. Since the 28 unclean acts are UNTRUE, we hope Judge Beauchesne will agree. If not, under Federal Rule 60d, we can file a separate cause of action. Until those are complete, this matter has not been adjudicated."

9. "The Federal Court then found that Sinclair did not provide adequate discovery and defaulted Sinclair allowing Durbin and Katakis to win. Katakis made $6.6 million and has no damages."

10. "Sinclair had 13 disability notices from his Doctors during that time period and even now, is only back about 50% of where he was. Sinclair was becoming a quadriplegic during the state court trial. The symptoms were already showing by March 2009. In fall 2008, Sinclair could do 100 situps and 100 pushups. By September, he could not do 1 pushup or 1 situp. His first surgery was November 30, 2009. He had 4 skeletal surgeries and learned how to walk 4 times. Even now, he is only back up to 50 situps and 50 pushups (50%) due to Katakis refusal to allow Sinclair time to heal[.]"

11. "Durbin's approach was Sinclair did some work during his disability so he should have done even more but I did easy things that would generate some cash flow. I provided 'disability' notice on most all Katakis matters which were 'hard' because I was disabled."

12. "Katakis made $6.6 million in the process by committing criminal foreclosure fraud and interfering with Sinclair et al contracts and according to Durbin, wants $15 million more. This is just sport for them."

13. "Sinclair submitede [sic] a motion to Judge Beauchesne that indicates the 'Fraud on the Court' which Durbin blocked because of Bankruptcy and then settled with the Trustee paying a small amount. This Court now must decide a separate action for 'Fraud on the Court' pursuant to Rule 60d."[4]

14. "Fraud on the Court has no statute of limitations and no limitation as to where the action must be brought[.]"

15. "Since a Fraud on the Court is being filed with this court, the 28 Unclean Hands and the federal 05439 Judgment [RICO Judgment] are not decided and res judicata and collateral estoppel do not apply[.]"

Opposition, p. 4–5; Dckt. 78. As one can see, the substance of the Opposition is that the final

---

[4]  As further addressed below, Defendant-Sinclair appears to acknowledge that by 2017, with a bankruptcy trustee having been appointed in his Bankruptcy Case, any such claims or contentions relating to the 2009 State Court Action trial were property of the Sinclair Bankruptcy Estate under the Trustee's exclusive control.  It appears that Defendant-Sinclair contends that because Judge Beauchesne did not allow Defendant-Sinclair to take, use, or control property (including legal and equitable rights) of the bankruptcy estate which is under the exclusive control of the bankruptcy trustee (11 U.S.C. §§ 323, 363, 542, 704, 542), the denial of Defendant-Sinclair's attempts to take the rights and property of the bankruptcy estate is somehow improper.

1  judgments and rulings of other trial and appellate courts should not be given proper *res judicata* and

2  collateral estoppel effect under applicable federal and state law.  Further, Defendant-Sinclair presses

3  the argument that the evidence he now wants to present can "disprove" the prior findings for which

4  final judgments have been issued (and affirmed on appeals taken therefrom) of other courts.

5          In the Points and Authorities portion of the Opposition, Defendant-Sinclair expands on these

6  arguments.    Defendant-Sinclair asserts that the Final State Court Judgment was obtained

7  fraudulently, thereby rendering the Final State Court Judgment void.  He contends that the Final

8  State Court Judgment, which has been affirmed on appeal, cannot therefore be given collateral

9  estoppel effect.

10          Defendant-Sinclair's Opposition then collaterally attacks the Final State Court Judgment,

11  DCA Opinions, and State Bar Court Decision.  He asserts that Plaintiff-CEMG, its attorney, and the

12  State Court judge all "knew" of Defendant-Sinclair's alleged "disability" and proceeded to enter the

13  Final State Court Judgment, which has been affirmed on appeal, against Defendant-Sinclair.  As

14  discussed below, though litigating the trial in the State Court Actions, the two District Court of

15  Appeals, the 2014 Sinclair Bankruptcy Case, and multiple other matters since 2009 (personally and

16  as the attorney for other unrelated persons) through the hearing on this Motion for Summary

17  Judgment, Defendant-Sinclair offers no explanation as to why he did not assert such fundamental,

18  purportedly "easily provable" defenses, if valid, prior to wanting to now do so in 2017.

19          The Opposition continues, asserting that there was a purported settlement in the State Court

20  Action and that the Final State Court Judgment is improper because of such purported settlement.

21  Further, such argument collaterally attacks the DCA Judgment Opinion affirming the Final State

22  Court Judgment, which Opinion rejected the contention that there was such a purported settlement.

23          Consistent with his litigation strategy and conduct in the 2014 Sinclair Bankruptcy Case,

24  related adversary proceedings, and other judicial proceedings, Defendant-Sinclair attempts to craft

25  an argument that Defendant-Sinclair's Constitutional rights were impinged upon in the RICO Action

26  because of his inability to prosecute due to a "disability."  The Opposition on this point is long on

27  argument but without legal support for how the attempted collateral attack of the Final State Court

28  Judgment and the RICO Judgment in this court is a legally effective opposition to the Motion for

1  Summary Judgment.

2      Defendant-Sinclair, on Page 11 of the Opposition, does address the legal doctrine of Unclean

3  Hands under California law.  In citing to *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal.

4  App. 4th 970 (1999), he directs this court to the following language in that case:

5          Not every wrongful act constitutes unclean hands.  But the
           misconduct need not be a crime or actionable tort.  Any conduct that
6          violates conscience, or good faith, or other equitable standards of
           conduct is sufficient to invoke the doctrine.

7  Dckt. 78.

8      As this court has previously addressed, Defendant-Sinclair argues that Plaintiff-CEMG

9  cannot merely state that there was a finding of "Unclean Hands" in the State Court Decision as a

10  "magic incantation" resulting in a conclusion that the Final State Court Judgment and RICO

11  Judgment are nondischargeable.  While an accurate statement of the law, such does not equate to

12  Defendant-Sinclair's conclusion that the express findings of the State Court and now the District

13  Court can never mean that the obligation is nondischargeable.  This court looks to the actual findings

14  of the other courts and then properly applies the doctrine of collateral estoppel.

15     Defendant-Sinclair does have a section of substantive opposition stating legal authorities for

16  his opposition to the present Motion for Summary Judgment.  Most of it consists of cutting and

17  pasting text from other documents and portions of Federal Rules of Civil Procedure 56 (summary

18  judgment) and 12(c) (judgment on the pleadings – the latter not the motion now before this court).

19     The Opposition further asserts that the Final State Court Judgment should not be respected

20  because Defendant-Sinclair submits his own allegations that Andrew Katakis committed "thirty-nine

21  unclean hands."  In substance, Defendant-Sinclair asserts that based on his contention of "thirty-nine

22  unclean hands of [Katakis]," the Final State Court Judgment is not a final determination for which

23  collateral estoppel applies.  Other than Defendant-Sinclair making arguments and using the phrase

24  "unclean hands," no meritorious legal authority is presented for his conjecture and contention that

25  Andrew Katakis is a bad guy so none of the final judgments obtained against Defendant-Debtor can

26  be enforced.

27     Defendant-Sinclair also argues that a motion under Federal Rule of Civil Procedure 12(b)

28  can only consider the pleadings.  He then argues that under Rule 12(c) a motion for judgment on the

pleadings can be recast as a motion for summary judgment. Therefore, the evidence presented in support of the Motion for Summary Judgment cannot be considered because it is not in the pleadings. The Motion for Summary Judgment before this court is brought pursuant to Federal Rule of Civil Procedure 56(a)—not Federal Rule of Civil Procedure 12(b) or 12(c). Plaintiff-CEMG is not asserting a defense in this Adversary Proceeding (a Federal Rule of Civil Procedure 12 presentation of defenses to a complaint), but is prosecuting the Complaint against Defendant-Sinclair. Again, other than Defendant-Sinclair's argument, no meritorious legal authority is provided for this conjecture.

Defendant-Sinclair's Opposition contains numerous arguments without support or legal authority that do not appear to relate to actually opposing Plaintiff-CEMG's Motion requesting a determination that the RICO Judgment is nondischargeable in the 2014 Sinclair Bankruptcy Case. Instead, Defendant-Sinclair reintroduces arguments attempting to collaterally attack the Final State Court Judgment and the RICO Judgment.

**Other Documents Filed By Defendant-Sinclair in
Other Judicial Proceedings**

Much of Defendant-Sinclair's opposition goes to his continuing contentions that he was and has been "disabled," that the "disability" was misrepresented to the State Court and District Court, and that the Final State Court Judgment, the DCA Opinions, and the RICO Judgment are void because of his various disabilities. In support of his contention of a disability, Defendant-Sinclair argues:

> Sinclair had 13 disability notices from his Doctors during that time period and even now, is only back about 50% of where he was. Sinclair was becoming a quadriplegic during the state court trial. The symptoms were already showing by March 2009. In fall 2008, Sinclair could do 100 situps and 100 pushups. By September, he could not do 1 pushup or 1 situp. His first surgery was November 30, 2009. He had 4 skeletal surgeries and learned how to walk 4 times. Even now, he is only back up to 50 situps and 50 pushups (50%) due to Katakis refusal to allow Sinclair time to heal . . . .

Opposition p. 4, Dckt. 78. Reference is made as part of the above argument by Defendant-Sinclair to "Exhibits 101 and & 102 [which] are 13 notices from Doctors plus the Hospital surgery reports." *Id.*, p. 5. No Exhibits 101 or 102 are filed with the Opposition. At the hearing, Defendant-Sinclair advised this court that there were some of the exhibits that have been filed elsewhere (2014 Sinclair

1    Bankruptcy Case and other adversary proceedings) and that he did not have to file them in

2    connection with this Opposition. In his Statement of Disputed Facts, Defendant-Sinclair identifies

3    these as "EXHIBIT 102, 101 IN EX #5." Stmt., p. 2; Dckt. 80.

4          Exhibits 101 and 102 appear to be included in the 1,803 pages of exhibits filed in support

5    of Defendant-Sinclair's motion for this court to vacate the order approving the settlement between

6    the Chapter 7 Trustee in the 2014 Sinclair Bankruptcy Case and Andrew Katakis and his related

7    entities. 2014 Sinclair Bankruptcy Case, Dckts. 578, 579, 580, 581, 582, 583. This court's staff also

8    located possible Exhibits 101 and 102 in Adversary Proceeding 15-9007, as part of the 1,665 pages

9    of exhibits filed by Defendant-Sinclair with his motion for summary judgment in that adversary

10   proceeding. 15-9007; Dckts. 56, 58, 59, 60, 61. This court has reviewed these filings in the 2014

11   Sinclair Bankruptcy Case and Adversary Proceeding 15-9007 which are asserted by Defendant-

12   Sinclair as a basis for this court not applying collateral estoppel to the RICO Decision and RICO

13   Judgment.

14         Beginning with the filings in the 2014 Sinclair Bankruptcy Case, a review of "Exhibit 101"

15   discloses the following (the page reference numbers are made to the page number of Docket 582,

16   not just "Exhibit 101," as the "Exhibit 101" pages are not individually numbered):

17   A.   Page 20 – Documents on Alexander Davis, M.D. letterhead, titled "Excuse Slip"
          addressed to "To Whom It May Concern," which is dated "12-06-2010." The Form
18        is blank except for stating that "Sinclair, Richard is under my care," and the one
          section titled "restrictions," which states "Patient will be out of work until 1/10/2011
19        due to recovering from back surgery (11/18/2010)." On its face, this "Excuse Slip"
          states a one month restriction from work.
20
21   B.   Page 21 – Document on Alexander Davis, M.D. letterhead, titled "Excuse Slip"
          addressed to "To Whom It May Concern," which is dated "09-23-2010." The Form
22        is blank except for the one section titled "restrictions," which states "Patient is
          unable to participate in prolonged hearings or trials from 9-15-2010 through 11-15-
23        2010 due to recovering from his cervical surgery." On its face, this "Excuse Slip"
          states that a "cervical surgery" occurred prior to September 15, 2010, and Defendant-
24        Sinclair was able to work, and was only limited from participating "in prolonged
          hearings or trial" for a two month period.

25   C.   Page 22 – Document on Alexander Davis, M.D. letterhead, titled "Excuse Slip"
          addressed to "To Whom It May Concern," which is dated "06-01-2010." The Form
26        is blank except for: [1] stating that "Sinclair, Richard 7-15-48 is under my care."
          The only other information is in the section titled "Other," which states "unable to
27        participate in prolonged hearings or trials from 04-18-2010 through 09-15-2010.
          Due to his recovery from his cervical surgery." On its face, this "Excuse Slip" states
28        that a "cervical surgery" occurred prior to April 18, 2010, and Defendant-Sinclair

was able to work, and was only limited from participating "in prolonged hearings or trial" for a two month period.

D.    Page 23 – Document on Alexander Davis, M.D. letterhead, titled "Excuse Slip" addressed to "To Whom It May Concern," which is dated "02-25-2010." The Form is blank except for: [1] stating that "Sinclair, Richard is under my care" and in the section titled "restrictions," which states "unable to return to work until 4-18-10."

E.    Page 24 – Document on Alexander Davis, M.D. letterhead, titled "Excuse Slip" addressed to "To Whom It May Concern," which is dated "01-08-2010." The Form is blank except for: [1] stating that "Richard Sinclair is under my care," [2] Defendant-Sinclair "was seen in my office today," and "Patient will be out of work until 3-1-2010 due to recovering from his recent cervical spine surgery."

F.    Page 25 – Document on Upinder K. Basi, M.D. letterhead addressed to "To Whom It May Concern," which is dated "11-06-2009." The letter says that Defendant-Sinclair suffers from "a significant medical condition, which at this time prevents him from being physically active." It further "requests" that Defendant-Sinclair be "excused from activities related to his profession for a period of 90 days." This is a very generic "To Whom It May Concern" letter for the period November 2009 to January 2010.

G.    Page 26 – Document on Upinder K. Basi, M.D. letterhead not addressed to anyone dated December 27, 2011. This requests that Defendant-Sinclair be excused from "work/school due to illness for the following dates . . . 12/8/11 to 2/15/12." The "signature" on this excuse from "work/school" is illegible and does not match that of Dr. Basi on other "excuse notes."

H.    Page 27 – A form on Orthomed Center letterhead for which there is an illegible signature and for which no doctor is identified. It states that Defendant-Sinclair is "Unable to Return to Work From 11-8-11 to 12-8-11" for unstated reasons.

I.    Page 28 – A form on Orthomed Center letterhead for which there is an illegible signature and for which no doctor is identified. It states that Defendant-Sinclair is "Unable to Return to Work From 9/27/11 to 11/8/11" for illegibly written reasons.

J.    Page 29 – A form on Orthomed Center letterhead for which there is an illegible signature and for which no doctor is identified. It states that Defendant-Sinclair is "Unable to Return to Work From 7/27/11 to 11/8/11" for illegibly written reasons.

K.    Page 30 – A form on Orthomed Center letterhead with an "Appt. Date 7/1/11" for which there is an illegible signature and for which no doctor is identified. It states that Defendant-Sinclair is "Released to Regular Work (no restrictions" on "9/15/11" and is allowed to do "Modified Work From 7/1/11 to 9/14/11," with the limitations being "no hearings/trials (over) half day."

L.    Page 31 – A form on Orthomed Center letterhead with an "Appt. Date 5/2/11" for which there is an illegible signature and for which no doctor is identified. It states that Defendant-Sinclair is "Unable to Return to Work From 3-8-11 to 6/5/11," and "Released to Regular Work 6/6/11."

M.    Page 32 – Documents on Alexander Davis, M.D. letterhead, titled "Excuse Slip" addressed to "To Whom It May Concern," which is dated "12-06-2010." The only text written on this form is "Patient will be out of work until 02/25/2011 due to recovering from back surgery (11/18/2010)."

N.  Page 33 – Documents on Alexander Davis, M.D. letterhead, titled "Excuse Slip" addressed to "To Whom It May Concern," which is dated "12-06-2010." This appears to be the same exhibit as the one on Page 20.

O.  Page 34 – Documents on Alexander Davis, M.D. letterhead, titled "Excuse Slip" addressed to "To Whom It May Concern," which is dated "09-23-2010." This appears to be the same exhibit as the one on Page 21.

P.  Page 35 – Document on Alexander Davis, M.D. letterhead, titled "Excuse Slip" addressed to "To Whom It May Concern," which is dated "06-01-2010." This appears to be the same exhibit as the one on Page 22.

Q.  Page 36 – Document on Alexander Davis, M.D. letterhead, titled "Excuse Slip" addressed to "To Whom It May Concern," which is dated "02-25-2010." This appears to be the same exhibit as the one on Page 23.

R.  Page 37 – Document on Alexander Davis, M.D. letterhead, titled "Excuse Slip" addressed to "To Whom It May Concern," which is dated "01-08-2010." This appears to be the same exhibit as the one on Page 24.

S.  Page 38 – Document on Upinder K. Basi, M.D. letterhead addressed to "To Whom It May Concern," which is dated "11-06-2009." The letter says that Defendant-Sinclair suffers from "a significant medical condition, which at this time prevents him from being physically active." This appears to be the same exhibit as the one on Page 26.

T.  Page 39 – Document on Upinder K. Basi, M.D. letterhead not addressed to anyone dated December 27, 2011. This appears to be the same exhibit as the one on Page 26.

U.  Page 40 – A form on Orthomed Center letterhead for which there is an illegible signature and for which no doctor is identified. This appears to be the same exhibit as the one on Page 27.

V.  Page 41– A form on Orthomed Center letterhead for which there is an illegible signature and for which no doctor is identified. It states that Defendant-Sinclair is "Unable to Return to Work From 9/27/11 to 11/8/11" for illegibly written reasons. This appears to be the same exhibit as the one on Page 28.

W.  Page 42 – A form on Orthomed Center letterhead for which there is an illegible signature and for which no doctor is identified. This appears to be the same exhibit as the one on Page 29.

X.  Page 43 – A form on Orthomed Center letterhead with an "Appt. Date 7/1/11" for which there is an illegible signature and for which no doctor is identified. This appears to be the same exhibit as the one on Page 30.

Y.  Page 44 – A form on Orthomed Center letterhead with an "Appt. Date 5/2/11" for which there is an illegible signature and for which no doctor is identified. This appears to be the same exhibit as the one on Page 31.

Z.  Page 45 – Document on Chet Mahida, M.D. letterhead which is dated "09-28-2010." It states that Defendant-Sinclair is "unable to travel nor is he able to engage in court room activities for the next 10 days (September 28, 2010 through October 28, 2010) as his condition is investigated and the appropriate work up is performed." This "To

1   Whom This May Concern" note appears to have been signed twice.

2   AA.   Page 46 – Document on Upinder K. Basi, M.D. letterhead not addressed to anyone
3         dated December 27, 2011.  This appears to be the same exhibit as the one on
          Pages 26 and 39.

4   BB.   Page 47 – This is a Form dated "03-27-2009" and appears to be a medical intake
5         form of some type.

6   No testimony is provided by anyone (other than by Defendant-Sinclair as to what other
7   persons, not before the court, are purported to have said out of court or in unauthenticated writings)
8   about the substance of the information and excuses provided.  This court has previously concurred
9   with Defendant-Sinclair's assessment in the 2014 Sinclair Bankruptcy Case that he is a highly
10  educated, very experienced attorney and business person.  Though Defendant-Sinclair is a highly
11  educated attorney, he has chosen not to present personal knowledge testimony or expert testimony
12  to support the arguments asserted in opposition the Motion for Summary Judgment.

13  Continuing to Exhibit 102 (Dckt. 582 pages 48 – 122), it consists of what appear to be more
14  medically related papers, for which no doctor or other medical professional has come forward to
15  provide any testimony.  As noted by this court in ruling in the 2014 Sinclair Bankruptcy Case on
16  Defendant-Sinclair's contention he was "disabled," even when this court sent a copy of the order
17  setting the hearing on the motion and requested that the doctor identified by Defendant-Sinclair
18  come forward for his or her patient, no doctor ever came forward to provide any evidence of any
19  disability. 2014 Sinclair Bankruptcy Case - Civil Minutes for Determination of Legal Competency,
20  Dckt. 337; Memorandum Opinion and Decision Approving Settlement,  pp. 14:27–20:16,  Dckt.
21  535; and Adv. No. 15-9009 – Memorandum Opinion and Decision Granting Summary Judgment
22  Motion, Dckt. 107.

23  The Exhibit 102 documents include: [1] Memorial Hospital Short Stay Form dated
24  November 30, 2009 (p. 49); [2] "Operative Report" referencing a surgery date of "11/30/2009"
25  (p. 57); [3] Memorial Medical Center "Discharge Summary" stating that the surgical procedure was
26  conducted November 30, 2009 and Defendant-Sinclair was discharged December 1, 2009 (p. 87);
27  [4] "Discharge Summary" (not signed by Alexander Davis, M.D.) stating that surgery was conducted
28  on November 18, 2010 (p. 98); and  [5] Stanislaus Surgical Hospital for a procedure on Defendant-

1   Sinclair's knee (p. 118–122). As above, it appears that some of the documents have been included

2   multiple times as part of Exhibit 102.

3          In Adversary Proceeding No. 15-9007, it appears that the Exhibits 101 and 102 are the same

4   as those discussed above. 15-9007; Dckt. 61, p. 11–114.

5          In reviewing these exhibits, this court first notes that their relevance arises in the State Court

6   Action as to events occurring in 2009, 2010, and 2011. Nothing more current has been presented.

7   As discussed at the hearing, though Defendant-Sinclair had this information and though these

8   documents existed since 2009 and through 2011 as they are purported to have been created, no

9   attempt was made to vacate the Final State Court Judgment based on the alleged disability. To the

10  extent raised in the State Court Action, it was rejected by the State Court judge.

11         As this court has previously noted in the Memorandum Opinion and Decision denying the

12  motion to reconsider in the 2014 Sinclair Bankruptcy Case, during the period 2010 through 2017

13  Defendant-Sinclair has thirty-three reported decisions (state appellate; bankruptcy court, not

14  including the 2014 Sinclair Bankruptcy Case; and federal district court) which were identified in a

15  LEXIS-NEXIS search by the court. 2014 Sinclair Bankruptcy Case; Dckt. 639 at pp. 17–22.

16  Defendant-Sinclair's arguments that he was not disabled to litigate these LEXIS-NEXIS reported

17  matters (this court did not survey the county superior courts for cases and other decisions not

18  reported on LEXIS-NEXIS) but was disabled to the point of not being able to tell the judge in the

19  State Court Action that he was disabled was not and is not supported by the evidence presented.

20  Defendant-Sinclair offers no explanation for why he did not pursue a contention that the Final State

21  Court Judgment should be voided in 2010 or 2011. He does not offer any explanation as to why he

22  did not do so in 2012, 2013, 2014, 2015, or 2016 – other than now protesting that there is no statute

23  of limitations so he did not have to and could elect to wait to raise it at the time and place of his

24  strategic choosing.

25  ///

26  ///

27  ///

28  ///

# PART II

## APPLICABLE LAW TO DETERMINATION
## OF A MOTION FOR SUMMARY JUDGMENT

In an adversary proceeding, summary judgment is proper when "[t]he movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056. The key inquiry in a motion for summary judgment is whether a genuine issue of material fact remains for trial. FED. R. CIV. P. 56(c); FED. R. BANKR. P. 7056; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.11[1][b] (3d ed. 2000). "[A dispute] is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute [over a fact] is 'material' only if it could affect the outcome of the suit under the governing law." *Barboza v. New Form, Inc. (In re Barboza)*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party moving for summary judgment bears the burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To support the assertion that a fact cannot be genuinely disputed, the moving party must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); FED. R. BANKR. P. 7056.

In response to a sufficiently supported motion for summary judgment, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine dispute for trial. *Barboza*, 545 F.3d at 707 (citing *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1055–56 (9th Cir. 2002)). The nonmoving party cannot rely on allegations or denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery materials, to show that a dispute exists. *Id.* (citing *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In ruling on a summary judgment motion, the court must view all of the evidence in the light

1  most favorable to the nonmoving party. *Barboza*, 545 F.3d at 707 (*citing Cty. of Tuolumne v. Sonora*

2  *Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001)). The court "generally cannot grant summary

3  judgment based on its assessment of the credibility of the evidence presented." *Agosto v. INS*,

4  436 U.S. 748, 756 (1978). "[A]t the summary judgment stage[,] the judge's function is not himself

5  to weigh the evidence and determine the truth of the matter[,] but to determine whether there is a

6  genuine issue for trial." *Anderson*, 477 U.S. at 249.

7  **Evidence Presented in Support of Motion for Summary Judgment**

8        The key evidence presented in support of the Motion for Summary Judgment is in the form

9  of the RICO Decision upon which the RICO Judgment was issued. Defendant-Sinclair counters not

10  with evidence, but with arguments (whether in the Opposition or placed in his Declaration) and his

11  contentions that the State Court Action was not fair, that he was disabled, and that he has other

12  matters he wants to litigate. While arguing, or testifying to such contentions, Defendant-Sinclair

13  fails to provide this court with evidence to counterbalance the issue preclusion effect of the RICO

14  Judgment and the RICO Decision.

15        In substance, Defendant-Sinclair's opposition is merely that he does not want this court to

16  give proper collateral estoppel effect to the detailed and extensive findings and conclusions in the

17  RICO Court Decision because Defendant-Sinclair does not agree with them. Though many years

18  have passed, with Defendant-Sinclair battling to delay, deter, and prevent the District Court from

19  completing the adjudication of the RICO claims in that action which was filed in 2003, it is now in

20  2017 that Defendant-Sinclair seeks to delay, deter, and prevent this court from ruling on the

21  Summary Judgment Motion because all of the other court final judgments and decisions are "easily"

22  vacated because of "fraud on the court." Though Defendant-Sinclair previously tried to convince

23  this court to improperly purport to "vacate" final judgments of the state court and orders of the

24  District Court, and failed,[5] he now attempts to obtain such improper relief on the sly, trying to argue

25  that this court should give proper collateral estoppel (issue preclusion) to the final judgments of

26  other courts.

27

28        [5]  See 2014 Sinclair Bankruptcy Case; Civil Minutes, Dckt. 113.

## DOCTRINE OF COLLATERAL ESTOPPEL/ISSUE PRECLUSION APPLICABLE IN FEDERAL COURT

In describing the five elements for collateral estoppel, the Bankruptcy Appellate Panel for the Ninth Circuit has stated,

> [F]or a prior judgment to be entitled to collateral estoppel effect, five elements must be met:
>
> 1) The issue sought to be precluded from relitigation must be identical to that decided in a former proceeding;
>
> 2) The issue must have been actually litigated in the former proceeding;
>
> 3) It must have been necessarily decided in the former proceeding;
>
> 4) The decision in the former proceeding must be final and on the merits; and
>
> 5) The party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.
>
> *Figueroa v. Campbell Indus.*, 45 F.3d 311, 315 (9th Cir. 1995); *Kelly*, 182 Bankr. at 258; *Berr*, 172 Bankr. at 306. See generally, 1B James W. Moore et al., Moore's Federal Practice P 0.441-43 (2d ed. 1994).

*Silva v. Smith's Pac. Shrimp (In re Silva)*, 190 B.R. 889, 892 (B.A.P. 9th Cir. 1995) (citation omitted).

Issue preclusion can apply when an issue has been decided completely in a prior proceeding. See *Robi v. Five Platters, Inc.*, 838 F.2d 318, 321–22 (9th Cir. 1988). The Supreme Court has directed that "issue preclusion attaches only '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment.'" *Arizona v. California*, 530 U.S. 392, 414 (2000) (quoting Restatement (Second) of Judgments § 27, at 250 (1982)).

The party "asserting collateral estoppel carries the burden of proving a record sufficient to reveal the controlling facts and pinpoint the exact issues litigated in the prior action." *In re Lambert*, 233 F. App'x 598, 599 (9th Cir. 2007). If the court has a reasonable doubt as to what was actually decided by the prior judgment, it will refuse to give it preclusive effect. *Id.*

As addressed by the Bankruptcy Appellate Panel in *Florida v. Ticor Title Ins. Co. (In re Florida)*, 164 B.R. 636, 640 (B.A.P. 9th Cir. 1994),

A bankruptcy court is precluded from determining the issue of willful and malicious conduct once the issue is settled in prior litigation. *Grogan v. Garner*, 498 U.S. 279, 284-85 n. 11, 112 L. Ed. 2d 755, 111 S. Ct. 654 (1991). New defenses are barred by the judgment. The bankruptcy court is not a last chance forum permitting a judgment debtor to relitigate, de novo, issues decided in prior litigation. [The debtor's] proffered evidence cannot be a basis for reconsideration of the two prior judgments simply by virtue of the debtor having filed bankruptcy.

. . .

[S]ection 523(a)(6) determines the character of the debt by focusing analysis on the nature of the act from which the debt arises, not the identity of the claimant. The assignee of a claim takes the claim with all rights attendant, and therefore the nondischargeable character of the debt in the hands of the original claimant is transferable.

## SCOPE OF NONDISCHARGEABLE DAMAGES
## AND RIGHTS OF ASSIGNEE

**Compensatory and Punitive Damages
Are Nondischargeable**

In considering nondischargeable damages, the Ninth Circuit Court of Appeals has determined that nondischargeable damages are not limited to just the compensatory damages caused by the wrongful acts. The punitive damages relating to such acts are also nondischargeable. In addressing punitive damages relating to fraud, the Circuit has stated:

Liability under state law for damages caused by fraud, whether punitive or compensatory, clearly represents a debt within the meaning of the bankruptcy code. *In re Bugna*, 33 F.3d 1054, 1058 (9th Cir. 1994); *In re St. Laurent*, 991 F.2d at 678. Under the Code, a "debt" is defined as "liability on a claim." 11 U.S.C. § 101(12). A "claim" is further defined as a "right to payment, whether or not such right is reduced to judgment . . . ." 11 U.S.C. § 101(5)(A). See *In re St. Laurent*, 991 F.2d at 678. "A 'right to payment' is 'nothing more nor less than an enforceable obligation, regardless of the objectives . . . to [be] served in imposing the obligation.'" Id. (quoting *Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 559, 109 L. Ed. 2d 588, 110 S. Ct. 2126 (1990)).

. . .

We therefore conclude that the language on its face does not clearly limit nondischargeable damages under § 523(a)(2)(A) to compensatory damages only.

*Cohen v. De La Cruz (In re Cohen)*, 106 F.3d 52, 56, 59 (1996). In the earlier decision, the Circuit concluded that the punitive damages relating to nondischargeable willful and malicious conduct stated:

We have held that "both compensatory and punitive damages are subject to findings of nondischargeability pursuant to section[] 523(a)(6) . . . ." *Moraes v. Adams (In re Adams)*, 761 F.2d 1422, 1428 (9th Cir. 1985). In *Adams*, the court rejected the debtor's argument that only the punitive portion was nondischargeable under this section. It noted, "'The exception is measured by the nature of the act, i.e., whether it was one which caused willful and malicious injuries. All liabilities resulting therefrom are non-dischargeable.'" *Id.* (quoting *Coen v. Zick*, 458 F.2d 326, 329-30

1    (9th Cir. 1972)).

2    *In re Britton*, 950 F.2d 602, 606 (9th Cir. 1991).

3
     **Enforcement of Nondischargeability Rights**
4    **by Assignee of Original Creditor**

5            In *Boyajian v. New Falls Corp. (In re Boyajian)*, 564 F.3d 1088, 1090–92 (Cir. 9th 2009),

6    the Ninth Circuit Court of Appeals addressed the issue of whether the assignee of a obligation may

7    assert nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(B) [fraud using a financial statement]

8    for fraud that was committed on the assignor relating to the claim.  The court states:

9             The clear import of this language is that a debt is non-dischargeable to the extent
             that it is "obtained by . . . use of a statement in writing" made with the intent to
10           deceive the creditor.  Read as a whole, this language does not provide that a debt is
             non-dischargeable only if the assignee creditor reasonably relied on the materially
11           false statement. . .  The most natural reading of the word "is" in subsection (iii) is
             simply that the debt is nondischargeable if, at the time the money is obtained by the
12           debtor, he or she used a materially false written statement that was intended to
             deceive.
13
             Second, Congress was undoubtedly aware that under general principles of
14           assignment law an assignee steps into the shoes of the assignor. . .In the absence of
             such specific language, we believe that Congress intended that the general law of
15           assignment remain applicable. . .
             . . .
16           Allowing an assignee to pursue non-dischargeability under § 523(a)(2)(B) is also
             supported by the policy goals of the Bankruptcy Code.  The Bankruptcy Code "limits
17           the opportunity for a completely unencumbered new beginning to the honest but
             unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S. Ct. 654, 112
18           L. Ed. 2d 755 (1991) (quotation marks omitted). While the bankruptcy court in this
             case held in favor of the Boyajians, it noted the perversity of permitting dishonest
19           debtors to receive a discharge through the fortuity that their creditor chose to assign
             the debt. Moreover, if assignment of such a debt were to obviate a future
20           non-dischargeability action in all cases where the assignee did not itself rely on
             misleading financial statements, the functioning of modern debt markets would be
21           unnecessarily disrupted. There is no reason to construe § 523(a)(2)(B)(iii) to require
             such an outcome.
22

23   *Id.*   The above principles equally apply to other frauds committed by the debtor as provided in

24   11 U.S.C. § 523(a)(2)(A).  *See Carter v. Brooms (In re Brooms)*, 447 B.R. 258, 265 (B.A.P. 9th Cir.

25   2011).

26   ///

27   ///

28   ///

# PART III

## PRIOR FINDINGS, CONCLUSIONS, AND DETERMINATIONS
## TO WHICH THE DOCTRINE OF COLLATERAL ESTOPPEL/ISSUE PRECLUSION
## APPLIES IN THIS ADVERSARY PROCEEDING

There are three prior decisions for which there are final judgments or a State Bar Court ruling for which the Doctrine of Collateral Estoppel is asserted to properly be applied in this Adversary Proceeding.

### RICO DECISION FINDINGS AND DETERMINATIONS

Defendant-Sinclair and Plaintiff-CEMG have litigated and previously determined facts in the RICO Action that also arise in this Adversary Proceeding. Applying the five factor test for the proper application of the Doctrine of Collateral Estoppel, this court concludes for all findings and determinations in the RICO Decision and RICO Judgment as follows:

First, the facts and determinations presented from the RICO Judgment to be given collateral estoppel effect are those applicable to the determination of nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6).

Second, the issues were actually litigated in the RICO Action.

Third, the issues for which collateral estoppel apply were those necessarily and expressly determined by the District Court.

Fourth, the RICO Judgment is "final" and has not been appealed.

Fifth, Defendant-Sinclair was a party in the RICO Action, the issues were determined, and the RICO Judgment is binding on Defendant-Sinclair.

Therefore, this court adopts and incorporates herein all of the determinations made in the RICO Decision.

**RICO Decision Attached as Addendum "A"
In Its Entirety**

As this court has addressed in other decisions concerning these parties, when applying prior findings of other court, this court uses the exact language of the prior decisions, not as paraphrased by either of these parties. To avoid disputes, this court expressly quotes (setting them out with quotation marks (" ") various findings and conclusions of the District Court, which are summarized

1    in the following section of this Decision).  These are not all of the District Court's findings and

2    conclusions, but ones selected to show the depth and breadth of the District Court's express rulings

3    upon which this court's decision is based.  All told, the District Court's Findings of Fact and

4    Conclusion of Law, a copy of which is attached to this Decision as Addendum "A," and that is

5    incorporated herein in its entirety by this reference, is comprised of 323 paragraphs.

6    **Summary of District Court Findings and Determinations**

7           The RICO Decision sets forth that court's findings that Defendant-Sinclair has been at the

8    center of a scheme (referred to as the "Fox Hollow Scheme" in the RICO Decision) to improperly

9    profit from the Fox Hollow Property dating back to the mid-1990s.  At the center of this Fox Hollow

10   Scheme is Defendant-Sinclair.  In November 1988 Defendant-Sinclair and his wife purchased and

11   tried to develop the Fox Hollow Property.  When that failed, Defendant-Sinclair then hatched the

12   Fox Hollow Scheme to try to save the Fox Hollow Property and generate financial gain for

13   Defendant-Sinclair.    As  the  RICO  Decision  states,  this  Fox  Hollow  Scheme  included

14   misrepresenting the condition of the property, churning the real estate recordings, misrepresenting

15   the property included in deeds of trust, attempting to take advantage of such misrepresentations to

16   buy the properties at a discount from the lenders who were the subject of the fraud, commencing

17   multiple lawsuits to delay foreclosures, misrepresenting that Defendant-Sinclair was authorized to

18   act for a homeowners association to collect dues and then divert the dues, and renting out Fox

19   Hollow Properties that Defendant-Sinclair did not own and diverting rent monies to Defendant-

20   Sinclair's own purposes.

21          As described in the RICO Decision, Defendant-Sinclair's conduct in perpetrating the Fox

22   Hollow Scheme is part of a well coordinated pattern of conduct – which the District Court

23   determined to be "the conduct of the [RICO] enterprise's affairs through a 'pattern of racketeering

24   activity' within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C.

25   § 1962(c)." Dist. Ct. Dec. ¶ 199.[6]  This activity of Defendant-Sinclair was not an isolated instance,

26

27        [6] Congress has provided a broad and far reaching definition of "racketeering activity" in
     18 U.S.C. § 1961(1).  This defined term includes:

28
           (1) "racketeering activity" means (A) any act or threat involving murder, kidnaping,

a simple mistake, or a mere misunderstanding. Rather, each of the acts fit together as part of the Fox Hollow Scheme, forming a web of "racketeering activity" in which to ensnare others for the economic gain of Defendant-Sinclair.

Congress provides in 18 U.S.C. § 1964(c) a civil remedy for one injured by a violation of the RICO statute, providing for trebled actual damages, costs, and attorney's fees. The conduct that constitutes a RICO violation is stated in 18 U.S.C. § 1962 to include:

> (a) [a]ny person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt . . ., to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. . .

> (b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**Specific Quotations From RICO Decision**

The following is a partial restatement of the findings and conclusions in the RICO Decision identifying the acts, conduct, misconduct, and coordinated actions of the Fox Hollow Scheme (the pattern of racketeering activity) by Defendant-Sinclair and his cohorts during the decades of the 1990s and into 2017.

For ease of identification, this court identifies each of the findings or conclusions of the District Court below using the paragraph number from the RICO Decision. In the following

------

gambling, arson, robbery, bribery, extortion, . . . (B) any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341(relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), . . .section 1956 (relating to the laundering of monetary instruments), . . .(D) any offense involving fraud connected with a case under title 11 (except a case under section 157 of this title), . . . .

1 quotations from the RICO Decision: (1) reference to "defendants" includes Defendant-Sinclair, and

2 (2) references to "plaintiffs" includes Plaintiff-CEMG. The findings and conclusions of the District

3 Court in the RICO Decision which are given collateral estoppel effect in this Adversary Proceeding

4 include, but are not limited to, the following (emphasis added by this court):

5 **I. Default of Defendant-Sinclair in RICO Action and Default Judgment Hearing**[7]

6 　　"9.　　The defendants in this case who had default entered against them are Richard
7 　　Sinclair, Brandon Sinclair, Lairtrust, Capstone, and Mauctrst (collectively "Defaulted
　　Defendants")."

8 　　"16.　　The bankruptcy court held a hearing on December 17, 2015 regarding
　　Defendant Richard Sinclair's legal competency. Judge Ronald Sargis concluded that
9 　　Defendant Richard Sinclair was legally competent to proceed as a party in his
　　bankruptcy case. Doc. 1196-1."

10

11 　　"18.　　Plaintiffs made a formal motion for default judgment. Doc. 1203. On
　　April 14, 2016, Defendant Richard Sinclair filed a timely opposition and declaration.
12 　　Doc. 1208. **Defendant Richard Sinclair also submitted 108 exhibits in support
　　of his opposition on May 3, 2016, well after the opposition deadline**."

13 　　"20.　　**The default judgment prove up hearing was held pursuant to Fed. Rule
14 　　Civ. Proc. 55(b)(2) on May 10, 2016.**"

15 **II. Facts As Alleged in the Consolidated Amended and Supplement Complaint ("CAC"),**
　　**Doc. 410**
16
17 　**Background Facts for Claims**
　**The Fox Hollow Property**

18 　　"42.　　The real property about which the present action relates (the "Fox Hollow
　　Property") is: commonly known as 152 20th Century Boulevard, Turlock, California;
19 　　located in the City of Turlock, County of Stanislaus, State of California; and more
　　particularly described as:

20
21 　　The East Half Of That Portion Of Land As Follows:

22 　　Beginning At The Northeast Corner Of Section 15, Township 5
　　South, Range 10 East, Mount Diablo Base And Meridian, According
　　To United States Government Township Plats Running Thence West
23 　　On The Section Line Between Section 10 And 15, 1,059.3 Feet;
　　Thence South 0 Degrees 45 Minutes East 472.5 Feet As Place Of
24 　　Beginning; Thence Same Course 472.5 Feet; Thence South 89
　　Degrees 30 Minutes 8ast368.76 Feet; Thence North East 0 Degrees
25

26 　　[7] This court has used the headings, which are shown in bold and justified to the left margin, for
27 the sections to which the quotations from the RICO Decision are taken to provide clarity due to the large
number of findings and conclusions made by the District Court.

28 　　Emphasis has been added by this court to the quoted paragraphs.

45 Minutes West 472.5 Feet; Thence North 89 Degrees 30 Minutes West 368.76 Feet To Place Of Beginning. Excepting Therefrom The West 15 Feet."

"43.     The Fox Hollow Property consists of approximately 1.76 acres, and is rectangular in shape, with approximately 170 feet fronting on 20th Century Boulevard, and a depth of approximately 442 feet."

"44.     On or about March 6,1996, Defendant Flake as executive trustee of the Julie Insurance Trust, filed in Book 37 of Maps, Page 38, Stanislaus County Records, a final subdivision map for the Fox Hollow Property, and thereby subdivided the Fox Hollow Property into Lots 1, 11, 18 and 19, and a designated remainder ("Fox Hollow Subdivision Map # 1"). Such lots as created by the filing of the Fox Hollow Subdivision Map #1 shall be referred to herein by their lot number (e.g., "Lot 1")."

"45.     Fox Hollow Subdivision Map # 1 as filed in the Official Records of Stanislaus County, California on March 6, 1996, depicted Lot 18A contiguous to Lot 19 and adjacent to Lot 18."

"46.     On or about July 21, 1998, Defendant Mauchley filed in Book 38 of Maps, Page 19, Stanislaus County Records, a final subdivision map for the Fox Hollow Property, and thereby further subdivided the designated remainder of the Fox Hollow Property into Lots 2 through 10, Lots 12 through 17, and a common area ("Fox Hollow Subdivision Map # 2"). Such lots as created by the filing of the Fox Hollow Subdivision Map #2 shall be referred to herein by their lot number (e.g., "Lot 2")."

"47.     Fox Hollow Subdivision Map # 2 as filed in the Official Records of Stanislaus County, California on July 21,1998, depicted Lot 2A as contiguous to Lot 12 and across the common area from Lot 2, depicted Lot 6A as contiguous to Lot l5 and across the common area from Lot 6, depicted Lot 7A as contiguous to Lot 16 and across the common area from Lot 7, depicted Lot 8A as contiguous to Lots 16 and 7A and across the common area from Lot 8, depicted Lot 9A as contiguous to Lot 18 and across the common area from Lot 9, and depicted Lot 10A as contiguous to Lot 17 and across the common area from Lot 10."

**Initial Purchase, Encumbrance, And Development Of Fox Hollow Property As An Apartment Complex**

"48.     The **Sinclairs purchased the Fox Hollow Property in November 1988** after obtaining approval from the City of Turlock to construct a 35-unit townhouse apartment complex, and obtained a construction loan in the face amount of $1,492,500 from Stockton Savings & Loan Association ("Stockton S&L"), secured by a first deed of trust against the Fox Hollow Property, that was recorded on November 7, 1988 (the " Stockton Construction Loan")."

"49.     Construction of the apartment complex on the Fox Hollow Property started in 1989 and was completed in late 1990 or early 1991. The apartment complex consisted of two rows of buildings along the east and west sides of the property facing each other, with a swimming pool at the south end, and access to 20th Century Boulevard at the northern boundary."

"50.     The buildings included three (3) detached single-family dwellings with one-car garage, nine (9) duplexes with attached one-car garages, and seven (7) duplexes with detached one-car garages."

"51. The **Sinclairs stopped making payments** on the Stockton Construction Loan **in July 1992**, and Stockton S&L recorded a Notice of Default on August ll, 1993, asserting a default in the amount of $172,525.92."

**Entitlements Obtained From The City Of Turlock To Subdivide And Convert The Fox Hollow Property Into A Twenty (20) Lot Planned Unit Development With A Homeowner's Association**

"52. On or about the **summer of 1992, Defendant Richard Sinclair made a preliminary proposal** to the Community Development Department of the City of Turlock (the "Turlock Development Department") **to subdivide the Fox Hollow Property** and convert the property to a planned unit development."

"53. On or about August 10, 2002, the Turlock Building Department responded to the preliminary proposal in writing, by letter sent to Richard Sinclair, in which the Turlock Building Department advised Defendant Sinclair that: The creation of a multi-lot subdivision from the existing apartment complex would require a formal submittal of applications for rezone, a planned development permit, a tentative subdivision map, and a conditional use permit; Mr. Sinclair's proposal to promote ownership of individual lots with multi-unit structures tended to promote a pattern of absentee owners sharing little beyond their investment; the City would require a complete building code analysis report of existing building construction and proposed property lines and would require construction modifications so that units were structurally and architecturally independent of each other prior to the recording of a final subdivision map; and under the circumstances, staff did not support the proposal as presented because of concerns about the proposal creating major challenges for a successful residential development."

"54. On or about September 17, 1992, Defendant **Richard Sinclair confirmed in writing** in a letter sent to the Director of the Turlock Development Department **that he agreed to implement the conditions for approval of the project into CC&Rs** for the property "to protect the general public's welfare and safety in perpetuity," and that **he had proceeded to have the CC&Rs and homeowners documents redrafted accordingly**."

"55. On or about February 2,1993, **Defendant Richard Sinclair as "Applicant" and "Owner" applied to the City of Turlock** for a conditional use permit, planned unit development, rezoning and vesting tentative map, to subdivide the Fox Hollow Property into nineteen (19) lots, and a common area, and to convert the apartment complex to a planned unit development with a homeowners association owning and being responsible for the maintenance of the common area and certain aspects of the individual lots (the "Project")."

"56. As part of the application for approval of the Project**, Defendant Richard Sinclair represented through his engineer** on the Vesting Tentative Map of Fox Hollow submitted to the City of Turlock on or about February 5, 1993, **that the garages that were detached** from the dwelling units **are denoted as Lots** with a number followed with the capital letter "A" and that the relationship between those "A" lots and the dwelling units was **that a garage lot corresponded to the dwelling unit with the same numeric lot number**, as for example as stated on the Vesting Tentative Map "GARAGE LOT 6A CORRESPONDS TO DWELLING UNIT LOT 6.""

"57 . On or about March 4, [1993], the **Turlock Community Development Department issued a letter to Defendant Richard Sinclair confirming that a**

**complete building code analysis of the existing building construction would be required,** that any modifications to the existing structures that were required to meet current standards for subdivided lots would need to be accomplished prior to recording the final subdivision map, that the existing landscaping must be repaired prior to recording of a final map, and that appropriate CC&Rs needed to be recorded to ensure the continued maintenance of the development."

"58.    **The Project was approved** by the Turlock City Planning Commission on or about April 1, 1993, and by the Turlock City Council on or about May 25, 1993, **subject to various conditions,** including among others: . . . . [various conditions specified in the RICO Decision]"

"59.    Defendant Richard Sinclair applied to and obtained approval of the Project from the City of Turlock on the basis that the Project involved thirty-five (35) town homes with one car garages on 1.76 acres and was "creating [a] 20 lot subdivision consisting of 3 detached single family dwellings, 7 detached duplexes, 9 duplexes attached by garages, and 1 lot for common area, pool, driveways, [and] parking.""

"60.    A structural building code compliance analysis for the Fox Hollow Property as required under Condition 4 a) was performed by an architect retained by Defendant Richard Sinclair and submitted to and approved by the City of Turlock in or about December 1993. The **structural work specified in the analysis to meet current standards for individually owned lots included installing twenty-seven (27) firewalls for the garages, three (3) fire walls in the units, eliminating six (6) roof overhangs, removing seven (7) windows, and adding two (2) roof vents.**"

"61.    In January 1994, Defendant **Richard Sinclair submitted an application to** the Turlock Community Development Department, for a modification to Condition 4 b) to the conditions of approval **for the** Project so that the work required to bring the **existing buildings into compliance with current standards be deferred until sometime after the recording of a final map for the Project** (the "Modification Application")."

"62.    Defendant Richard Sinclair was advised in a letter sent on or about February 7, 1994, from the Turlock Community Development Department, that after further discussion involving the City Engineer, City Attorney's Office, and the building official and the senior planner of the Community Development Services, they were unable to develop an option that would ensure no City involvement in completion of the project in the event the property owners failed to fulfill their obligations in the matter after recording the final map, and accordingly, **the options available were to: Complete the original conditions of the vesting map, file multiple final maps and completing the conditions covering the portion of the property subject to each final map, or re-subdividing the property as a condominium project**."

"63.    On or about **February 17, 1994, the Turlock Planning Commission denied the Modification Application** and thereby continued to require that all modifications to meet current standards for individually owned lots be completed prior to recording the final map."

"64.    Thereafter, on or about April 29, 1994, **Defendant Richard Sinclair notified** the Planning Department of the City of Turlock in writing that he would be completing multiple maps for the subdivision and that: "There are **sufficient funds within the Homeowner's Association to replace and maintain** said [common area] lighting," **Said statement was false when made in that no homeowners**

**association had been created nor were there funds within a homeowner association** to replace and maintain lighting or otherwise maintain the common area."

"65.     On or about **June 8, 1994, Defendant Richard Sinclair filed a Voluntary** Petition under Chapter 11 of the **Bankruptcy** Code on behalf of himself and his spouse, with the United States Bankruptcy Court, Eastern District of California, Case No.94-92271-A-11 (the "[1994] Sinclair Bankruptcy Case")."

**Defendants Lose Fox Hollow Property In Late 1994 Through Foreclosure And Then Reacquire Fox Hollow Property In October 1995**

"66.     The **Sinclairs lost the Fox Hollow Property to Stockton S&L through a non- judicial foreclosure on** the Stockton Construction Loan on or about **December 13, 1994**."

"67.     On or about the summer of 1995, **Defendant Richard Sinclair contacted Defendant Flake and Defendant Mauchley**; and discussed with each of them **reacquiring the Fox Hollow Property** from the lender, and continuing to pursue the Project."

"68.     Pursuant to such discussions, **Defendant Richard Sinclair formed a trust for Defendant Mauchley in August 1995** called "Mauctrst", and **Defendant Stanley Flake, as Trustee of The Julie Insurance Trust,** purchased the Fox **Hollow Property from the** lender (which had been renamed Stockton Federal Bank) on or about October 31, 1995, for approximately $1.27 million that Defendant Flake, as trustee of the F. Hanse Trust had advanced for the purchase."

**Fox Hollow CC&Rs Recorded in September 1996**

"69.     On or about September 16, 1996, **Defendant Flake**, as trustee of the Julie Insurance Trust executed as the declarant, **and Defendant Sinclair** caused to be **recorded** as Document No. 96-0078121-00 in the Official Records of Stanislaus County, California, a **Declaration of Covenants, Conditions and Restrictions for the Fox Hollow Property** (the "Fox Hollow CC&Rs")."

"70.     Article I, Section 16 of the Fox Hollow CC&Rs, defines "Association" as the "Fox Hollow of Turlock Owners' Association, a non-profit mutual benefit corporation, membership in which shall be limited to owners (as hereinafter defined) and in which all owners have a membership interest.""

"71.     Article I, Section 11 of the Fox Hollow CC&Rs, defines "Owner " and "Owners" as "the record owner or owners, whether one or more persons or entities, of a fee simple title to a lot. . . .""

"72. Article I, Section 11, defines "Lots" as "Those certain parcels of land, together with the single family residential improvements attached thereto, described on the map of Fox Hollow subdivision, as Lots 1-19, County of Stanislaus, State of California.""

"73.     Defendant Flake, as trustee of the Julie Insurance Trust, declared in Article II, Section 1, that the Fox Hollow Property was subject to the Fox Hollow CC&Rs."

"74.     Pursuant to the Fox Hollow CC&Rs: Defendant Flake, as trustee of the Julie Insurance Trust, was required to convey to the Association fee title to the common

area for the Fox Hollow Property free and clear of all liens and encumbrances "prior to the conveyance of title to the first lot" and to appoint the initial Board of the Association consisting of three (3) Directors (Art. III, §§ 3 & 6); the Association was charged with the duty to repair and maintain the common area and certain aspects of the Lots (Art. IV § 1); and the Board of the Association was mandated to "establish regular monthly assessments for operations and maintenance of the Project . . . payable in monthly installments on the first day of each month commencing on the first day of the first month following conveyance of the first Lot." (Art. V, § 2)."

"75.    Article V, Section 1 of the Fox Hollow CC&Rs provides in part that: "Declarant hereby covenants and agrees for each Lot owned by it within the Project, and each Owner of any Lot by acceptance of a deed is deemed to covenant and agree, to pay to the Association the dues levied pursuant to this Article.""

"76.    **Defendants reaffirmed in the Fox Hollow CC&Rs that the "A" lots were not separate from their corresponding dwelling units** in that among other things: (a) Article V provides that the monthly assessments for operations and reserves shall be charged to the residential units on the Lots; and (b) the easements for ingress and egress over the common area under Article VI are "for the benefit of the Lots and Lot Owners.""

**Defendants' Five (5) Loan Fraudulent Financing Scheme In February 1997**

"77.    On or about early 1997, **Defendants Richard Sinclair,** Mauchley and Flake **carried out fraudulent record title churning and financing transactions involving Fox Hollow**, by **creating the false appearance of a planned unit development with a homeowners association** and the **false appearance of an arms length transaction between Defendants Flake and Mauchley** in order to borrow more than $1.4 million against the Fox Hollow Property.

"78.    **Defendant Richard Sinclair established the price for** the conveyance of **Lots 1, 11, 18 and 19, and the remainder of the Fox Hollow Property**, from Defendant Flake, as trustee of the Julie Insurance Trust, to Defendant Mauchley at $1.9 million."

"79.    **As part of the scheme**, Defendant **Flake**, as trustee of the Julie Insurance Trust, **conveyed record title to Lots 1, 11, 18, 19, and the balance of the Fox Hollow Property, to Defendant Mauchley**, by five separate deeds accepted by Defendant Mauchley, and recorded in the Official Records of Stanislaus County, California on February 26, 1997."

"80.    **Also, as part of the scheme, Defendant Richard Sinclair assisted** Defendant Mauchley **in obtaining loans on Lots 1, 11, 18 and 19, each in the amount of $119,000, and an additional loan in the amount of $1 million against the balance of the Fox Hollow Property**, from GMAC Mortgage Corporation ("GMAC"), secured by first deeds of trust in favor GMAC, also recorded in the Official Records of Stanislaus County, California, on February 26, 1997."

"81.    **Also, as part of the scheme**, the **$1.9 million price for Fox Hollow was paid to Defendant Flake from the proceeds on the five (5) loans from GMAC** and by a Deed of Trust in favor of Defendant Flake, as trustee of the Capstone Trust, against the Fox Hollow Property, executed on or about February 21, 1997, by Defendant Mauchley, and recorded on or about March 3,1997, that purportedly secured an obligation in the amount of $444,888, and provided that Defendant Flake, as trustee of the Capstone Trust will provide lot releases for the fifteen (15) lots

being created (the lots other than Lots 1, 11, 18 and 19) for the payment of $37,037 per lot, and lot releases on Lots 1, 11, 18 and 19 for the payment of $16,447.33 per lot."

"82.    Defendant Mauchley represented and promised in the "Planned Unit Development Rider" included in the deeds of trust in favor of GMAC that were recorded against Lots 1, 11, 18, and 19, on or about February 26,1997,that:

> **The Property includes**, but is not limited to, a parcel of land improved with a **dwelling, together** with other such parcels and certain **common areas and facilities,** as described in covenants, conditions and restrictions of record (the "Declaration").

> The **Property is a part of a planned unit development** known as Fox Hollow . . . [and] the Property also **includes** Borrower's interest in the **homeowners association** or equivalent entity owning or managing the common area and facilities of the PUD (the "Owners Association"), and the uses, benefits and proceeds of Borrower's interest. PUD COVENANTS. In addition to the covenants, and agreements made in the security instrument, Borrower and Lender further covenant and agree as follows: [¶]   A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's constituent documents. The "Constituent Documents" are the: (I)  Declaration; (ii) articles of incorporation, trust instrument or equivalent document which creates the Owners Association; and (iii) any by laws or other rules or regulations of the Homeowners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents."

"83.    **Said representations and promises in the Planned Unit Development Riders were false when made**. The **true facts known by Defendants Richard Sinclair**, Mauchley and Flake, **and concealed by them from GMAC**, were that: there **was no homeowners association** or equivalent entity to own or manage the common area and facilities of the PUD; **title to the common area had not been transferred to a homeowners association**; and **Defendants Richard Sinclair**, Mauchley and Flake, and each of them, **had no intention at that time to form a homeowners association, to transfer title to the common area to a homeowners association**, or **to charge and collect dues and assessment to maintain the common area and lots**, all as required of them in the Fox Hollow CC&Rs and by the conditions of approval by the City of Turlock for the Project."

"84.    **Defendants Richard Sinclair**, Mauchley and Flake, and each of them, also **concealed from GMAC that the corresponding one car garage for Lot 18 was on Lot 18A, that the corresponding one car garage for Lot 18 was not included in the legal description** under the deed of trust for the loan on lot 18, that the corresponding **one car garage for Lot 18 was left as additional collateral for Defendant Flake** to receive the balance of the sales price from the creation of the other fifteen (15) lots, and that the **corresponding one car garage for Lot 18 was left out as part of the deal between Defendants Richard Sinclair, Mauchley and Flake."**

"85.    **GMAC made said loans in reliance upon said representations and promises,** and had it known the true facts and concealed facts, it **would not have completed said loans without compliance with the Fox Hollow CC&Rs and City of Turlock conditions for the Project, and without including the corresponding**

**one car garage on Lot 18A** in the legal description in the deed of trust for the loan on Lot 18."

**Defendants' Fifteen (15) Loan Fraudulent financing Schedule in July 1998**

"86.     **Defendants Richard Sinclair**, Mauchley and Flake, **continued the fraudulent record title churning and financing scheme for Fox Hollow in 1998**."

"87.     **As part of the scheme, Defendant Richard Sinclair**, in the name of Defendant Mauchley, **filed applications for loans against each of the fifteen (15) remaining lots at Fox Hollow** and **continued to process Fox Hollow Subdivision Map # 2, for purpose of obtaining said loans**."

"88.     Each of said loans was conditioned on the filing of Fox Hollow Subdivision Map # 2 to create the lots, and each of said loans was based on each of the lots being individually saleable."

"89.     **As part of said scheme, by early 1998, Defendants Richard Sinclair**, Mauchley and Flake **planned to transfer record title to the lots at Fox Hollow to an entity to be called Mauctrst  LLC** immediately after such loans funded. Pursuant to such plan: Defendant Mauchley executed an "Option & Operating Agreement For Real Property And Contracts" on or about January 1, 1998, individually, as "Mauctrst" and as member manager of Mauctrst LLC, that provided among other things that **Defendant Richard Sinclair would be paid a monthly fee of $10,000** for overseeing the management and control of various properties including Fox Hollow; Defendant **Richard Sinclair executed and caused to be filed with the California Secretary of State "Articles of Organization" for Mauctrst LLC on** or about April 28, 1998; Defendant Richard Sinclair prepared, Defendant Mauchley executed, Defendant Mauctrst accepted and **Defendant Richard Sinclair caused to be recorded** in the Official Records of Stanislaus County, California, **a grant deed conveying record title to Lots 1 through 19 to Mauctrst on or about July 29,1998** (only seven (7) days after the July 1998 loans closed); and **Defendant Richard Sinclair prepared** and Defendants Mauctrst and Mauchley executed **a deed of trust from Mauctrst LLC dated July 23, 1998 and recorded on December 3, 1998 against Lots 1  through 19**, that **purportedly secured an obligation in the amount of $271,000**, and provided that Defendant Flake, as trustee of the Capstone Trust would provide lot releases for lots 8, 10, 16 upon the payment of $7,742.85 per lot, and for Lots 1-7 , 9, 1l-15, and 17-19 upon the payment of $15,485.70 per lot (the "July 1998 Flake Lot Release Trust Deed")."

"90.     **As part of said scheme**, **Defendant Mauchley**, on or about July 9, 1998, **executed loan applications for each of such loans,** describing the property by unit number or numbers, and **representing that the property had been acquired in 1995."**

"91.     **On or about July 22, 1998, Defendant Mauchley**, after he had recorded Fox Hollow Subdivision Map # 2, creating fifteen (15) more lots with duplexes or single family townhouses, **closed the fifteen (15) new loans secured by a first deed of trust against the each lot.** The total amount of these loans was **more than $1.8 million.**"

"94.     Defendant Mauchley represented and promised in the "Planned Unit Development Rider" included in the deeds of trust securing the loans on Lots 3, 4, 6, 7, 8, 9, 10, 12, 14, 16 and 17, and that were recorded on or about July 22, 1998, that:

1

2　　　　　　The Property includes, but is not limited to, a parcel of land improved
　　　　　　with a dwelling, together with other such parcels and certain common
3　　　　　　areas and facilities, as described in covenants, conditions and
　　　　　　restrictions of record (the "Declaration").

4　　　　　　The Property is a part of a planned unit development known as Fox
　　　　　　Hollow . . . [and] the Property also includes borrower's interest in the
5　　　　　　homeowners association or equivalent entity owning or managing the
　　　　　　common area and facilities of the PUD (the "Owners Association"),
6　　　　　　and the uses, benefits and proceeds of Borrower's interest.

7　　　　　　PUD COVENANTS. In addition to the covenants, and agreements
　　　　　　made in the security instrument, Borrower and Lender further
8　　　　　　covenant and agree as follows: [¶] A. PUD Obligations. Borrower
　　　　　　shall perform all of Borrower's obligations under the PUD's
9　　　　　　constituent documents. The "Constituent Documents" are the: (I)
　　　　　　Declaration; (ii) articles of incorporation, trust instrument or
10　　　　　　equivalent document which creates the Owners Association; and (iii)
　　　　　　any by laws or other rules or regulations of the Owners Association.
11　　　　　　Borrower shall promptly pay, when due, all dues and assessments
　　　　　　imposed pursuant to the Constituent Documents."

12

13　　　"95.　　**Said representations and promises in the Planned Unit Development
　　　Riders were false when made**. The **true facts known by Defendants Richard
14　　　Sinclair**, Mauchley and Flake, **and concealed by them** from each of such lenders,
　　　were: **there was no homeowners association** or equivalent entity to own or manage
15　　　the common area and facilities of the PUD; **title to the common area had not been
　　　transferred to a homeowners association**; and **Defendants Richard Sinclair**,
16　　　Mauchley and Flake, and each of them, **had no intention at that time to form a
　　　homeowners association**, to **transfer title to the common area to a homeowners
17　　　association**, or **to charge and collect dues and assessment** to maintain the common
　　　area and lots, all as required of them in the Fox Hollow CC&Rs and by the
18　　　conditions of approval by the City of Turlock for the Project."

19　　　"96.　　**Defendants Richard Sinclair**, Mauchley and Flake, and each of them,
　　　**concealed from each of the lenders that the corresponding one car garages** for
20　　　Lots 2, 6, 7 , 8, 9 and 10, **were on Lots 2A, 6A, 7A, 8A, 9A and 10A**; that the
　　　corresponding **one car garages for Lots 2, 6, 7, 8, 9 and 10, were not included in
21　　　the legal description in the deed of trust for the loan on each such lot**; and that
　　　the **corresponding one car garages for Lots 2, 6, 7, 8, 9 and 10, were left as
22　　　additional collateral for Defendant Flake** and were left out as part of the deal
　　　between Defendants Richard Sinclair, Mauchley and Flake in 1997."

23　　　"97.　　**Defendants Richard Sinclair**, Mauchley, Flake and Mauctrst, and each of
　　　them, **concealed from the lenders** on such loans **that they had not, despite being
24　　　required to do so** in the Turlock City conditions for approval of the Project, **made
　　　the modifications to** the structures as required in the building code analysis and **had
25　　　not relocated utilities** so that each lot was individually served by electricity,
　　　telephone, gas and cable television, **and thereby prevented such lots from being
26　　　individually saleable even though each lot was provided as collateral for one of
　　　the** loans and the value of the lot as collateral was based upon the lot being
27　　　individually saleable."

28　　　"98.　　**As part of said July 1998 loans, Granite Bay Funding, closed the loans**

33

to Defendant Mauchley secured by first deeds of trust against lots 3, 7, 9 and 14, each securing a loan **in the amount of $130,000**, and then **for value received completed the sale, transfer and assignment of such loans to CEMG's processor**, Allied American Funding, on or about August 1998, who that in turn, sold, **transferred and assigned said loans to CEMG's predecessor, Conti Mortgage Corporation** on or about August 1998. Granite Bay Funding, Allied American Funding, and Conti Mortgage Corporation shall be collectively referred to hereinafter as "Conti" and Lots 3, 7, 9 and 14 shall be referred to collectively as the "Conti Lots.""

"99.    **Each of said lenders (including without limitation Conti**) made said loans and purchased said loans **in reliance upon said representations and promises**, and **had they known the true facts and concealed facts, they each would not have made and purchased said loans** as alleged herein without compliance with the Fox Hollow CC&Rs and City of Turlock conditions, and without including the corresponding one car garages on Lots 2A, 6A, 7A, 8A, 9A and 10A, in the legal description in the deed of trust for the loan on Lots 2, 6, 7, 8, 9 and 10."

"100.    Defendant Flake in his various capacities, advanced approximately $1.27 million to purchase the Fox Hollow Property in October 1995, and as a result of the February 1997 financing scheme, received approximately $1.4 million in cash in February 1997, and as a result of the July 1998 financing scheme received approximately $545,000 in cash in July 1998 and the July 1998 Flake Lot Release Trust Deed."

**Defendants Use Their Refusal And Failure To Complete The Requirements To Subdivide The Fox Hollow Property To Try To Force The Lenders To Sell The Loans To Defendant-Sinclair and His Co-Conspirators At A Substantial Discount**

"101.    **On or about July 1, 1999**, and after Defendant Mauchley had gone into default on each of the loans obtained as part of the financing scheme in February 1997 and July 1998, **Defendant Richard Sinclair, in the name of Mauctrst, filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code**, with the United States Bankruptcy Court, Eastern District of California, Case No. 99-28903-C-11 (the "Mauctrst Bankruptcy Case")."

"102.    **Defendants continued to conceal their failure to comply with the requirements of the City of Turlock for** the subdivision and conversion to a planned unit development for the Fox Hollow Property **until at least on or about November 18, 1999**, when they **started disclosing some of the information in an effort to try to renegotiate or purchase at a substantial discount the loans** on the Lots at Fox Hollow Property."

"103.    **The first of such disclosure was made by Defendants** Mauctrst, **Richard Sinclair**, and Mauchley, on or about November 18,1999, in a First Amended Disclosure Statement filed in the Mauctrst Bankruptcy Case, **in which they admitted**:

At the time that the 19 loans were put into place on Fox Hollow . . . 19 **appraisals were obtained** valuing the 16 duplexes at $185,000 each with the other 3 single family residences valued at $93,500 each. One of the duplex appraisals is attached as Exhibit "F" and incorporated herein by reference. The **total appraised value at the time was $3,240,500, subject to final completion of the subdivision firewalls and underground relocation of utilities to**

**accommodate individual ownership in this planned united development**."

"104.   **Defendants** Mauctrst, **Richard Sinclair** and Mauchley **made the same admission in their Second Amended Disclosure Statement** filed in the Mauctrst Bankruptcy Case on December 17, 1999."

"105.   Prior to the time the loans closed, **Defendants Richard Sinclair**, Mauchley and Flake **believed that the value of Fox Hollow would be enhanced upon completion of the requirements of the City of Turlock** so that the lots would be individually saleable.  Moreover, **Defendant Richard Sinclair was aware that completion of such requirements was material** in that **he was aware** during the [1994] Sinclair Bankruptcy Case, that **the appraised value for Fox Hollow as an apartment complex was approximately $1.7 million dollars while he placed the value of Fox Hollow with individually saleable lots at approximately $3 million**."

"106.   **The schedules filed by Defendants Richard Sinclair**, Mauchley and Mauctrst in the Mauctrst Bankruptcy Case on or about September 7, 1999 and amended schedules filed on or about December 8,1999, also **disclosed that Mauctrst had paid Defendant Richard Sinclair over the period of twelve (12) months proceeding the filing of the Bankruptcy Case, approximately $160,000.**"

"107.   **Defendants** Mauctrst, **Richard Sinclair** and Mauchley also **admitted in such schedules and amended schedules** filed in the Mauctrst Bankruptcy Case**, that Conti Mortgage Corporation was the successor to and held an undisputed security interest** on the July 1998 loans against Lots 3, 7 , 9 and 14."

"108.   On or about December 9,1999, the trustee in the Mauctrst Bankruptcy Case filed a motion for authority to abandon various real property, including the Fox Hollow Property, on the ground that such property was substantially over-encumbered."

"109.   On or about January 14, 2000, the Bankruptcy Court approved the abandonment by the bankruptcy trustee of the Fox Hollow Property back to Mauctrst."

"110.   On or about **January 25, 2000, Defendant Richard Sinclair**, on behalf of Defendants, **disclosed in writing in letters mailed to representatives of the lenders** holding the July 1998 deeds of trusts on Lots 2, 3, 4, 5, 7, 9, 13, 14 and 15, in an effort to purchase their loans for $80,000 (when the amount then due exceeded $130,000):

>   Currently, this **property cannot be sold** as a duplex or single family residence. The **subdivision has not been completed**. Underground electrical work, relocation of utilities and individual meters are among the requirements still to be completed for the City of Turlock.
>   . . .
>
>   * * *
>
>   **Only someone who controls all properties can complete these requirements**. I have a client who is willing to do this and would complete the purchase quickly."

"112.   **While Defendants**, as alleged above, **began disclosing their failure to meet**

**certain of the requirements** of the City of Turlock to subdivide the Fox Hollow Property and convert it into a planned unit development, **they continued to conceal their failure to comply with other requirements** until at least late 2000 including the requirements to: (a) Form the homeowners association; (b) convey the common area to the homeowners association; (c) appoint a board of directors for the homeowners association; and (d) commence the assessment of monthly dues sufficient to fund the operation and maintenance of the Fox Hollow Property in accordance with the Fox Hollow CC&Rs."

**Defendants Fraudulent HOA Dues And Assessments Billing Scheme In 2000 and Early 2001**

"115. **As a part of the ongoing misuse of the homeowners association and their efforts to defraud the lenders**, Defendants Richard Sinclair, Mauchley and Brandon Sinclair, purportedly as the Board of Directors of Fox Hollow HOA (even though the articles of incorporation for Fox Hollow HOA had not been filed with the California Secretary of State), **started on or about August 1, 2000, to** send through the U.S. mail written **dues statements to the various lenders** on the Lots at Fox Hollow, demanding payment of $300 per month per lot, including without limitation, as follows: On Lot 1 to GMAC from September 21, 2000 through December 31, 2000; on Lot 2 to Bank One from October 1, 2000 through January 31, 2001; on Lot 4 to Bank One from August 1, 2000 through January 31, 2001; on Lot 5 to Bank One from October 1, 2000 through January 31, 2001; on Lot 7 to Conti Mortgage from August l, 2000 through January 31, 2001; on Lot 11 to GMAC from September 21, 2000 through December 31, 2000; on Lot 15 to Bank One from October 1, 2000 through January 31, 2001; on Lot 18 to GMAC from September 21, 2000 through December 31, 2000; and on Lot 19 to GMAC from September 21, 2000 through December 31, 2000."

"116. **On or about November 2000, Defendant Richard Sinclair**, purportedly on behalf of the homeowners association, **sent a letter to an attorney for Bank One National Association**, as trustee, formerly FKA First National Bank of Chicago as trustee ("Bank One"), **demanding payment of dues for October and November on Lots 2, 4, 5 and 15**, and stating in the "PS" "A number of people have inquired about purchasing the duplexes that your clients owns. Please advise us of the price as-is, where-is, so we may pass along the information." (D348.)"

"117. **Defendants Richard Sinclair**, Mauchley and Brandon Sinclair, on or about December 2000, **pursued foreclosures on various lots for failure to pay assessments**, and recorded on December 19, 2000, and caused to be sent through the U.S. mail notices of delinquent assessment in the name of Fox Hollow HOA, for lots 1, 2, 4, 5, 11, 15, 18 and 19."

"118. Thereafter, **on or about January 22,2001, Defendants Richard Sinclair**, Mauchley and Brandon Sinclair recorded and **caused to be sent through the U.S. mail notices of delinquent assessment** in the name of Fox Hollow HOA, for lots 2, 4, 5, 7 and 15."

"119. **Defendants Richard Sinclair**, Mauchley and Brandon Sinclair, **represented** in each such dues statement, letter and notice of delinquent assessment **that there was a homeowners association**, that **Brandon Sinclair was president of the homeowners association**, and that **dues of $300 per lot per month were due and owing to the** homeowners association starting August l, 2000."

"120. **Said representations were false when made.** The true facts known by

**Defendants Richard Sinclair**, Mauchley, and Brandon Sinclair, and concealed by them from each of such lenders were that: (1) Defendants had **failed and refused to form Fox Hollow HOA** as a non-profit mutual benefit corporation until on or about December 6, 2000; (2) Defendants had **failed and refused to collect any dues and assessments from themselves**; and (3) Defendants **intended to and did use payments of association dues and assessments to finance lawsuits they had initiated against various lenders** seeking to enjoin and delay the foreclosures on their loans."

"121. **Each of said lenders**, including without limitation GMAC, **made dues payments to said Defendants** in reliance upon said representations, and had they known the true facts and concealed facts, they each would not have made such payments."

**The Foreclosure Delay Litigation**

"122. **Defendant Richard Sinclair** prepared and **filled** in the names of Defendants Mauctrst and Mauchley, as plaintiffs therein, **seven (7) lawsuits** over the period March 22, 2000 and July 21, 2000, in the Stanislaus County Superior Court (Case Nos. 253769, 254996, 269907, 269969, 270025, 271066 and 271115), against various lenders on Lots at Fox Hollow, seeking **to enjoin the foreclosures** (the "Foreclosure Delay Cases")."

"123. Although **Defendants Richard Sinclair**, Mauctrst and **Mauchley succeeded** in using Foreclosure Delay Cases **to delay the foreclosures on the various lots without making any further payments on any of the loans**, said Defendants lost six (6) of the lawsuits and settled the remaining case against GMAC involving Lots 1,11, 18 and 19 as more specifically alleged below."

**Defendant-Sinclair's and His Co-Conspirators' Fraudulent Financing Scheme Continues In 2001 With Two (2) More Loans On Lots At Fox Hollow And With Rent And Tenant Deposit Skimming On Lots That They Had Lost Through Foreclosure By Lenders**

"134. On or about May 2001, **Defendants Mauchley and Flake**, as trustee of the Capstone Trust, **entered into a settlement agreement** with GMAC, of the lawsuit commenced by Mauchley and Mauctrst, Stanislaus County Superior Court Case No. 269907, in which Defendant Mauchley agreed to drop said lawsuit, and **Defendant Flake, as a purported junior lien holder on Lots 1, 11, 18 and 19, agreed to purchase said lots for $114,750 each ($459,000 total) in cash**, with possession of said lots "delivered to Capstone at close of escrow.""

"135. **Defendants Richard Sinclair**, Mauchley and Flake **concealed from GMAC during the negotiations of said agreement**, at the time said agreement was executed by the parties, and thereafter through at least July 2002, that **they had agreed among themselves to use Capstone Trust as a straw buyer who would immediately upon purchase of a lot from GMAC, transfer title to such lot to Defendant Richard Sinclair** in a second escrow as part of Defendant Richard Sinclair obtaining a loan against such lot in an amount substantially in excess of the amount paid to GMAC, and Defendants Richard Sinclair and Flake would split among themselves the net loan proceeds in excess of closing costs and the amount paid to GMAC."

"136. **Pursuant to such fraudulent scheme**, **Defendant Flake**, as trustee of the Capstone Trust, closed escrow on the purchase of Lot 19 from GMAC on or about

August 1, 2001, and then **immediately conveyed title to said lot to Defendant Richard Sinclair by Grant Deed recorded** on or about August 2, 2001,who simultaneously obtained a loan from Long Beach Mortgage Company, in the amount of $152,000, secured by a first deed of trust against Lot 19 that was also recorded on or about August 2, 2001, with the proceeds from such loan used to pay GMAC the purchase price of $114,750 and the closing costs, and the balance of the net loan proceeds in the amount of approximately **$31,420 distributed to Defendants Richard Sinclair and Flake**."

"137.　Also, **pursuant to such fraudulent scheme, Defendant** Flake, as trustee of the Capstone Trust, closed escrow on the purchase of Lot 1 from GMAC on or about December 10, 2001, and then immediately **conveyed title to said lot to Defendant Brandon Sinclair by Grant Deed** recorded on or about December 10, 2001, who simultaneously obtained a loan from Decision One Mortgage Company, in the amount of $142,500, secured by a first deed of trust against Lot 1 that was also recorded on or about December 10, 2001, with the proceeds from such loan used to pay GMAC the purchase price of $114,750 and the closing costs, and the balance of the net loan proceeds of approximately **$18,452.14 distributed to Defendants Richard Sinclair and Flake."**

"138.　**Pursuant to the Fox Hollow Scheme, Defendant Richard Sinclair conveyed title to Lot 19 to Lairtrust** by Grant Deed recorded on or about February 4,2002, and Defendant Brandon Sinclair conveyed title by Grant Deed to Lot 1 to Capstone LLC, also recorded on or about February 4, 2002."

"139.　**Had Defendants Richard Sinclair and Flake disclosed the true facts** to GMAC, Long Beach Mortgage Company, and Decision One Mortgage Company, **GMAC would not have completed the sales of Lots 1 and 19, and Long Beach Mortgage Company and Decision One Mortgage Company would not have closed said loans**."

"140.　**While the purchase of said lots was pending, Defendant Richard Sinclair**, by facsimile, **sent to GMAC**, on or about June 27,2002, **asked for access to the units for purposes of inspection**. **Unknown to GMAC**, and despite said statement as well as the term in the settlement agreement that possession shall transfer upon close of escrow, **Defendants Richard Sinclair**, Brandon Sinclair and Mauctrst **had continued to rent out and collect rents on units on Lots 1, 11, 18 and 19, following completion of the foreclosure** [by GMAC] **of the same on September 29, 2000. Defendants** Brandon Sinclair, **Richard Sinclair** and Lairtrust **collected rents on said lots during times they did not own said lots**, through August 1, 2001, as to Lot 19, December 10, 2001 as to Lot 1, and June 25, 2002, as to Lots 11 and 18, in an amount according to proof at trial, all while **failing to pay homeowner association dues and failing to maintain said property."**

"141.　**Defendants Richard Sinclair** for Lairtrust and Capstone LLC also **entered in to written leases on units 104, 133 and 135 with tenants and then refused the demands for return of first month's rent and security deposits** in the amounts of $1,825, $1,850 and $1,895 respectively which such rights of the tenants have been assigned to Plaintiff CEMG."

"142.　**Despite losing title to Lot 7 through foreclosure on June 6, 2000, Defendants Richard Sinclair** and Mauctrst **continued to lease out and collect rents on units on said lot** in an amount according to proof at trial, **until on or about February 2003, all while failing to pay homeowner association dues and failing to maintain said property**."

**Defendants Continue To Falsely Assert Ownership In And
A Right Of Possession To Garage Lots And Common Area**

"164.  Defendants have continued and threaten to continue their misconduct as alleged herein."

"165.  Defendants, from and after the commencement of this action up to the present time have failed and refused to convey record clear title to the "A" Lot to Plaintiff CEMG, despite demand having been made and accordingly, Plaintiff CEMG has been prevented from obtaining approval of the subdivision through the California Department of Real Estate, and from receiving profits form selling the individual single-family residences and duplexes during on or about 2005 and 2006 at a time when market values were substantially higher than they are currently."

"166.  On or about June 26, 2007, **Defendant Richard Sinclair caused to be recorded** a **quitclaim deed purportedly transferring title** to Lots 2A, 6A,7A, 8A, 9A, 10A, and 18A, from Defendant Mauchley to Defendant Lairtrust, as Instrument No. 2007-0084538-00, Official Records of Stanislaus County, California."

"167.  On or about April 17, 2008, **Defendant Richard Sinclair as "Member/Manager for Mauctrst LLC"**,served by U.S. Mail on Plaintiffs and on the tenants at the Fox Hollow Property of unit number 131 and garage lot 2A, unit number 113 and garage lot 6A, unit number 109 and garage lot 10A, unit number 111 and garage lot 7A, unit number 107 and garage lot 8A, unit number 101 and garage lot 9A, unit number 103 garage lot 9A, unit number 105 and garage lot 10A, unit number 100 and garage lot 18A, and unit number 102 and garage lot 18A, **a "Notice of Termination of Tenancy/Occupancy And Use Of Premises' demanding on behalf of the owner, Defendants Mauctrst and Mauchley, or their predecessor** Stanley Flake, Trustee, that such tenants and Plaintiffs remove themselves from and deliver up possession, occupancy and use of the reference garage lot, as for example 'Garage Lot Unit 2A Located at 152 20th Century Blvd., Turlock, California 95380', on or before May 19, 2008, and stating that the notice is given 'to terminate your tenancy, occupancy and use of the premises of the above described property.'""

168.  Thereafter, on or about May 22, 2008, **Defendant Richard Sinclair**, again on behalf of Defendants Mauchley and Mauctrst, or their predecessor-in-interest, Stanley Flake, Trustee, **wrote to CEMG and demanded that CEMG and its tenants vacate the garages on lots 2A, 6A, 7A, 8A, 9A, 10A and 18A,** and if they failed to do so by 5:00 p.m. on May 28, 2008, unlawful detainer action would follow."

"169.  On or about July 2, 2008, **Defendant Richard Sinclair commenced unlawful detainer** actions in the names of Mauctrst and Lairtrust, in the Superior Court of California, County of Stanislaus, Case Nos. 628615 and 62852, **against CEMG and its tenants for lots 9A and 2A respectively**, in which Defendants Mauctrst and Lairtrust asserted they are the owners of such garage lots, and sought to evict CEMG and its tenants from such garage lots."

"171.  On or about April 17, 2008, **Defendant Richard Sinclair** as "Member/Manager for Mauctrst LLC", also **served** by U.S. Mail on the tenants of each of the thirty-five (35) units at Fox Hollow and on Plaintiffs, a **"Notice of Termination of Tenancy/Occupancy** And Use Of Premises" for the **"Driveway and Common Area** Located at 152 20th Century Blvd.,Turlock, California 95380,"

demanding on behalf of the owner, Defendants Mauctrst and Mauchley, or their predecessor Defendant Stanley Flake, Trustee, that such tenants and Plaintiffs remove themselves from and deliver up possession, occupancy and use of the premises described above, on or before May 19, 2008, and stating that the notice is given "to terminate your tenancy, occupancy and use of the premises of the above described property.""

**Count One Fraud**

"174.  As set forth above, Plaintiff **CEMG is the assignee of all claims of Conti arising out of or related to the July 1998 loans on Lots 3, 7, 9 and 14**."

"175.  The **Defendants**, and each of them, **knew that said representations and promises were false at the time they were made**, and Defendants, and each of them, **concealed said facts and made the representations and promises with the intent to induce** said lenders to make said loans and dues payments, and **with the intent to defraud and deceive said lenders, including without limitation, Conti."**

"176.  **Defendants Richard Sinclair**, Mauchley and Flake, commencing on or about 1995, and **continuing until at least 2003** and according to proof at trial, **knowingly agreed, colluded and conspired with each other and among themselves to fraudulently create the false appearance of a homeowners association and individually saleable lots** at Fox Hollow in order **to obtain loans** secured by portions of Fox Hollow and **to enrich themselves at the expense of the lenders**, the successors to the lenders and the homeowners association, by **skimming off loan proceeds, dues collected in the name of the homeowners association, and rental income and tenant deposits**, all while concealing their scheme and attempting to shield themselves from individual liability by creating shell companies and churning record title to the property (the "Fox Hollow Scheme")."

"177.  Defendant Mauctrst joined in, agreed to and become a part of Fox Hollow Scheme by on or about April 1998; Defendant Lairtrust joined in, agreed to and become a part of Fox Hollow Scheme on or about May 2000; Defendant Brandon Sinclair joined, agreed to on and become a part of Fox Hollow Scheme by in or about June 2000; and Defendant Capstone LLC joined in, agreed to and become a part of Fox Hollow Scheme by on or about December 2001."

"178.  **Defendants** agreed to, **participated in, aided and abetted, and committed acts in furtherance of** and in pursuance to **the Fox Hollow Scheme from on or about 1995 and to the present**, in that, among other things: Defendant Flake, as trustee of the Julie Insurance Trust, purchased the Fox Hollow Property from Stockton Savings Bank on or about October 31, 1995, with Defendant Flake, as trustee of the F. Hanse Trust proving the funds for the purchase; **Defendant Richard Sinclair** contacted the architect for the Project on or about November 1995, to let him know Defendant Flake would be paying the bills; Defendant Flake met with the architect for the Project and thereafter, on or about November 18, 1995, started paying the architect for his prior work on the Project; Defendant Flake continued to pay for architectural services with respect to the Fox Hollow Subdivision including, without limitation, on December 15, 1995; **Defendant Richard Sinclair** assisted Defendant Flake with respect to the subdivision; Defendant Flake, as trustee of the Julie Insurance Trust, signed the final map for Fox Hollow Lots 1, 11, 18 and 19 on or about November 10, 1995; **Defendant Sinclair** filed an unlawful detainer proceeding on January 18, 1996, in the Stanislaus County Municipal Court, Case No. 74645, on behalf of himself and Defendant Flake, as "Owner", on unit 103 at Fox Hollow; **Defendant Richard Sinclair** communicated with the City of Turlock and

worked with the civil engineer and architect for the Project to complete the final map for Fox Hollow Lots 1, 11, 18 and 19 and caused Fox Hollow Subdivision Map #1 to be recorded, on or about March 6,1996: **Defendant Richard Sinclair** revised and Defendant Flake as trustee of the Julie Insurance Trust, signed the Fox Hollow CC&Rs in September 1996; **Defendant Richard Sinclair** caused the Fox Hollow CC&Rs to be recorded, on or about September 16, 1996 and returned to "Mauctrst"; **Defendant Sinclair** filed an unlawful detainer proceeding on November 8, 1996, in the Stanislaus County Municipal Court, Case No. 81879, on behalf of himself and Defendant Flake, as "Owner", on unit 109 at Fox Hollow; **Defendant Richard Sinclair** assisted Defendant Mauchley in obtaining financing from GMAC in or about February 1997 for the Project as more specifically alleged herein; Defendant Flake in or about February 1997 requested and received an extension of time from the City of Turlock for one year to complete various improvements on the Fox Hollow Property with respect to the subdivision; **Defendant Richard Sinclair** facilitated the transfer of title of the Fox Hollow Property from Defendant Flake, as trustee of the Julie Insurance Trust, to Defendant Mauchley on February 26, 1997 as more specifically alleged herein; **Defendant Richard Sinclair** communicated with the City of Turlock and worked with the civil engineer and architect for the Project to complete a final map for the remaining Fox Hollow lots; Defendant Mauchley signed Fox Hollow Subdivision Map # 2 on or about February 27, 1998; **Defendant Richard Sinclair** signed and filed limited liability company articles of organization in the name of Mauctrst LLC with the California Secretary of State on or about April 28, 1998; **Defendant Richard Sinclair** assisted Mr. Mauchley over the period from on or about February 1998 to on or about July 1998 in obtaining fifteen (15) loans from several lenders against lots at the Fox Hollow Property as more specifically alleged herein; **Defendant Sinclair** sent a facsimile to the City of Turlock on February 20, 1998, forwarding an assignment from Defendant Flake to Defendant Mauchley; **Defendant Sinclair** sent a letter via facsimile to Mr. Sessions of GMAC Mortgage in Hawaii, on or about May 5, 1998, providing financial information concerning Mr. Mauchley; **Defendant Richard Sinclair** caused Fox Hollow Subdivision Map # 2 to be filed in the Official Records of Stanislaus County, California, on July 21,1998; Mr. Mauchley signed the loan documents for the July 1998 loans on or about July 9, 1998, including without limitation, the loan applications, promissory notes and deeds of trust that were recorded in the Official Records of Stanislaus County, on July 22, 1998; **Defendant Richard Sinclair** prepared and Mr. Mauchley signed a deed conveying title to the Fox Hollow Lots 1 through 19 to Mauctrst that was recorded in the Official Records of Stanislaus County, California, on or about July 29,1998; **Defendant Sinclair** prepared, filed and prosecuted unlawful detainer actions on behalf of himself and Mr. Mauchley as "Owner" in the Stanislaus County Superior Court, on unit 121 at Fox Hollow on or about October 5, 1998 (Case No. 182407),on unit 119 at Fox Hollow on February 1, 1999 (Case No. 1851990), on unit 127 at Fox Hollow on February 1, 1999 (Case No. 185201), on unit 121 at Fox Hollow on March 25,1999 (Case No. 186532), on unit 127 at Fox Hollow on June 4, 1999 (Case No. 228301), on unit 105 at Fox Hollow on June 16, 1999 (Case No. 228676), on unit 131 at Fox Hollow on February 14, 2000 (Case No. 252225), on unit 125 at Fox Hollow on March 17 ,2000 (Case No. 253689), on unit 117 at Fox Hollow on October 1, 2000 (Case No. 274533), on unit 116 at Fox Hollow on October 18, 2000 (Case No. 274549), and on unit 127 at Fox Hollow on March 6, 2001(Case No. 288094); in September 1999 and again in December 1999, **Defendant Richard Sinclair** filed schedules in the Mauctrst Bankruptcy Case on behalf of Mauctrst and Mr. Mauchley, stating under penalty of perjury that Mauctrst was owned fifty percent (50%) by Defendant Mauchley and fifty percent (50%) by his spouse, when Mr. Mauchley denies his spouse had any ownership interest in Mauctrst; **Defendant Richard Sinclair** in the name of Mauctrst and Mauchley, filed at least six (6) lawsuits in the Stanislaus Superior

Court between March 22, 2000 and July 21, 2000 (Case Nos. 253769, 254996, 269907, 270025, 271066 and 277115) and obtained preliminary relief delaying foreclosures on various lots at the Fox Hollow Property, and then lost all those case; in one of those cases (Case No. 254996)**, Defendant Richard Sinclair** in the name of Mauctrst and Mauchley, obtained a preliminary injunction enjoining the foreclosure on lots 9 and 14, and also claimed the preliminary injunction pertained to lots 3 and 7, that was conditioned upon them making the required monthly payments on the promissory notes as they come due, and then failed and refused to make a single payment and enjoyed the benefit of the injunction until 2003; **Defendant Richard Sinclair** prepared and filed with the California Secretary of State articles of organization for Defendant Lairtrust, on or about May 26, 2000; **Defendant Richard Sinclair** prepared documents that purported to be minutes of Fox Hollow homeowner's association board meetings over the period June through December 2000, that stated Mr. Mauchley was in attendance, when Mr. Mauchley denied attending any board meetings; **Defendant Richard Sinclair** and Defendant Brandon Sinclair signed a letter dated August l, 2000 in which the Fox Hollow HOA purportedly waived any conflict of interest arising by reason of **Defendant Richard Sinclair's** representation of the homeowner's association while also representing Brandon Sinclair and Mr. Mauchley in other matters, including matters against lenders who were foreclosing on and owned lots at the Fox Hollow Property; **Defendant Richard Sinclair** and Brandon Sinclair signed and mailed out dues statements, letters and notices of delinquent assessments to lenders over the period August 1, 2000, through January 31, 2001, in the name of Fox Hollow HOA, asserting dues of $300 per month per lot were due and payable to the homeowners association; on or about May 2001, **Defendant Richard Sinclair** negotiated and Defendants Mauchley and Flake signed a settlement agreement with GMAC under which Defendant Flake as Trustee of the Capstone Trust, would purchase lots 1, 11, 18 and 19, and then **Defendants Richard Sinclair**, Brandon Sinclair and Flake set up secret double escrows and concealed material facts from GMAC and the lenders as herein alleged; Defendant Brandon Sinclair signed and **Defendant Richard Sinclair** caused articles of organization for Defendant Capstone LLC to be prepared and filed with the California Secretary of State on or about December 3, 2001; **Defendants Richard Sinclair** transferred title to Lot 19 to Lairtrust on or about February 4, 2002; Defendants Brandon Sinclair transferred title to Lot 1 to Capstone LLC on or about February 4,2002; **Defendant Richard Sinclair** prepared, Defendant Mauchley executed and **Defendant Richard Sinclair** caused to be recorded in 2007, a deed conveying record title to the "A" lots to Defendant Lairtrust; **Defendant Richard Sinclair**, on behalf of Defendants Mauchley, Mauctrst and Flake sent Notices of Termination of Tenancy/Occupancy And Use Of Premises to Plaintiffs and the tenants at Fox Hollow in April 2008, purportedly to evict them from the common area and the "A" Lots at Fox Hollow; and **Defendant Richard Sinclair** filed in the names of Mauctrst and Lairtrust unlawful detainer actions in state court in July 2008 to evict CEMG and its tenants from the garages on Lots 2A and 9A."

"179.   **Defendants,** and each of them, **attempted to and intended to perfect and carry out the Fox Hollow Scheme** so that they could continue the scheme described above, or abandon the same at any time, and **all loss would fall on Bank One, GMAC, Conti, Absher-Avanta, HFC Beneficial, Plaintiffs and other lenders and members of the public** who might be induced to make loans on, invest in or purchase lots and units at Fox Hollow, while Defendants retained their profits from such scheme."

"180.   As a proximate result of the fraudulent conduct of Defendants as hereinabove alleged, **Conti Mortgage completed a foreclosure on and Lot 7 on or about**

**June 6, 2000 for a credit bid of only $85,000 when $144,595.85** was due and owing on the loan at the time, and was thereby damaged in the amount of approximately $50,000 and according to proof at trial, and sold Lot 7 and the loans on Lots 3, 7, 9 and 14 to Plaintiff CEMG **for a loss of more than $500,000** and according to proof at trial."

"181.   Further, **Plaintiff CEMG as a proximate result of such fraudulent conduct**, in addition to the claims assigned to it by Conti, **was required to and did incur expenses in correcting and remedying the failure to complete the requirements for the subdivision map and otherwise rehabilitate Lots 3, 7, 9 and 14 in an amount in excess of $280,000** and according to proof at trial, and otherwise incurred expenses and lost profits relating the individual lots at Fox Hollow."

"182.   Further, Plaintiff Fox Hollow HOA as a proximate result of such fraudulent conduct, was required to and did: incur and pay receivers fees and receivers attorneys fees in the amount of $28,265.28, incur and pay expenses in correcting and remedying the failure to complete the requirements for the subdivision map and otherwise rehabilitate the common area in an amount in excess of $300,000 and according to proof at trial and was deprived of homeowners dues collected and retained by defendants in an amount according to proof at trial.

"183.   In doing the things alleged herein, **Defendants, and each of them**, acted **willfully and with the intent to cause injury** to Bank One, GMAC, Conti, Absher-Avanta, HFC-Beneficial, Plaintiff CEMG as assignee of the claims of Conti, and Plaintiffs individually, **and in conscious disregard of the rights of** Bank One, GMAC, Conti, Absher-Avanta, HFC-Beneficial, Plaintiff CEMG as assignee of the claims of Conti, and Plaintiffs individually, thereby **warranting an assessment of punitive damages in an amount appropriate to punish Defendants**, and each of them, and to deter others from engaging in similar misconduct."

**Count Two RICO**

"192.   At all times relevant herein from and after on or about 1995**, Defendants Richard Sinclair**, Mauchley and Flake **formed an association-in-fact to own and operate Fox Hollow** and divide among themselves money and benefits derived therefrom. **This association-in-fact was an "enterprise" within the meaning of RICO**, 18 U.S.C. § 1961(4)."

"193.   At all times relevant herein from and after April 1998, Defendant Mauctrst joined said association-in-fact. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. §  1961(4)."

"194.   At all times relevant herein from and after May 2000, Defendant Lairtrust joined  said association-in-fact. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. §  1961(4)."

"195.   At all times relevant herein from and after June 2000, Defendant Brandon Sinclair joined said association-in-fact. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. §  1961(4)."

"196.   At all times relevant herein from and after December 2001, Defendant Capstone LLC joined said association-in-fact.  This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4)."

"197.   At all relevant times, said enterprises were engaged in, and their activities

43

affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c)."

"198.　**The RICO Defendants** [including Defendant-Sinclair], for purposes of **executing such scheme and artifice to defraud and for obtaining money**, loans and property **by means of a false or fraudulent pretense, representation and promise**, and attempting to do so, transmitted and caused to be transmitted by means of wire communications in interstate or foreign commerce writings and signals ("Wiring"), and also deposited, caused to be deposited and authorized the following materials and things to be placed in any post office or authorized depository, or deposited or caused to be deposited the following matters or things to be sent or delivered by private or commercial interstate carrier ("Mailing"): Wiring and/or Mailing loan applications and other loan documents for the February 1997 loans; Wiring and/or Mailing demands for payments into the escrows relating to the February 1997 loans; causing the funds from the lender to be Wired or Mailed into and disbursed from the five (5) escrows for the February 1997 loans; Wiring and/or Mailing the loan applications and other loan documents for the July 1998 loans; Wiring and/or Mailing demands for payments into the escrows relating to the July 1998 loans; causing the funds to be Wired and/or Mailed into and disbursed from the fifteen (15) escrows for each of the July 1998 loans; Mailing dues statements to the lenders over the period of August through December 2000 as hereinabove alleged; Mailing the notices of delinquent assessment to the lenders on or about December 19, 2000 and on or about January 22, 2001, as hereinabove alleged; Wiring and/or Mailing the settlement agreement with GMAC as herein alleged; Wiring and/or Mailing the loan application and other loan documents relating to the loan on Lot 19 that closed on or about August 2, 2001, and on Lot 1 that closed on or about December 10, 2001; Wiring and/or Mailing demands for payments into the escrows relating to the loan on Lot 19 that closed on or about August 2, 2001, and on Lot 1 that closed on or about December 10, 2001; causing the funds to be to be Wired or Mailed into and disbursed from the escrow for the loan on Lot 19 on or about August 2, 2001and for the loan on Lot 1, on or about December 10, 2001."

"199. At all times relevant herein, **RICO Defendants conducted or participated**, directly or indirectly, **in the conduct** of the enterprise's affairs **through a "pattern of racketeering activity"** within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c)."

"200. Specifically, at all relevant times, **RICO Defendants engaged in "racketeering activity"** within the meaning of RICO, 18 U.S.C. § 1961(1), by engaging in the acts set forth above. The acts set forth above **constitute** a violation of one or more of the following statutes: 18 U.S.C. § 1341 (**mail fraud**); and 18 U.S.C. § 1343 (**wire fraud**). RICO Defendants each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity."

"201.　**The acts of racketeering activity referred to in the previous paragraph constitute a "pattern of racketeering activity"**, within the meaning of 18 U.S.C. § 1961(5). The acts alleged were related to each other by virtue of common participants, common victims and a common method of commission, and the common purpose and common result of defrauding the lenders and Fox Hollow HOA and enriching the Defendants at the expense of the lenders and Fox Hollow HOA while concealing Defendants fraudulent activity."

"202. At all relevant times, the **RICO Defendants** each were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), in that they **agreed to conduct and participate, directly and indirectly, in the conduct of**

**affairs of the enterprise through a pattern of racketeering activity**, as alleged herein, in violation of 18 U.S.C. § 1962(d)."

"203.  The RICO Defendants committed and caused to be committed a series of overt acts in furtherance of such conspiracy and to affect the objects thereof, including but not limited to the acts set forth above."

"204.  As a result of RICO Defendants' violations of 18 U.S.C. §§ 1962(c) and (d) and each of them, the Fox Hollow HOA incurred expenses and has been damaged as herein alleged in an amount according to proof at trial, including, but not limited to, receivers fees and receivers attorneys fees, expenses in correcting and remedying the failure to complete the requirements for the subdivision map and otherwise rehabilitating the property, and for homeowners dues collected and retained by defendants."

"205.  As a result of RICO Defendants' violations of 18 U.S.C. §§ 1962(c) and (d) and each of them, **Plaintiff CEMG has incurred expenses and been damaged** as alleged herein, and according to proof at trial, **including, but not limited** to, **losses suffered by Conti on the foreclosure** on Lot 7 **and on the sale of loans** on Lots 3, 7 , 9 and 14 to CEMG, the costs and expenses incurred in **correcting and remedying the failure to complete the requirements for the subdivision map** and otherwise rehabilitate Lots 3, 7, 9 and 14, **loans made to Fox Hollow HOA to cover a portion of the fees** and **expenses incurred by it as a result of the conduct of Defendants** as alleged herein, expenses incurred and profits lost relating the individual lots at Fox Hollow, and the payments of deposits to tenants that Defendants wrongfully withheld."

"206.  Pursuant to RICO, 18 U.S.C. § 1964(c), Fox Hollow HOA and **CEMG** are **entitled to recover three-fold their damages plus costs and attorneys' fees** from the RICO Defendants."

**Count Three Unjust Enrichment**

"209.  As a result of the conduct of Defendants, they have been unjustly enriched at the expense of Plaintiff and the law thereby implies a contract by which Defendants must pay to Plaintiffs the amount by which, in equity and good conscience, the **Defendants have been unjustly enriched at the expense of Plaintiffs.**"

**Count Four Accounting**

"212.  Defendants, as alleged herein, collect dues and assessments on behalf of the homeowners association, paid themselves funds rightfully belonging to the homeowners association, and collected rents and deposits from tenant of units at Fox Hollow at times when such Defendants did own the units."

"213.  The amount of money due from Defendants to Plaintiffs is unknown to Plaintiffs and cannot be ascertained without an accounting of such dues, assessments, payments, rents and deposits."

**Count Five Constructive Trust Re: Garage Lots**

"216.  The lenders who made the February 1997 loans and July 1998 loans commissioned appraisals of the unit or units identified in each loan application, and received appraisals listing each unit as having a one car garage."

"217.   On or September 15, 1998, Defendant Mauctrst filed with the California Department of Real Estate a Notice of Intention (Common Interest) on Fox Hollow of Turlock ("Notice"). The Notice, at page 3, Section 2.L, provides that the improvements at Fox Hollow of Turlock will contain one "1 car garage for each residential unit, and common area parking spaces.""

"218.   The legal description in the deeds of trust executed by Defendant Mauchley for the February 1997 and July 1998 loans were prepared, at least in part, by employees of the title company retained in connection with each particular transaction and were ambiguous in that they included the unit number or numbers as a description of the property and also included a lot number for Lots 2, 6, 7, 8, 9, 10 and 18 without including the "A" lot for the corresponding one garage for the unit or units described in the deed of trust."

"219.   Defendant Mauchley, by virtue of applying for such loans based upon unit numbers and under the circumstances as alleged herein, agreed either expressly or impliedly to include as collateral for and is estopped from denying that the collateral for such loans did not include, the corresponding one-car garage for each unit."

**Count Six Declaratory And Injunctive Relief Re: Garage Lots**

"227.   **Defendants have and threaten to continue to claim ownership in the "A" Lots at the Fox Hollow Property and to harass the tenants thereon**, and accordingly, an injunction should issue enjoining and restraining Defendants and each of them from asserting, claiming or communicating to tenants at the Fox Hollow Property that they, or any of them, hold or claim any ownership in and to such any such "A" Lots, or otherwise to interfere with the use and enjoyment of such "A" Lots by Plaintiffs and any tenants at Fox Hollow."

**Count Eight Specific Performance Re: Common Area**

"250.   **Defendants have and threaten to continue to claim ownership in the Fox Hollow Common Area and to harass the tenants of CEMG** at the Fox Hollow Property, and accordingly, an **injunction should issue enjoining and restraining Defendants and each of them from asserting, claiming or communicating to tenants at the Fox Hollow Property** that they, or any of them, hold or claim any ownership in and to the Fox Hollow Common Area, or otherwise from interfering with the use and enjoyment of the Fox Hollow Common Area by Plaintiffs and any tenants at the Fox Hollow Property."

**III. Findings of Fact from the Prove Up Hearing**

"251.   On September 13, 2002, Plaintiff CEMG purchased Lots 3 , 7 , 9, and 14 from Conti for $61,250 each. Ex. 11, pages 3 and 4. **The price of Lots 9 and 14 were reduced to $52,500 in light of legal challenges raised by Defendants**. Doc. 1237, Transcript,3l:32-33:5. Ex. 11, Addendum."

"252.   The amount owing on the loans at the time Conti sold them was $193,678.11 for Lot 3, $144,595.85 for Lot 7, $199,995.14 for Lot 9, and $199,370.55 for Lot 14. Exs. 13, 14, and 15; Doc. 1237,Transcript, 34:17-36:6. **Conti suffered a total loss of $510,139.65 due to selling the loans for less than the outstanding loan balance**. Ex. 16; Doc. 1237, Transcript, 36: 18-37:14."

"253.   **In order for the subdivision of Fox Hollow to be approved by the City of**

**Turlock, improvements had to be made, including** "installing twenty-seven (27) firewalls for the garages, three (3) fire walls in the units, eliminating six (6) roof overhangs, removing seven (7) windows, and adding two (2) roof vents." Doc. 410, CAC, ¶¶ 35-38. Plaintiffs hired architect Vernon Fergel to determine what needed to be done on Fox Hollow to permit subdivision. Doc. 1237, Transcript, 48:11-21. The building code analysis by Fergel recommended installing firewalls for garages, installing firewalls for certain units, eliminating certain roof overhangs, and checking or adding smoke detectors. Ex. 18."

"254. The **physical condition of the Fox Hollow project**, both structures and grounds, **in late 2002 was poor**. Ex.17; Doc.1237, Transcript, 38:1-46:19. In rehabilitating its Lots, Plaintiff CEMG, substantially replaced the interior of the buildings, leaving only the foundations, studs, and sheetrock. Doc. 1237, Transcript, 50:17-23."

"255. **The total cost of rehabilitating was** $75,068.08 for Lot 3, $69,348.75 for Lot 7, $78,781.16 for Lot 9, and $68,955.14 for Lot 14 for **a total of $292.153.13**. Ex. 20; Doc. 1237, Transcript, 53:16-54:5.

"256. Plaintiff Fox Hollow HOA rehabilitated the common areas. Doc. 1237, Transcript, 49:12-50:6. Plaintiff Fox Hollow HOA spent a total of $350,110.95 in 2003 and 2004 on these projects. Doc. 1237, Transcript, 80:4-82:7 ; Exs. 24-25 .

"257. Plaintiff CEMG planned to sell the Lots after remodeling them. Doc. 1237, Transcript, 58:1-3. However, California's Department of Real Estate would not give the necessary approval because "one of the issues had to do with the common ownership of the - - the road. And there was some garage lots that were retained by Mr. Sinclair's group, so he basically held those captive. Therefore, not allowing us to finalize the DRE white report." Doc. 1237 , Transcript, 58:6-20; See Ex. 36. **The dispute over ownership of the common areas and the garage lots prevented the Lots from being sold to the general public."**

"259. Plaintiff CEMG had a real estate appraisal of their Fox Hollow Lots done in 2004. The report of December 12, 2004 by W.G. Bartha & Associates estimated that the Lots would sell for a total of $6,350,000. Ex. 37. Katakis estimated that in that time frame, each duplex was worth $410,000 and each single family unit was worth $205,000 for a total of $6,355,000. Doc.1237, Transcript, 66:8-19; Ex. 38, page 2. In contrast, Katakis estimated that as of May 28, 2015, each duplex was worth $253,746.91 and each single family unit was worth $141,751.25 for a total of $3,977,710.47. Doc.1237, Transcript, 66:20-67:5: Ex. 38, page 1. After taking into [account] the cost of marketing and actual sales, Katakis estimates that Plaintiff CEMG lost $2,353,516.63 in not being able to sell the Lots in 2004-2005. Doc. 1237, Transcript, 67:19-25. **Delay in the sale of the Lots cost Plaintiff CEMG $2,353,516.63.**"

"262. Plaintiffs reached a settlement with Defendant Mauchley. Doc. 1237, Transcript, 68:21-22. To settle the CAC part of their dispute, Defendant Mauchley agreed to transfer to Plaintiffs three pieces of property worth a total of $460,000 and a $50,000 promissory note. Ex. 42. Katakis stated that the promissory note is worthless as it was discharged in bankruptcy. Doc. 1237, Transcript, 70: 19-25. The total amount set aside to settle the claims contained in the CAC is $460,000."

"263. Plaintiffs reached a settlement with Flake Defendants. Doc. 1179. To settle the CAC part of their dispute these Defendants agreed to pay Plaintiffs $2,625,000 (70% of the total settlement amount of $3,750,000). Doc. 1237, Transcript,72:8-10.

Katakis stated that a part of that amount was spent on attorney's fees, leaving $2,297,793 to settle the substantive claims contained in the CAC. Doc.1237, Transcript, 72:11-73:5; Ex.44."

**IV. Conclusions of Law**

**A. Sufficiency Of The Claims**

**1. RICO**

"274.    "[P]leading requirements should be enforced strictly when default judgments are sought under RICO. Not only is the monetary penalty for failure to answer greatly enhanced by the provisions for treble damages, but a defendant's reputation may be stigmatized." *Alan Neuman Productions. Inc. v. Albright*, 862 F.2d 1388, 1393 (9th Cir. 1988), citations omitted. In light of this admonition, Plaintiffs' RICO claim is read narrowly to focus on the more specific factual assertions."

"275.    Plaintiffs summarize the nature of the RICO claim as Defendants "knowingly agreed, colluded and conspired with each other and among themselves to fraudulently create the false appearance of a homeowners association and individually saleable lots at Fox Hollow in order to obtain loans secured by portions of Fox Hollow and to enrich themselves at the expense of the lenders, the successors to the lenders and the homeowners association, by skimming off loan proceeds, dues collected in the name of the homeowners association, and rental income and tenant deposits, all while concealing their scheme and attempting to shield themselves from individual liability by creating shell companies and churning record title to the property." Doc. 410, CAC, ¶ 151. The specific actions Plaintiffs cite as constituting the heart of the RICO claim are set out in detail in Paragraph 153. Doc. 410, CAC, ¶ 153."

"276.    **One part of the scheme was obtaining mortgages for the various Fox Hollow lots in 1997-98 while making misrepresentations and withholding material information from the lenders**. To borrow the money, **Defendants created the false appearance of an arms length transaction between Defendants Flake and Mauchley**. Doc. 410, CAC, ¶ 52. The Fox Hollow CC&Rs were executed and recorded on September 16,1996 by Defendants Flake and Richard Sinclair. Doc. 410, CAC, ¶ 44. It spelled out the operation and rules of the Fox Hollow HOA. Doc. 410, CAC, ¶¶ 45-50. In particular, it required transfer to the HOA of "fee title to the common area for the Fox Hollow Property free and clear of all liens and encumbrances 'prior to the conveyance of title to the first lot." Doc. 410, CAC, ¶ 49. The deeds of trust for these mortgages also included a Planned Unit Development Rider which specified that the loan also included an interest in the HOA and that Defendant Mauchley as the borrower promised to abide by the articles of incorporation of the HOA. Doc. 410, CAC, ¶¶ 57 and 69. The mortgages were conditioned upon the Lots being individually saleable. Doc. 410, CAC, ¶ 63. However, **Defendants did not incorporate the Fox Hollow HOA until December 6, 2000.** Doc. 410, CAC, ¶ 95. **There is still a cloud over the title of the common areas as Defendants refused to transfer them to Fox Hollow HOA**. At the time Defendant Mauchley obtained the loans "there was no homeowners association or equivalent entity to own or manage the common area and facilities of the PUD; title to the common area had not been transferred to a homeowners association; and **Defendants Richard Sinclair**, Mauchley and Flake, and each of them, **had no intention at that time to form a homeowners association, to transfer title to the common area, or to charge and collect dues and assessment to maintain the common area and lots**, all as required of them in the Fox Hollow

CC&Rs and by the conditions of approval by the City of Turlock for the Project." Doc. 410, CAC, ¶¶ 58 and 70. Plaintiffs allege that **Defendants concealed these facts from the Lenders**. Doc. 410, CAC, ¶ 58. In obtaining the loans, Defendants used mails and/or interstate phone calls or electronic communications. Doc. 410, CAC, ¶ 173. Properties on a Fox Hollow development that did not have an HOA and have been subdivided to be individually saleable are worth less than properties in a project that have those tasks completed. **Defendants were aware that whether a Lot was individually saleable was an important distinction in determining the worth of the Properties**. In 2000, Defendants sent the Lenders letters through the mail that revealed these problems in a bid to buy back the deeds of trust from the Lenders for less than the amount outstanding on the loans. Doc. 410, CAC, ¶¶ 77 and 85. **By misrepresenting the state of the Fox Hollow development when initially obtaining the mortgages, Defendants defrauded the Lenders.** A related matter is ownership of the garages associated with the Lots, In obtaining the mortgages, **Defendants "concealed from each of the lenders that the corresponding one car garages" for Lots 2, 6, 7, 8, 9, 10, and 18 were not included in the legal description in the deed of trust for the loan."** Doc. 410, CAC, ¶¶ 59 and 71. Again, this would act to decrease the value of the Lots. **Defendants continue to use the state of subdivision and question over title to the garages to frustrate Plaintiff CEMG's attempts to sell the Lots it owns."**

"277. Another **part of the scheme involved misusing the name of Fox Hollow HOA** to **fraudulently obtain money from the Lenders**. The **Lenders** (and their successors) **foreclosed on the various Fox Hollow Lots** in 2000-2003. Doc. 410, CAC, ¶ 89. **Yet** starting on August 1, 2000 (before the HOA's incorporation), **Defendants Richard Sinclair**, Mauchley, and Brandon Sinclair **represented themselves as the Board of Directors of the Fox Hollow HOA** and through the mail demanded monthly dues of $300 upon the Lenders who successfully foreclosed. Doc. 410, CAC, ¶ 90. GMAC paid the amounts Defendants, representing themselves as Fox Hollow HOA, demanded. Doc. 410, CAC, ¶ 96."

"278. "Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.' 18 U.S.C. § 1964(c). Plaintiffs assert that Defendants' actions violated 18 U.S.C. § 1962(c) and (d). Doc. 410, CAC, ¶ 180. Under federal RICO law, '(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt. (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.' 18 U.S.C. § 1962(c) and (d). 'To state a claim under § 1962(c), a plaintiff must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 547 (9th Cir. 2007), citations omitted."

"279. An "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "[A]n association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). "[B]are assertions of a pattern of racketeering activity do not establish an enterprise." *Doan v. Singh*, 617 Fed. Appx. 684, 686 (9th Cir. 2015). Plaintiffs'

factual allegations in the CAC adequately describe conduct of an enterprise consisting of "an association-in-fact to own and operate Fox Hollow and divide among themselves money and benefits derived therefrom" with activities connecting Defendants with the enterprise taking place between 1995 and 2001. Doc. 410, CAC, ¶ 167. Each of the Defendants participated and took action on behalf of the association-in-fact."

"280.  A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). "RICO defines as racketeering activity only acts that are 'indictable' (or, what amounts to the same thing, 'chargeable' or 'punishable') under one of the statutes identified in § 1961(1)" *RJR Nabisco Inc. v European Cmt.*, 136 S. Ct. 2090, 2102 (2016). Section 1961(1) includes "any act which is indictable under any of the following provisions of title 18, United States Code:... section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)." 18 U.S.C. § 1961(1)(B). Plaintiffs allege multiple acts of mail and wire fraud undertaken by the association-in-fact between 1997 and 2001. Doc. 410, CAC, ¶ 173. Mail fraud is defined as "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1341. Wire fraud is defined as "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1343. "Sections 1341 and 1343 reach any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter v. United States*, 484 U.S. 19, 27 (1987). "[C]auses to be delivered" and "causes to be transmitted" is interpreted broadly. *United States v. Garner*, 663 F .2d 834, 838 (9th Cir. 1981), citing *United States v. Maze*, 414 U.S. 395, 399 (1974) ("the government may prove the use of the mails for the purpose of executing a scheme to defraud by showing that a defendant acted knowing that the use of the mails would follow in the ordinary course of business, or that, even when not intended, such use was reasonably foreseeable. In addition, the mailings need not be an essential part of the contemplated scheme, they need only be made for the purpose of executing the scheme"). Plaintiffs have alleged multiple acts of mail and/or wire fraud in connection with their scheme. Each of the Defendants intended to participate in the scheme to defraud the Lenders."

"281.  These activities affected interstate commerce. 'A minimal effect on interstate commerce satisfies this jurisdictional element.' *United States v. Bagnariol*, 665 F.2d 877, 892-93 (9th Cir. 1981) (noting that 'interstate telephone calls' could suffice).

Plaintiffs specifically alleged that Defendant Richard Sinclair sent a letter via facsimile to Mr. Sessions of GMAC Mortgage in Hawaii on May 5, 1998 providing financial information on Defendant Mauchley in support of the mortgage application. Doc. 410, CAC, ¶ 153."

"282.   Plaintiffs have stated RICO claims against all the Defaulted Defendants."

**B. Money Damages**

**1. RICO**

"297.   "Any person injured in his business or property by reason of a violation of section 1962 of this chapter [18 U.S.C. § 1962] may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1964(c). **The trebling of civil RICO damages is mandatory**. See *Allstate Ins. Co. v. Nassiri*, 2013 U.S. Dist. LEXIS 98348, *5-6 (D. Nev. July 15, 2013) ("Having reviewed 18 U.S.C. § 1964(c), the court finds that it is required to treble damages"); *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 277 (9th Cir. 1988) ("the treble damages mandated by RICO"). Section 1964(c) "requires the plaintiff to establish proximate cause in order to show injury 'by reason of a RICO violation.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008). Civil RICO allows for joint and several liability. See *Beneficial Standard Life Ins. Co. v. Madariaga*, 851 F.2d 271, 272 (9th Cir. 1988) (noting that the district court issued a judgment finding defendants joint and severally liable); *Fleischhauer v. Feltner*, 879 F .2d 1290, 1301 (6th Cir. 1989) ("the nature of the RICO offense mandates joint and several liability")."

"298.   **As part of the purchase of Lots 3, 7, 9, and 14, Plaintiff CEMG acquired from Conti an assignment of all associated legal and equitable claims**. Doc. 1237, Transcript, 33:6-16; Ex. 11, pages 3 and 4. "[F]ederal courts have consistently held that parties may assign RICO claims." *HIF Bio. Inc. v. Yung Shin Pharms. Indus. Co.*, 2006 U.S. Dist. LEXIS 97002, *14 (C.D. Cal. June 9, 2006), citing *Lerman v. Joyce Int'l*, 10 F.3d 106, 112-13 (3rd Cir. 1993) and *In re National Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litigation*, 636 F. Supp. 1138, 1156 (C.D. Cal. 1986). For these Lots, **Plaintiff CEMG (standing in the shoes of Conti) is the proper party to seek RICO damages**. Granite Bay Funding was the original lender on the mortgages secured by first deeds of trust for Lots 3, 7, 9, and 14 in July 1998; Conti acquired those loans from Granite Bay Funding in August 1998. Doc. 410, CAC, ¶ 73. Granite Bay kept the loans for only a month. There is no indication that Granite Bay suffered any financial repercussions due to Defendants' fraud. Defendants concealed the failure to complete the subdivision through November 18, 1999. Doc. 410, CAC, ¶¶ 77 and 85. When Conti sold Lots 3, 7, 9, and 14 to Plaintiff CEMG in 2002, Defendants had already defaulted on the mortgages. Conti sold the loans to Plaintiff CEMG for less than the amount owed. **Conti suffered a financial loss of $510,139.65 due to Defendants' actions. Ex. 16. The trebled amount is $1,530,418.95.**"

"299.   Plaintiff CEMG claims $292,153.13 in "compliance/rehab costs" for Lots 3, 7, 9, and 14. Ex. 20. Defendant Richard Sinclair objected to this category of damages as much of the money was spent 'to spruce up a 20+ year old building.' Doc. 1208, Opposition to Motion for Default Judgment, pages 89-90. At the prove up hearing, Katakis testified that the rehabilitation of those Lots was extensive: "We replaced almost everything inside. When I say everything, I mean everything, from Sheetrock to all flooring, to electrical, all outlets, all cabinetry, all hard surfaces, tile work, all

plumbing, all light fixtures, just go on and on. The only things that weren't replaced for the most part were the foundations and studs and Sheetrock. Everything else had to be replaced." Doc. 1237, Transcript, 50:17 -23. The report by the architect Fergel, who evaluated what was required for the "Proposed Planned Development (P.D.) zoning to convert existing apartments to duplexes and single units" did not call for redoing the interiors; instead, the report recommended installing firewalls for garages, installing firewalls for certain units, eliminating certain roof overhangs, and checking or adding smoke detectors. Ex. 18. **Plaintiffs stated that the rehab "included completing the requirements of the City of Turlock for separate ownership of the lots, and also a complete renovation of the exteriors and interiors of many of the units that were no longer habitable."** Doc. 401, CAC, ¶ 135, emphasis added. Thus the total figure Plaintiff CEMG requests includes monies expended to make corrections necessary to subdivide Fox Hollow as well as funds spent on other improvements. The evidence presented does not allow for clarifying which expenditures were which. Failing to keep up with general repairs on the individual Lots is not part of Plaintiffs' RICO claim. See Doc. 410, CAC, ¶ 153. **Plaintiff CEMG has not provided sufficient evidence to determine how much it spent to complete the changes required to gain approval for subdivision. This request for** [compliance/rehab] **damages is denied."**[8]

"300.   Plaintiff CEMG has owned 17 of the 19 Fox Hollow Lots (all but Lots 1 and 19) since 2003. Doc. 410, CAC, ¶¶ 120-128, **Plaintiff CEMG was prevented from selling the Lots to individual buyers due to Defendants' failure to transfer certain garage spaces to Plaintiff CEMG and the common areas to Plaintiff Fox Hollow HOA**. As a consequence, Plaintiff CEMG could not sell their Lots in late 2004, early 2005 when real estate prices were high. **Plaintiff CEMG has suffered a loss of $2,353,516.63 due to the delay. Doc. 1237, Transcript, 67:19-25 . The trebled amount is $7,060,549. 89."**

## V. Order

"317.   **Defaulted Defendants' RICO violations caused Conti $510,139.65 in damages and Plaintiff CEMG of $2,353,516.63 in damages**. Conti has assigned its rights to Plaintiff CEMG. Treble damages apply. Plaintiff CEMG would be awarded $8,590,968.84 against the Defaulted Defendants, jointly and severally."

"318.   The settlement with Defendant Mauchley and the Flake Defendants has yielded $460,000 and $2,297,793 respectively in funds available to satisfy this judgment.  The total sum of $2,757,793 shall be used to offset the RICO award. **Thus, the amount awarded to Plaintiff CEMG against the Defaulted Defendants is reduced to $5,833,175.84.**"

"320.   Defaulted Defendants' fraudulent conduct resulted in a cloud over the title of certain garage lots. Plaintiff CEMG is entitled to and owns and holds the right to possession of Lots 2A, 6A, 7A, 8A, 9A, 10A. and 18A of the Fox Hollow property according to Fox Hollow, a subdivision, recorded in the Official Records of Stanislaus County, California, on March 6, 1996, in Book 37 of Maps, Page 37, and Fox Hollow No. 2, a subdivision, recorded in the Official Records of Stanislaus County, California, on July 21, 1998, in Book 38 of Maps, Page 19 (the 'detached

---

[8]  It is clear that the RICO Decision is not merely a default for which relief was "automatically" granted, but made upon a detailed consideration of the evidence and clean findings of the District Court. Defendant-Sinclair actively litigated against the entry of the judgment through the prove-up hearing required by the District Court judge.

garage lots') as of the commencement of the action in April 2003, and such Defaulted **Defendants and each of them have no ownership of or right to exclude Plaintiffs or any of the tenants at Fox Hollow from any such detached garage lots**. **Defendants Richard Sinclair**, Mauctrst, and Lairtrust, and each of them, and their agents, servants, and employees, and all other persons **acting under, in concert with or for them, are permanently enjoined from asserting, claiming or communicating to tenants at the Fox Hollow property** (located at 152 20th Century Boulevard, Turlock, Stanislaus County, California) that they or any of them hold or claim any ownership or right to possession for the detached garage lots or otherwise from interfering with the use and enjoyment of any of the detached garage lots by Plaintiffs and the tenants at the Fox Hollow property."

321.    Defaulted Defendants' fraudulent conduct resulted in a cloud over the title of the common areas. Plaintiff Fox Hollow HOA is entitled to ownership in and the right to possession of the Common Area and Access Easement and Public Utility Easement depicted on Fox Hollow No. 2 subdivision map filed of record in Stanislaus County, California, on July 21, 1998, in Book 38, Page 19 (the 'Fox Hollow Common Area') as of the commencement of the action in April 2003, and such Defaulted Defendants and each of them have no ownership of or right to exclude Plaintiffs or any of the tenants at Fox Hollow from the Fox Hollow Common Area. Defendants Richard Sinclair and Mauctrst, and each of them, and their agents, servants, and employees, and all other persons acting under, in concert with or for them, are permanently enjoined from asserting, claiming or communicating to tenants at Fox Hollow that they or any of them hold or claim any ownership or right to possession for the Fox Hollow Common Area or otherwise from interfering with the use and enjoyment of the Fox Hollow Common Area by Plaintiffs and the tenants at the Fox Hollow property."

"322.  Plaintiffs may file a motion for attorney's fees and cost bill in accord with Local Rules 292 and 293."

**ADDITIONAL FINDINGS AND CONCLUSIONS FROM:**
**(1) THE 2014 SINCLAIR BANKRUPTCY CASE,**
**(2) STATE COURT DECISION,**
**(3) STATE BAR COURT DECISION**
**TO WHICH THE DOCTRINE OF COLLATERAL ESTOPPEL APPLIES**

**2014 Sinclair Bankruptcy Case and**
**Adversary Proceeding 15-9009**

In Adversary Proceeding 15-9009, Plaintiff-CEMG is one of several parties that have obtained an order granting summary judgment ("MSJ Nondischargeability Decision") that the obligations arising out of the Final State Court Judgment are nondischargeable as having arisen from the willful and malicious conduct of Defendant-Sinclair. *Katakis et al. v. Sinclair*, Bankr. E.C. Cal. Adv. 15-9009.

In that Adversary Proceeding, the court applied the doctrine of collateral estoppel to the State Court Decision and Final State Court Judgment thereon, the two decisions of the California District

1  Court of Appeal affirming the State Court Decision and the Final State Court Judgment and award

2  of attorney's fees thereon; and the State Bar Court Decision.

3          In the MSJ Nondischargeability Decision, this court reviewed this court's prior

4  determinations that Defendant-Sinclair has not suffered from the asserted "disabilities," including

5  identifying various federal and state court matters litigated by Defendant-Sinclair, including several

6  appeals before the California District Court of Appeal. 15-9009; MSJ Nondischargeability Decision,

7  Dckt. 107 at pp. 19:20-28, 20:1-8, 32:12-28, 33:1-6.

8          This court readdressed the repeated contention of there being a "disability" in the decision

9  denying Defendant-Sinclair's motion for reconsideration of this court's order approving the

10  settlement of the estate's claims against Plaintiff-CEMG and its related entities.  2014 Sinclair

11  Bankruptcy Case; Decision,  Dckt. 639 at pp. 15:17-22:15.  This court's decision in denying the

12  motion to reconsider included, "The court continues to determine that the asserted 'disability' is a

13  sham and fraud being perpetrated by Debtor."  *Id.* at 22:14-15.  That decision included a summary

14  of bankruptcy court, District Court, and California Court of Appeal (but not any superior court)

15  decisions reported on LEXIS-NEXIS during the period 2010 through 2017 (with Defendant-Sinclair

16  being suspended from the practice of law in the Summer of 2015), which total 35 different reported

17  decisions.

18          This court has previously concluded that applying the rules of collateral estoppel for the

19  Final State Court Judgment, Defendant-Sinclair's conduct relating to the Fox Hollow Property from

20  the early 1990s through the 2014 Sinclair Bankruptcy Case establishes a scheme of willful and

21  malicious conduct rendering the Final State Court Judgment nondischargeable. 15-9009, Dckt. 107.

22  The damages determined nondischargeable in Adversary Proceeding 15-9009 are the attorney's fees

23  and costs awarded as part of the Final State Court Judgment and for the appeals taken by Defendant-

24  Sinclair therefrom.

25          This court's findings and conclusions in the MSJ Nondischargeability Decision, drawn from

26  the Final State Court Judgment, State Court Decision, two District Court of Appeal Decisions, and

27  the State Bar Court Decision are similar to those in the RICO Decision.  The RICO Decision goes

28  into even greater detail of Defendant-Sinclair's Fox Hollow Scheme that unfolded over the years

and decades to try and draw as much economic value from the Fox Hollow Property at the cost and expense of others.

The RICO Decision also includes findings of Defendant-Sinclair's fraud, causing damages to Conti Mortgage and that those rights have been assigned to Plaintiff-CEMG as part of its purchase of the promissory notes which were the subject of Defendant-Sinclair's actual fraud.

## STATE COURT DECISION

**Exhibit 13, Dckt. 73.**

Defendant-Sinclair and the Katakis Plaintiffs (including Plaintiff-CEMG) have litigated and previously determined facts in the prior State Court Action that also arise in this Adversary Proceeding. The court again determines that the Findings and Determinations of the State Court in the State Court Decision are properly the subject of collateral estoppel in this Adversary Proceeding. Applying the five factor test as discussed below, the court concludes the doctrine of collateral estoppel applies for all findings and determinations in the State Court Decision set forth in Addendum "B."

First, the facts and determinations presented from the Final State Court Judgment and State Court Decision to be given collateral estoppel effect are those applicable to the determination of nondischargeability pursuant to 11 U.S.C. § 523(a)(2)(A) and (a)(6).

Second, the issues were actually litigated as part of a 36-day trial in the State Court Action.

Third, the issues for which collateral estoppel apply were those necessarily and expressly determined by the State Court.

Fourth, the Final State Court Judgment is "final" and has been affirmed on appeal. While Defendant-Sinclair now argues that in 2017 he thinks that the Final State Court Judgment should be attacked, it has not been during the years preceding the commencing of the Bankruptcy Case and has not been vacated.

Fifth, Defendant-Sinclair was a party in the State Court Action, the issues were determined after the 36-day trial in the State Court Action, and the Final State Court Judgment is binding on Defendant-Sinclair.

Therefore, the court adopts and incorporates herein all of the determinations made in the

State Court Decision stated in Addendum "B" attached hereto.

To avoid confusion in light of the roles being reversed in the State Court Action, with Defendant-Sinclair being the plaintiff and Katakis Plaintiffs (including Plaintiff-CEMG) being the defendant, the court substitutes the defined terms for these parties in this Decision for the references to persons in the State Court Decision and judgment in the findings and determinations adopted in Addendum "B." When the State Court judge made a finding expressly as to only Defendant-Sinclair, it has identified him as "Mr. Sinclair." The court has retained the State Court's reference to Mr. Sinclair individually in citing to the State Court Decision.

**Summary of State Court Decision Findings and Conclusions**

An additional findings and determinations in the State Court Decision include, but are not limited to, the following. Defendant-Sinclair affirmatively misrepresented the existence of the Fox Hollow HOA as early as 1994 (in writing to the City of Turlock), with Defendant-Sinclair later testifying that there was no HOA until at least 2000. State Court Decision, ¶ 1 at 6:13.5–16.5; Dckt. 73. The March 1996 purported subdividing of the Fox Hollow Property by recording Subdivision Map 1 was knowingly improper by Defendant-Sinclair, his not having met the conditions for the recording of such Map. *Id.*, ¶ 3 at 6:20–22. The knowingly improper recording of subdivision maps by Defendant-Sinclair continued in 1998 when he improperly recorded Subdivision Map 2 for the Fox Hollow Property. *Id.*, ¶ 6 at 6:27.5-28, 7:1–2.5; ¶ 7 at 7:3.5–5.

Defendant-Sinclair used the improperly recorded maps in July 1998 to obtain fifteen loans for which the purported subdivided lots were used as collateral. *Id.*, ¶ 8 at 7:6–8. Defendant-Sinclair filed and prosecuted a bankruptcy case for his co-conspirator Mauctrst, LLC in 1999 in which he misrepresented who were the owners of Mauctrst, LLC. *Id.*, ¶ 11 at 7:15–19. Defendant-Sinclair has admitted to benefitting $160,000.00 through Mauctrst, LLC for the Fox Hollow endeavor in the year before the July 1, 1999 Mauctrst LLC bankruptcy case being filed. *Id.*, ¶ 12 at 7:20–22.5. The determinations in the State Court Decision included that "Mauctrst LLC was a fiction designed to allow the misuse of the bankruptcy court" by Defendant-Sinclair. *Id.* at 18:27–28, 19:1.5-2.5.

In January 2000, Defendant-Sinclair attempted to negotiate significant discounts on the loans

secured by the Fox Hollow Property lots based on the collateral value being impaired for reasons solely attributable to Defendant-Sinclair's misconduct. *Id.*, ¶ 13 at 7:23.5–25.5. In March 2000, notice of default having been sent by lenders, Defendant-Sinclair then commenced the litigation portion of the Fox Hollow Scheme, filing seven lawsuits to enjoin the foreclosures–losing "nearly all" of such suits. *Id.*, ¶ 14 at 7:26.5–28. In June 2000, Defendant-Sinclair was able to obtain a preliminary injunction and then failed to comply with a condition thereof, never making any of the payments required by the court. *Id.*, ¶ 15 at 8:1.5–4.

In a state court receivership action in July 2002, Defendant-Sinclair advised the court that the Fox Hollow HOA board had resigned, that there was no board, and that elections had to be held. Then, when the new board members took office, Defendant-Sinclair asserted that the old board was still in place and threatened the new board members with baseless charges in an effort to prevent the new board from collecting dues and assessments, and to maintain the appearance that Defendant-Sinclair and his co-conspirators controlled the HOA. The State Court Decision concludes that Defendant-Sinclair lied to the receivership court. *Id.* at 9:11.5-16.

Defendant-Sinclair's conduct included having "doctored a Summons (J228) and prepared an Amended Complaint (J237) and served both documents on CEMG and Mr. Katakis without Court approval, without them being filed and then allowed the litigation to proceed for months." *Id.*, ¶ 26 at 9:17–18.5

These findings and determinations further demonstrate that, for his own financial benefit, Defendant-Sinclair engaged in intentional, willful, malicious conduct, without just cause or excuse, which harmed Plaintiff-CEMG (directly and the assigned claims), as well as other persons, all for Defendant-Sinclair's (and his co-conspirators') financial gain.

**Full Text of State Court Findings and Conclusions
Attached as Addendum B**

The findings and determinations made in the State Court Action given collateral estoppel effect in this Adversary Proceeding and determined not to be in material dispute pursuant to Federal Rule of Civil Procedure 56(g) and Federal Rule of Bankruptcy Procedure 7056 are set forth in Addendum "B" attached hereto, with the actual language of the specific findings and determinations

1  of the State Court set forth in double quotation marks (" . . . ").

2          **STATE BAR COURT DECISION FINDINGS AND DETERMINATIONS**

3  **Exhibit 18, Dckt. 73.**[9]

4          In the State Bar Court Decision, the findings and determinations have been made in that

5  proceeding in which Defendant-Sinclair was a party. The State Bar Court judge stated that with

6  respect to the Fox Hollow Property matter before the State Bar Court, while many of the findings

7  were made by the trial and appellate court in the State Court Action, "this [State Bar] court,

8  nonetheless, must assess them independently under the more stringent standard of proof applicable

9  to disciplinary proceedings. (*Maltaman v. State Bar* (1987) 43 Cal.3d 924, 947.)." Exhibit 18; State

10 Bar Court Decision, Dckt. 73 at 2. Further, the State Bar Court's findings were made under the

11 "clear and convincing" evidence standard, not the lower preponderance of the evidence standard in

12 civil court proceedings. *Id.* at 3.

13         This court determines that the findings and conclusions in the State Bar Court Decision were

14 actually determined as part of the litigation in which Defendant-Sinclair was a party. Further, all

15 of the determinations made in the State Bar Court Decision set forth in Addendum C hereto: (1) are

16 identical to the grounds asserted in this Motion for Summary Judgment as the basis for the relief

17 requested here; (2) were actually litigated in the State Bar Court Action; (3) were necessarily

18 determined in the State Bar Court Action; and (4) such issues determined are being asserted in this

19 Adversary Proceeding against Defendant-Sinclair, who is the party against whom such

20 determinations were made in the State Bar Court Action.

21         To avoid confusion, the court substitutes the defined terms for these parties in this Decision

22 for the references to persons in the State Bar Court Decision adopted in Addendum "C."

23
**Summary of State Bar Court Findings and Conclusions**
24 **Bar State Court Decision**

25         In the State Bar Court Decision, the State Bar Court judge made similar and further

26

27         [9] The court uses a letter paragraph identification methodology for the State Bar Court Decision
28 findings and determination to distinguish them from arabic numbering used in referencing the State Court
Decision quotations.

conclusions demonstrating the willful and malicious conduct by Defendant-Sinclair in perpetrating the Fox Hollow Scheme. Those include, but are not limited to, the following summary.

In the Mauctrst, LLC bankruptcy case, Defendant-Sinclair failed to account for the proceeds of two fire insurance claims, and over fifty cancelled checks and two bank statements were missing. Additionally, Defendant-Sinclair failed to account to the trustee for $135,000.00 he had received from Mauctrst, LLC between August 1998 and June 1999. *Id.* at 9. Mauctrst, LLC was an entity formed by Defendant-Sinclair, which paid Defendant-Sinclair a monthly salary of $10,600.00 to manage the Fox Hollow Property. *Id.* at 8.

The State Bar Court made the same finding that Defendant-Sinclair attempted to profit at the expense of lenders by trying to purchase the Fox Hollow lots at a reduced price because the purported subdivision done by Defendant-Sinclair was defective and the purported individual lots were unsaleable. *Id.* at 9–10.

Defendant-Sinclair was paid $50,000.00 for "assisting" with the formation of an HOA for the Fox Hollow Property. *Id.* at 12.

In July 2002 Defendant-Sinclair stated in writing filed with the receivership court that all board members had resigned from the Fox Hollow HOA. Then, in December 2002, Defendant-Sinclair asserted that the prior board members (Defendant-Sinclair and his co-conspirators) had not resigned and that he was owed money for legal services provided to the HOA.

The express findings in the State Bar Court Judgment that Defendant-Sinclair engaged in a fraudulent real estate schedule (the RICO Decision Fox Hollow Scheme) and Defendant-Sinclair's conduct included: "(1) creating the false appearance of a homeowners association and individually saleable lots; (2) seeking and obtaining loans secured by portions of Fox Hollow based on false pretenses and misrepresentations; (3) skimming off loan proceeds, dues collected in the name of the FHOA, rental income, and tenant deposits; (4) filing bankruptcies and lawsuits to try and delay foreclosures and/or keep the lots; and (5) providing false testimony and misrepresentations to the civil courts to conceal and perpetuate the scheme to defraud." *Id.* at 24. Further, that "[b]y engaging in the scheme to defraud, including perpetuation of the scheme through an alter ego, respondent committed acts involving moral turpitude, dishonesty, and corruption, in wilful violation of Business

and Professions Code, section 6106." *Id.*

The State Bar Court Decision concurs with the State Court Decision and the DCA Opinions that this scheme spanned from 1994 and into the 2010s with the trial in the State Court Action. *Id.* at 29. The State Bar Court Judge found that during the Fox Hollow Scheme period, Defendant-Sinclair "has consistently and repeatedly engaged in deceptive and improper conduct in an effort to procure personal financial gain. The length and extent of [Defendant-Sinclair's] pattern of misconduct warrant significant weight in aggravation." *Id.* at 31.

In connection with the willfulness and maliciousness of his conduct, the State Bar Court Decision states that Defendant-Sinclair's,

> actions demonstrate his indifference toward rectification or atonement for the consequences of his misconduct . . . [Defendant-Sinclair's] misconduct resulted in significant harm to Katakis and the administration of justice. Fighting and unwinding [Defendant-Sinclair's] pattern of misconduct has cost Katakis over $1.3 million dollars in attorney's fees [damages in the Final State Court Judgment which are not part of the RICO Judgment damages] and has taken a toll on his emotional and physical wellbeing. Further, [Defendant-Sinclair's] misconduct and stalling tactics have resulted in a waste of judicial resources.

*Id.* at 31.

These findings and determinations further demonstrate that, for his own financial benefit, Defendant-Sinclair engaged in intentional, willful, malicious conduct, without just cause or excuse, which harmed Plaintiff-CEMG (directly and the assigned claims), as well as other persons, all for Defendant-Sinclair's (and his co-conspirators') financial gain.

**Full Text of State Bar Court Findings and Conclusions**
**Attached as Addendum C**

The findings and determinations made in the State Bar Court Decision given collateral estoppel effect in this Adversary Proceeding and determined not to be in material dispute pursuant to Federal Rule of Civil Procedure 56(g) and Federal Rule of Bankruptcy Procedure 7056 are set forth in Addendum B hereto, with the actual language of the specific findings and determinations of the State Court set forth  using double quotation marks (" . . . ").

///

///

# PART IV

## RULING

Plaintiff-CEMG seeks relief on two separate and independent legal theories, though both are based on the same set of operative, overlapping facts. The amount of damage arising from the alleged fraud and willful and malicious injury is asserted to be an obligation of Defendant-Sinclair on the judgment for $5,833,175.84 in RICO damages awarded to Plaintiff-CEMG in the RICO Action. The Complaint seeks a judgment determining that the RICO Judgment and obligation owing thereon are nondischargeable, and not the entry of a new monetary federal judgment. If determined nondischargeable, then the RICO Judgment may continue to be enforced through the RICO Action, not through this court, to the extent determined nondischargeable.

### TREBLED RICO DAMAGES AWARDED FOR FRAUD COMMITTED BY DEFENDANT-SINCLAIR TO PLAINTIFF-CEMG'S ASSIGNOR ARE NONDISCHARGEABLE PURSUANT TO 11 U.S.C. § 523(a)(2)(A)

The first basis for asserting that the obligations owed to Plaintiff-CEMG on the RICO Judgment (the RICO damages) are nondischargeable is a contention that the obligation is for "money, property, services, or an extension, renewal, or refinancing of credit" obtained by fraud. The statutory basis for such a contention is found in 11 U.S.C. § 523(a)(2)(A), which states as follows:

§ 523. Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by–

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

The Ninth Circuit Court of Appeals explained the application of 11 U.S.C. § 523(a)(2)(A) in *Turtle Rock Meadows Homeowners Ass'n v. Slyman* (*In re Slyman*) as:

Under §523(a)(2)(A) of the Bankruptcy Code, a debt for services obtained by the debtor under "false pretenses, a false representation, or actual fraud" is nondischargeable. 11 U.S.C. §523(a)(2)(A) (2000). "**The purposes of this provision are to prevent a debtor from retaining the benefits of property obtained by fraudulent** means and to ensure that the relief intended for honest

1  debtors does not go to dishonest debtors." 4 Collier on Bankruptcy Par. 523.08[1][a]
2  (15th ed. rev. 2000).

3  234 F.3d 1081, 1085 (9th Cir. 2000) (emphasis added).  The Ninth Circuit continued, stating the

4  following basic grounds for "actual fraud" under 11 U.S.C. § 523(a)(2)(A):

5      The five elements, each of which the creditor must demonstrate by a preponderance
        of the evidence, are: (1) misrepresentation, fraudulent omission or deceptive conduct
6      by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or
        conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the
7      debtor's statement or conduct; and (5) damage to the creditor proximately caused by
        its reliance on the debtor's statement or conduct. *American Express Travel Related*
8      *Servs. Co. v. Hashemi* (*In re Hashemi*), 104 F.3d 1122, 1125 (9th Cir. 1997);
        *Citibank (South Dakota), N.A. v. Eashai* (*In re Eashai*), 87 F.3d 1082, 1086 (9th Cir.
9      1996).

10 *Id.*

11     The ruling in *Turtle Rock* harkens back to the Supreme Court's unanimous decision authored

12 by Justice Sandra Day O'Connor in *Cohen v. De La Cruz*, 523 U.S. 213, 217–19 (1998) (emphasis

13 added),  which states:

14     The Bankruptcy Code has long prohibited debtors from discharging liabilities
        incurred on account of their fraud, embodying a basic policy animating the Code of
15     affording relief only to an "**honest but unfortunate debtor**." *Grogan v. Garner*,
        supra, at 287  (internal quotation marks omitted); see id., at 290; *Brown v. Felsen*,
16     442 U.S. 127, 138, 60 L. Ed. 2d 767, 99 S. Ct. 2205 (1979). Section 523(a)(2)(A)
        continues the tradition, excepting from discharge "any debt . . . for money, property,
17     services, or an extension, renewal, or refinancing of credit, to the extent obtained by
        . . . false pretenses, a false representation, or actual fraud."
18

19     The most **straightforward reading of § 523(a)(2)(A)** is that it **prevents
        discharge** of **"any debt" respecting "money, property, services, or . . . credit"**
20     that the debtor has **fraudulently obtained**, including treble damages assessed on
        account of the fraud. See *Field v. Mans*, 516 U.S. 59, 61, 64, 133 L. Ed. 2d 351, 116
21     S. Ct. 437 (1995) (describing § 523(a)(2)(A) as barring discharge of debts "resulting
        from" or "traceable to" fraud). . . .

22     Moreover, the phrase "to the extent obtained by" in § 523(a)(2)(A), . . .
        makes clear that **the share of money, property, etc., that is obtained by fraud
23     gives rise to a nondischargeable debt**. . . [and] . . ."any debt" arising therefrom is
        excepted from discharge**. . . .**
24

25     The application of 11 U.S.C. § 523(a)(2)(A) has been the subject of a recent Supreme Court

26 decision in *Husky International Electronics, Inc. v. Ritz*, ___ U.S. ___, 136 S. Ct. 1581 (2016).  The

27 Supreme Court concluded that the definition of the term "actual fraud" was not limited to only the

28 good old fashion "five finger fraud" (with the "first couple fingers" being the knowing, intentional

misrepresentation made directly to the creditor, upon which the creditor justifiably relied) but encompassed broader fraudulent conduct. In reality, as discussed below, this is not inconsistent with the long-standing definition of "actual fraud" for purposes of 11 U.S.C. § 523(a)(2)(A) in the Ninth Circuit, with the "first finger" being "misrepresentation, fraudulent omission **or deceptive conduct by the debtor**." See elements as stated in *Turtle Rock Meadows Homeowners Ass'n v. Slyman* above.

The Supreme Court did not flush away that the creditor must have a claim for "actual fraud" under 11 U.S.C. § 523(a)(2)(A), but recognized that "fraud" can be nondischargeable in a matter in which there is not a specific, express misrepresentation made as part of the "deceptive conduct." The discussion of this principle by the Supreme Court illuminating what constitutes "actual fraud," beyond the express misstatement made directly to the creditor, includes:

> But the historical meaning of "actual fraud" provides even stronger evidence that the phrase has long encompassed the kind of conduct alleged to have occurred here: a transfer scheme designed to hinder the collection of debt.

*Husky Intl. Elec. Inc. v. Ritz*, 136 S. Ct. at 1586. Further,

> "Actual fraud" has two parts: actual and fraud . . . Thus, anything that counts as "fraud" and is done with wrongful intent is "actual fraud."

*Id.* The fraud found in "fraudulent conveyance" law is a recognized actionable actual fraud for which the wrongdoer is held accountable for which there does not need to be a "misrepresentation" which induces conduct of the injured party. While not an "inducement fraud," the actual fraud in a fraudulent conveyance claim is one of concealment and hindrance, with the fraud being the non-disclosure of the truth, not the disclosure of a non-truth.

**$1,530,418.95 of RICO Fraud Damages**
**Are Nondischargeable**

The District Court determined that based on Defendant-Sinclair's fraud, Conti Mortgage, whose rights were assigned to Plaintiff-CEMG suffered damages of $510,139.65. The RICO Decision makes extensive findings of Defendant-Sinclair's (1) misrepresentations, fraudulent omissions or deceptive conduct by the debtor; (2) his knowledge of the falsity or deceptiveness of his statement or conduct; (3) that he intended to deceive his lenders, including Plaintiff-CEMG's

predecessor in interest; (4) justifiable reliance by the creditor on Defendant-Sinclair's statement or conduct; and (5) damage to Plaintiff-CEMG's predecessor in interest proximately caused by its reliance on Defendant-Sinclair's statement or conduct. The District Court's findings in the RICO Decision include, but are not limited to those in paragraphs 86, 87, 88, 89, 95, 96, 97, 98, 99, 175, 176, 178, 179, 180, 198, 252, 276, 298, and 317. The RICO Decision trebles those damages due to Defendant-Sinclair's conduct to $1,530,418.95.

Those fraud damages are nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A). Defendant-Sinclair argues that because Plaintiff-CEMG bought the notes at a discounted amount, discounted due to Defendant-Sinclair's fraud, then he should be absolved of the RICO damages flowing from his fraud. But the notes and the fraud claims appended to them are enforceable against Defendant-Sinclair, without Debtor-Sinclair discounting his damage obligation and benefitting from his improper conduct. Those claims are enforceable by Plaintiff-CEMG as determined in the RICO Judgment. That is consistent with the purpose underlying the discharge and debts determined to be nondischargeable, as Justice O'Connor stated for the Supreme Court that is the "honest but unfortunate debtor" who obtains the extraordinary relief of a discharge of debt in the bankruptcy case. *Cohen v. De La Cruz*, 523 U.S. 213, 217–19 (1998). Defendant-Sinclair is not the "honest but unfortunate debtor," but the debtor who intentionally committed fraud as part of his Fox Hollow Scheme.

### TREBLED RICO DAMAGES AWARDED FOR DAMAGES TO PLAINTIFF-CEMG FROM THE CONDUCT OF DEFENDANT-SINCLAIR ARISING FROM THE FOX HOLLOW SCHEME ARE NONDISCHARGEABLE PURSUANT TO 11 U.S.C. § 523(a)(6)

As a second and separate basis for determination that all of the obligations (intentional acts for which there was no just cause or excuse) owing for the RICO damages awarded in the RICO Judgment are nondischargeable, Plaintiff-CEMG asserts that the damages flow from the willful and malicious injury inflicted on it by Defendant-Sinclair. That ground is stated by Congress in 11 U.S.C. § 523(a)(6).

11 U.S.C. § 523(a)(6)

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not

discharge an individual debtor from any debt--

>(6) for willful and malicious injury by the debtor to another entity or to the property of another entity; . . . .

In *Ormsby v. First American Title Co. (In re Ormsby)*, the Ninth Circuit Court of Appeal explained the dual requirement for a determination of an injury to have been the result of "willful and malicious" conduct:

>The Supreme Court in *Kawaauhau v. Geiger (In re Geiger)*, 523 U.S. 57, 118 S. Ct. 974, 140 L. Ed. 2d 90 (1998), made clear that for section 523(a)(6) to apply, the actor must intend the consequences of the act, not simply the act itself. *Id.* at 60. Both willfulness and maliciousness must be proven to block discharge under section 523(a)(6).
>
>In this Circuit, "§ 523(a)(6)'s willful injury requirement is met only when the debtor has a **subjective motive to inflict injury** or when the **debtor believes that injury is substantially certain to result from his own conduct**." *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002). The Debtor is charged with the knowledge of the natural consequences of his actions. *Cablevision Sys. Corp. v. Cohen (In re Cohen)*, 121 B.R. 267, 271 (Bankr. E.D.N.Y. 1990); see *Su*, 290 F.3d at 1146 ("In addition to what a debtor may admit to knowing, the bankruptcy court may consider circumstantial evidence that tends to establish what the debtor must have actually known when taking the injury-producing action.").
>
>                    . . .
>
>"A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *Petralia v. Jercich (In re Jercich)*, 238 F.3d 1202, 1209 (9th Cir. 2001) (internal citations omitted). Malice may be inferred based on the nature of the wrongful act. See *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 554 (9th Cir. 1991). 7 To infer malice, however, it must first be established that the conversion was willful. See *Thiara*, 285 B.R. at 434.

591 F.3d 1199, 1206–07 (9th Cir. 2010) (emphasis added).

**$5,833,175.84 Of RICO Damages Arising From**
**Defendant-Sinclair's RICO Racketeering Activity**
**Are Nondischargeable Pursuant to 11 U.S.C. § 523(a)(6)**

This court begins with the findings and determinations in the RICO Decision because it is the RICO Judgment that Plaintiff-CEMG seeks to have determined nondischargeable. The District Court made specific findings concerning the Defendant-Sinclair's conduct constituting his Fox Hollow Scheme. The District Court concluded that Defendant-Sinclair engaged in a multi-year scheme of fraud, improper transfers, improper demands, and litigation. Defendant-Sinclair engaged in a multi-year (1997 to the 2016 default judgment hearing) scheme of fraudulent record title churning and financing transactions to borrow more than $1.4 million against the Fox Hollow

Property for his personal financial enrichment. RICO Decision ¶¶ 77, 86, 178, Exhibit 11; Dckt. 73.

Defendant-Sinclair, working with his co-conspirators, engaged in a willful and intentional pattern of conduct that the District Court has determined to be the Fox Hollow Scheme. *Id.* ¶ 176. This conduct included Defendant-Sinclair's failure and refusal to form the Fox Hollow HOA, though falsely representing its existence when it was to his advantage, until December 2002. *Id.* ¶ 120. Defendant-Sinclair and his co-conspirators failed to collect any dues and assessments from themselves during the period in which they asserted to be owners of lots in the Fox Hollow Property, though they demanded payment, under the color of a Fox Hollow HOA payment of such from other owners of lots that are part of the Fox Hollow Property. *Id.*

During the period 1995 through at least 2003, Defendant-Sinclair colluded and conspired to fraudulently create the false appearance of a homeowners association and individually saleable lots at Fox Hollow to obtain loans secured by portions of Fox Hollow to enrich Defendant-Sinclair and his co-conspirators at the expense of the lenders. The misconduct included, but was not limited to, skimming off loan proceeds, dues collected in the name of the homeowners association, and rental income and tenant deposits, all while concealing the Fox Hollow Scheme and attempting to shield Defendant-Sinclair and his co-conspirators from individual liability by creating shell companies and churning record title to the property (the 'Fox Hollow Scheme'); *Id.* ¶ 176.

Defendant-Sinclair then diverted and used payments of alleged HOA dues and assessments paid by owners of lots in the Fox Hollow Property to finance lawsuits against lenders, delay foreclosures, and extend the time that Defendant-Sinclair and his co-conspirators could improperly assert the right to and control of the Fox Hollow Property. *Id.* ¶ 120.

Defendant-Sinclair engineered a conveyance of title to Lot 19 to himself so he could obtain a loan and divert $31,420.00 of the loan proceeds to himself and co-conspirator Stanley Flake. *Id.* ¶ 136.

Defendant-Sinclair aided and abetted, and committed acts in furtherance of the Fox Hollow Scheme, including:

> (1) renting properties, collecting rents, and prosecuting unlawful detainer actions for the Fox Hollow Property when neither he nor his co-conspirators were owners of the properties at issue;

(2) communicating with the City of Turlock concerning the requirements for a Final Subdivision Map for the Fox Hollow Property;

(3) facilitating transfers of title to lots in the Fox Hollow Property between his co-conspirators to facilitate their scheme to borrow monies from lenders;

(4) assisting co-conspirators in obtaining loans as part of the Fox Hollow Scheme;

(5) providing information to the lenders making such loans;

(6) improperly filing Subdivision Map 2 with the knowledge that the required conditions had not been completed;

(7) creating co-conspirator Mauctrst, LLC in 1998;

(8) preparing bankruptcy documents stating that Mauctrst, LLC owned the Fox Hollow Property, filing bankruptcy, and representing co-conspirator Mauctrst in its 1999 bankruptcy case;

(9) filing suits and obtaining injunctions in at least six actions enjoining foreclosures and then failing to make the payments required as a condition of the injunctions;

(10) creating co-conspirator Lairtrust in 2000;

(11) preparing documents purporting to be minutes of HOA meetings in 2000 which his co-conspirators denied being accurate;

(12) in 2000 and 2001 mailing out bills for and demanding payment of dues and assessments alleged to be owing to Fox Hollow HOA when no such HOA had been created;

(13) setting up a secret double escrow and concealing facts from lenders after foreclosure to obtaining title to the Fox Hollow Property for himself and his co-conspirators;

(14) creating co-conspirator Capstone, LLC in 2001; and

(15) preparing documents purporting to transfer title of lots in the Fox Hollow Property to co-conspirators, purporting to terminate leases and evict tenants from lots in the Fox Hollow Property owned by Plaintiff-CEMG.

*Id.* ¶ 178.

Though the CC&Rs prepared and recorded by Defendant-Sinclair for the Fox Hollow Property required and represented that common area lots had been transferred to the Fox Hollow HOA, no lots were transferred. *Id.*, ¶ 276. That was done intentionally, which resulted in harm to Plaintiff-CEMG. Defendant-Sinclair then used those created title defects to attempt to buy the lots at a discount to profit from the defects. *Id.* Even as of the 2017 prove up hearing, Defendant-Sinclair continued to use the improper failure to properly transfer title to damage Plaintiff-CEMG. *Id.*

The District Court expressly determined that Defendant-Sinclair, with his co-conspirators, "attempted to and intended to perfect and carry out the Fox Hollow Scheme so that . . .all loss would fall on Bank One, GMAC, Conti, Absher-Avanta, HFC Beneficial, Plaintiffs and other lenders and members of the public who might be induced to make loans on, invest in or purchase lots and units at Fox Hollow, while Defendants retained their profits from such scheme." *Id.*; ¶ 179, ¶ 183.

As part of the Fox Hollow Scheme, Defendant-Sinclair's conduct included improperly dividing title to common areas and garage lots to hold those portions captive and impede Plaintiff-CEMG from using the Fox Hollow Property it purchased. That improper, intentional conduct by Defendant-Sinclair caused Plaintiff-CEMG to incur $2,353,516.63 in damages which under RICO are trebled to $7,060,549.89. *Id.*; ¶¶ 257, 259, 300. Additionally, as part of the Fox Hollow Scheme, Defendant-Sinclair caused $510,139.65 in damages, which are trebled under RICO to $1,530,418.95, relating to the claims assigned to Plaintiff-CEMG by Conti Mortgage. *Id.*, ¶ 298.

The total RICO damages caused by Defendant-Sinclair's Fox Hollow Scheme awarded to Plaintiff-CEMG, when trebled, are $8,590,968.84. *Id.*, ¶ 317.[10]

The RICO Decision then gives Defendant-Sinclair a credit of $2,757,793.00 for the settlement amounts paid or to be paid by his co-conspirators for the damage caused by the Fox Hollow Scheme perpetrated by Defendant-Sinclair and his co-conspirators. Applying the settlement credit to the $8,590,968.84 in damages caused by Defendant-Sinclair, the District Court reduces the amount of the judgment awarded Plaintiff-CEMG against Defendant-Sinclair to $5,833,175.84. *Id.*, ¶ 318.

Though not damages to be determined nondischargeable, the RICO Judgment includes quiet title relief correcting the title to the Fox Hollow Property and determining that Defendant-Sinclair and his co-conspirators have no right, title, or interest in specific lots pursuant to the deeds they recorded and had used to frustrate and damage Plaintiff-CEMG in its efforts to exercise its rights

---

[10]  Though Defendant-Sinclair contends that there was not a "real" adjudication during the fifteen years that the RICO Action was pending, it is clear that the RICO Decision is not merely a default for which relief "request" was "automatically" granted. Rather, the RICO Decision makes it clear that it is a decision made upon a detailed consideration of the evidence and clean findings of the District Court. Defendant-Sinclair actively litigated against the entry of the judgment through the prove-up hearing required by the District Court judge.

as the owner of such lots.  ¶¶ 318, 320, 321.  That remedied a portion of Defendant-Sinclair's willful, intentional, and without just cause or excuse misconduct continuing up through the entry of the RICO Judgment.

The RICO Decision and RICO Judgment also award attorney's fees and costs to be determined pursuant to post-judgment motions. *Id.*, ¶ 322.

The findings and determinations of the District Court in the RICO Decision (attached hereto as Addendum "A"), including but not limited to those summarized above, clearly establish that Defendant-Sinclair engaged in: (1) wrongful acts (over an almost 20-year period), (2) done intentionally (as part of a well coordinated Fox Hollow Scheme with his co-conspirators), (3) which necessarily caused injury (here to Plaintiff-CEMG), and (4) was done without just cause or excuse. Defendant-Sinclair's Fox Hollow Scheme necessarily had to cause those damages to Plaintiff-CEMG (both the assigned claims and the damages directly to Plaintiff-CEMG). Defendant-Sinclair intentionally created, expanded, and aggressively litigated to block and thwart Plaintiff-CEMG from exercising its ownership rights in the Fox Hollow Property lots. Defendant-Sinclair not only knew that his scheme was causing harm on others, but he affirmatively used it to buy (secretly) lots back from lenders at a discount–the discount being based on the harm being visited upon everyone (other than his co-conspirators) that became involved in Fox Hollow Property transactions. The RICO Judgment for $5,833,175.84, plus attorney's fees, costs, post-judgment interest, and all future amounts accruing thereto is nondischargeable pursuant to 11 U.S.C. § 523(a)(6) as injury caused to Plaintiff-CEMG by the willful and malicious conduct caused by Defendant-Sinclair.

# PART V

## RELIEF GRANTED

The Motion for Summary Judgment is granted, with judgment to be entered for Plaintiff California Equity Management Group, Inc. ("Plaintiff-CEMG") and against Defendant Richard Sinclair that:

A.      The amount owing on the Judgment issued by the United States District Court in *Fox Hollow of Turlock Owners' Association et al v. Mauctrst LLC et al*, E.D. Cal. No. 1:03-cv-05439 (the "RICO Judgment"), including all costs and attorney's fees awarded, and interest and additional post-judgment amounts thereon or related thereto in favor of Plaintiff-CEMG and against Defendant Richard Sinclair is

nondischargeable pursuant to 11 U.S.C. § 523(a)(6).

B.  That $1,530,418.95 of the RICO Judgment, including all costs and attorney's fees awarded, and interest and addition post-judgment amounts thereon or related thereto is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), as an additional and independent basis for such relief as to that portion of the judgment,

C.  That Costs and Attorney's Fees, if any are sought, will be awarded pursuant to a post-judgment bill of costs and motion for attorneys' fees.

The RICO Judgment and obligations thereunder having been determined nondischargeable, this court's judgment for nondischargeability shall provide that the RICO Judgment shall be enforced through the District Court, and no monetary judgment replacing it is entered by this court.

There being the claims of Co-Plaintiff Fox Hollow of Turlock Owners' Association not having been determined in this Summary Judgment Motion and remaining to be adjudicated, the court does not enter judgment in this Adversary Proceeding at this time. Fed. R. Civ. P. 54(b) and Fed. R. Bankr. P. 7054.

**Dated:** November 29, 2017

**By the Court**

Ronald H. Sargis, Judge
United States Bankruptcy Court

70

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ADDENDUM "A"

1

2

3                          **UNITED STATES DISTRICT COURT**

4                          **EASTERN DISTRICT OF CALIFORNIA**

5

6   **FOX HOLLOW OF TURLOCK**              **CASE NO. 1:03-CV-5439 AWI SAB**
    **OWNER'S ASSOCIATION, a California**
7   **Nonprofit Mutual Benefit Corporation, et**   **FINDINGS OF FACT AND**
    **al.,**                                  **CONCLUSIONS OF LAW**
8
                        **Plaintiffs**
9
                      **v.**
10
    **MAUCTRST, LLC, et al.,**
11
                        **Defendants**
12

13  **I. Procedural History**

14      1.   The plaintiffs in this case are Fox Hollow of Turlock Owners' Association ("Fox Hollow

15           HOA") and California Equity Management Group, Inc. ("CEMG").

16      2.   The defendants in this case are Richard Sinclair, Brandon Sinclair, Lairtrust, LLC

17           ("Lairtrust"), Capstone, LLC ("Capstone"), Mauctrst, LLC ("Mauctrst"), Gregory

18           Mauchley and Stanley M. Flake (both personally and as trustee of the Julie Insurance

19           Trust, the F. Hanse Trust, and the Capstone Trust, collectively "Flake Defendants").

20      3.   This case is related to a state court case filed on April 24, 2003 in Stanislaus County

21           Superior Court, Case No. 332233 ("State Court Action").  Parts of the present case were

22           stayed pending final resolution of the State Court Action.  The parties filed a notice of

23           settlement on July 16, 2007. Doc. 303.  However, in the State Court Action, it was

24           determined that the settlement was unenforceable.  The case was resolved in a bench trial.

25           The ruling by the Superior Court was affirmed by the Fifth District Court of Appeal and

26           the petition for review was denied by the California Supreme Court in 2013.

27      4.   The operative complaint in this case is the Consolidated Amended and Supplemental

28           Complaint ("CAC"), Doc. 410.

5. Defendants Richard Sinclair, Brandon Sinclair, Mauchley, Mauctrst, Capstone, and Lairtrust also filed counterclaims against Plaintiffs. Docs. 80, 425, and 471. These counterclaims were dismissed with prejudice Doc. 1014.

6. The Flake Defendants reached a settlement with Plaintiffs. Doc. 1179. The claims against them were dismissed. Doc. 1187.

7. Defendants Mauchley and Mauctrst also reached a settlement with Plaintiffs. Doc. 1009. The claims against Defendant Mauchley were dismissed. Doc. 1195. By stipulation of the relevant parties, Mauctrst's answer was stricken and default was entered against Mauctrst with the damages to be determined as part of the prove up hearing. Doc. 1017.

8. Defendants have failed to obey a variety of court orders in this case. They have been sanctioned multiple times. See Docs. 613, 891, and 1014. Additionally, they have been warned about their noncompliance without sanctions being imposed. See Docs. 727 and 860. In the end, Defendants Richard Sinclair, Brandon Sinclair, Lairtrust, and Capstone were specifically warned that the court would enter default against them if they did not comply with court order. Doc. 1014, 19:27-20:3. On September 26, 2014, as a sanction for repeated violations, their answers were stricken and default was entered. Doc. 1070.

9. The defendants in this case who had default entered against them are Richard Sinclair, Brandon Sinclair, Lairtrust, Capstone, and Mauctrst (collectively "Defaulted Defendants").

10. Defendants Richard Sinclair and Brandon Sinclair appealed the order. Docs. 1072 and 1073. Their appeals were dismissed for lack of jurisdiction as the entry of default was not an appealable order. Doc. 1080.

11. On November 28, 2014, Defendant Richard Sinclair filed for bankruptcy. Doc. 1078. All proceedings against Defendant Richard Sinclair were stayed. Doc. 1079. The bankruptcy court modified the automatic stay to permit Plaintiffs to proceed in their case against Richard Sinclair. On May 11, 2015, the stay in this case was lifted. Doc. 1092.

12. Meanwhile, Defendant Richard Sinclair made a motion for a new trial. Doc. 1083. The motion was treated as a request for reconsideration and denied. Doc 1184.

13. On October 16, 2015, the court ordered the parties to confer regarding a status conference

1    hearing date at which time the prospect of a prove up hearing could be discussed. Doc.

2    1189.

3    14. Defendant Richard Sinclair asked that the hearing be set after December 31, 2015 due to

4        medical issues. Doc. 1190.

5    15. The status conference was set for January 11, 2016 and Defendants Richard Sinclair and

6        Brandon Sinclair were ordered to personally appear. Doc. 1194.

7    16. The bankruptcy court held a hearing on December 17, 2015 regarding Defendant Richard

8        Sinclair's legal competency.  Judge Ronald Sargis concluded that Defendant Richard

9        Sinclair was legally competent to proceed as a party in his bankruptcy case. Doc. 1196-1.

10   17. On January 11, 2016, Defendants Richard Sinclair and Brandon Sinclair failed to appear at

11       the hearing.  The court set a briefing schedule for default judgment and set the prove up

12       hearing for May 10, 2016. Doc. 1199.

13   18. Plaintiffs made a formal motion for default judgment. Doc. 1203.  On April 14, 2016,

14       Defendant Richard Sinclair filed a timely opposition and declaration. Doc. 1208.

15       Defendant Richard Sinclair also submitted 108 exhibits in support of his opposition on

16       May 3, 2016, well after the opposition deadline.

17   19. On May 5, 2016, Defendant Richard Sinclair filed an ex parte motion to continue the prove

18       up hearing; he asserted that due to his medical issues, he was not allowed to drive until the

19       end of May. Doc. 1217.  The request was denied and the court directed Defendant Richard

20       Sinclair to find alternate means of transportation to make it to the hearing. Doc. 1219.

21   20. The default judgment prove up hearing was held pursuant to Fed. Rule Civ. Proc. 55(b)(2)

22       on May 10, 2016.

23   21. None of the Defaulted Defendants took part in the hearing.  The morning of the hearing,

24       Defendant Richard Sinclair asked to appear telephonically but his request was denied. Doc.

25       1237, Transcript, 1:13-25.

26   22. At the hearing, Defendant Richard Sinclair's declaration and exhibits were stricken as a

27       sanction for his failure to appear and failure to comply with court orders requiring his

28       appearance at hearings. Doc. 1237, Transcript, 10:6-14.

23. Andrew Katakis, Sherri Lucy, and Casey Johnson testified. All of Plaintiffs' proffered exhibits, 1 through 50, were admitted. At the conclusion of the prove up hearing, the court invited Plaintiffs to submit proposed findings of fact and conclusions of law ("proposed FOFCOL").

24. Plaintiffs filed proposed FOFCOL and a supplemental brief. Docs. 1226 and 1227. Defendant Richard Sinclair filed an opposition. Doc. 1228.

25. Defendant Richard Sinclair also filed a motion for reconsideration of the court's decision to strike his exhibits from the record. Doc. 1222.

**II. Facts As Alleged in the Consolidated Amended and Supplemental Complaint ("CAC"), Doc. 410**

**Nature Of The Action**

26. This action arises out of the defendants' fraudulent real estate scheme of creating the false appearance of a homeowners association and individually saleable lots at a thirty-five (35) unit town home complex located in Turlock, California, and known as Fox Hollow of Turlock ("Fox Hollow"), in order to obtain loans secured by portions of Fox Hollow and to enrich themselves at the expense of the lenders, the successors to the lenders and the homeowners association by skimming off loan proceeds, dues collected in the name of the homeowners association, and rental income and tenant deposits, all while concealing their scheme and attempting to shield themselves from individual liability by creating shell companies and churning record title to the property (the "Fox Hollow Scheme").

27. Among other things, various defendants as more specifically alleged below: (1) represented to the City of Turlock in 1994 that Fox Hollow had a homeowners association with funds for common area lighting when no homeowners association existed; (2) conveyed title to individual lots at Fox Hollow between themselves in 1997 without either forming a homeowners association or conveying title to the common area at Fox Hollow to the homeowners association as they were required to do by the City of Turlock as a condition to the subdivision that had created such lots; (3) falsely represented to a lender in

4

1997 as part of obtaining five (5) loans totaling almost $1.5 million secured by lots at Fox

Hollow that Fox Hollow had a homeowners association even though no homeowners

association existed; (4) obtained a further subdivision of Fox Hollow in 1998 without

either forming a homeowners association or conveying title to the common area at Fox

Hollow to the homeowners association, and without performing work required to make the

lots individually saleable such as constructing firewalls between lots and relocating

underground utilities to individual lots, all as they were required to do by the City of

Turlock as a condition to the subdivision that created such lots; (5) falsely represented to

several lenders in 1998 as part of obtaining fifteen (15) loans totaling more than $1.8

million secured by lots at Fox Hollow that Fox Hollow had a homeowners association even

though no homeowners association existed, and fraudulently concealed from those lenders

that the lots were not individually saleable and that appraisals upon which the loans were

based were subject to the completion of work such as firewalls and utility relocations that

defendants had not done; (6) fraudulently concealed from the lenders in 1997 and in 1998

that the collateral for some of the loans did not include the one car garages that

corresponded to the units included as collateral; (7) created a shell company called

Mauctrst LLC and transferred record title to the lots at Fox Hollow to that shell company

only seven (7) days after the fifteen (15) loans in 1998 closed, and then less than one (1)

year later and after defaulting on all those loans, put the shell company in bankruptcy to

delay the foreclosures; (8) created documents and instruments purporting to give Capstone

Trust secured rights to Fox Hollow as a front for defendants to skim further money off Fox

Hollow; (9) exploited the fact defendants had not performed the work to make the lots

individually saleable to try to force the lenders to sell the loans to defendants at a

substantial discount off the amount due, after Fox Hollow was abandoned by the

bankruptcy trustee as severely over encumbered; (10) concealed from the lenders that the

collateral for some of the loans did not include the one car garages corresponding to the

units securing the loans and then exploited the error to prevent the units from being

separately saleable; (11) manufactured homeowners association records and purported to

1   act during the second one-half of 2000 on behalf of the homeowners association (even

2   though they had not formed the homeowners association nor conveyed the common area to

3   the homeowners association); (12) demanded in the name of the homeowners association

4   that the lenders who were completing the foreclosures on their loans pay homeowners

5   association assessments of $300 per month per lot or face delinquency notices, liens and

6   foreclosures; (13) formed Plaintiff Fox Hollow HOA, on December 6, 2000, and thereby

7   imposed upon it the unfunded obligations, liabilities and expenses to complete the

8   requirements of the City of Turlock and to repair and maintain the common area and

9   buildings on the property that defendants had neglected; (14) initiated at least six (6)

10  lawsuits in state court to further delay the remaining foreclosures, all of which they lost;

11  (15) initiated a seventh (7th) lawsuit in state court to further delay the foreclosures on four

12  (4) of the other lots, and then settled that suit by using a fraudulent double escrow to

13  purchase two (2) of the lots from the lender in the first escrow while skimming off loan

14  proceeds in the second escrow on each lot; (16) rented units at Fox Hollow and collected

15  deposits and rents on those units even though they did not own the units; (17) refused to

16  turn over first month's rent and tenant deposits upon demand; and (18) throughout the

17  entire time, neither assessed to themselves nor otherwise paid for the costs and expenses of

18  keeping up, repairing and maintaining Fox Hollow.

19  28. As a result of the fraudulent scheme, among other things, the lenders lost millions of

20      dollars including on claims assigned to Plaintiff CEMG, and Plaintiff Fox Hollow HOA as

21      the homeowners association by virtue of its obligations under the CC&Rs for the property,

22      and Plaintiff CEMG as the successor to the lenders, were required to and did spend more

23      than $1.3 million to perform the work required by the City of Turlock to make the lots

24      individually saleable and to otherwise remedy the waste and neglect of Fox Hollow

25      committed by defendants.

26  **Parties**

27  29. Plaintiff Fox Hollow of Turlock Owners' Association ("Fox Hollow HOA") is, and at all

28      times herein mentioned since on or about December 6, 2000 was, a non-profit mutual

benefit corporation organized and existing under the laws of the State of California, with its principal office located in Stanislaus County, California.

30. Plaintiff California Equity Management Group, Inc. ("CEMG") is, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of California, with its principal office located in Stanislaus County, California.

31. Defendant Mauctrst, LLC ("Mauctrst") is and at all times mentioned herein since on or about April 28, 1998, was a limited liability company, conducting business in Stanislaus County, California, and owned and controlled by Defendants Mauchley and Richard Sinclair.

32. Defendant Gregory Mauchley ("Mauchley") is an individual who, at all times in this action was commenced resided in Stanislaus County, California.

33. Defendant Richard C. Sinclair ("Richard Sinclair") is an individual who, at all times mentioned herein, resided in Stanislaus County, California. Defendant Richard Sinclair and his spouse, Deborah A. Sinclair, will be referred to from time-to-time herein as the "Sinclairs."

34. Defendant Stanley M. Flake ("Flake"), at all times alleged herein, resided in Tuolumne County, California, and was trustee of the Julie Insurance Trust, trustee of the F. Hanse Trust, and trustee of the Capstone Trust.

35. Defendant Brandon Sinclair is an individual who, at all times mentioned herein, resided in Stanislaus County, California.

36. Defendant Lairtrust, LLC ("Lairtrust") is and at all times mentioned herein since on or about May 26, 2000, was a limited liability company, conducting business in Stanislaus County, California, and owned and controlled by the Sinclairs.

37. Defendant Capstone, LLC ("Capstone, LLC") is and at all times mentioned herein since on or about December 3, 2001, was a limited liability company, conducting business in Stanislaus County, California, and owned and controlled by Defendants Richard Sinclair and Brandon Sinclair.

38. Defendant Mauctrst is, and at all times mentioned herein was, the alter ego of Defendants

1　Mauchley and Richard Sinclair, in that there exists, and at all times herein mentioned, has

2　existed, a unity of interest and ownership between such Defendants such that any

3　separateness has ceased to exist, in that among other things Defendants Mauchley and

4　Richard Sinclair used assets of Defendant Mauctrst for their personal uses, caused assets of

5　Defendant Mauctrst to be transferred to both or one of them without adequate

6　consideration, treated assets of Mauctrst as owned by them individually, withdrew funds

7　from Defendant Mauctrst's bank accounts for their personal use, and inadequately

8　capitalized Mauctrst for the activities it conducted. Adherence to the fiction of separate

9　existence of Mauctrst as an entity distinct from Defendants Richard Sinclair and Mauchley

10　would permit an abuse of the limited liability privilege and would sanction a fraud and

11　promote injustice in that among other things Defendants Mauchley and Richard Sinclair,

12　and each of them, carried on their investment and real estate business in the limited

13　liability company's name exactly as they had conducted it previous to formation,

14　exercising complete control and dominance of such business to such an extent that any

15　individuality or separateness of Defendant Mauctrst and Defendants Mauchley and Richard

16　Sinclair does not, and at all times herein mentioned did not, exist.

17　39. Plaintiffs are informed and believe, and thereupon allege, that at all times mentioned

18　herein, each and every Defendant was the agent and employee of each and every other

19　Defendant and, in doing the acts herein alleged, was acting within the actual and apparent

20　course and scope of such agency and employment and with the permission and consent of

21　each other Defendant, and each Defendant ratified the conduct of each other Defendant and

22　is estopped by reason of his, her and its conduct and statements from denying such agency

23　and employment and that he, she or it acted within such course and scope of agency and

24　employment.

25　**Jurisdiction and Venue**

26　40. This court's jurisdiction is based on 28 U.S.C. § 1331; 15 U.S.C. § 1964(a); and applicable

27　principles of supplemental jurisdiction under 28 U.S.C. § 1367(a).

28　41. Venue is proper in this judicial district and division pursuant to 28 U.S.C. §§ 1391(b); 18

U.S.C. § 1965; and Local Rule 3-120(d).

**Background Facts For Claims**

**The Fox Hollow Property**

42. The real property about which the present action relates (the "Fox Hollow Property") is: commonly known as 152 20th Century Boulevard, Turlock, California; located in the City of Turlock, County of Stanislaus, State of California; and more particularly described as: The East Half Of That Portion Of Land As Follows:

Beginning At The Northeast Corner Of Section 15, Township 5 South, Range 10 East, Mount Diablo Base And Meridian, According To United States Government Township Plats Running Thence West On The Section Line Between Section 10 And 15, 1,059.3 Feet; Thence South 0 Degrees 45 Minutes East 472.5 Feet As Place Of Beginning; Thence Same Course 472.5 Feet; Thence South 89 Degrees 30 Minutes East 368.76 Feet; Thence North 0 Degrees 45 Minutes West 472.5 Feet; Thence North 89 Degrees 30 Minutes West 368.76 Feet To Place Of Beginning. Excepting Therefrom The West 15 Feet.

43. The Fox Hollow Property consists of approximately 1.76 acres, and is rectangular in shape, with approximately 170 feet fronting on 20th Century Boulevard, and a depth of approximately 442 feet.

44. On or about March 6, 1996, Defendant Flake as executive trustee of the Julie Insurance Trust, filed in Book 37 of Maps, Page 38, Stanislaus County Records, a final subdivision map for the Fox Hollow Property, and thereby subdivided the Fox Hollow Property into Lots 1, 11, 18 and 19, and a designated remainder ("Fox Hollow Subdivision Map # 1"). Such lots as created by the filing of the Fox Hollow Subdivision Map #1 shall be referred to herein by their lot number (e.g., "Lot 1").

45. Fox Hollow Subdivision Map # 1 as filed in the Official Records of Stanislaus County, California on March 6, 1996, depicted Lot 18A contiguous to Lot 19 and adjacent to Lot 18.

46. On or about July 21, 1998, Defendant Mauchley filed in Book 38 of Maps, Page 19, Stanislaus County Records, a final subdivision map for the Fox Hollow Property, and thereby further subdivided the designated remainder of the Fox Hollow Property into Lots 2 through 10, Lots 12 through 17, and a common area ("Fox Hollow Subdivision Map #

2"). Such lots as created by the filing of the Fox Hollow Subdivision Map #2 shall be referred to herein by their lot number (e.g., "Lot 2").

47. Fox Hollow Subdivision Map # 2 as filed in the Official Records of Stanislaus County, California on July 21, 1998, depicted Lot 2A as contiguous to Lot 12 and across the common area from Lot 2, depicted Lot 6A as contiguous to Lot 15 and across the common area from Lot 6, depicted Lot 7A as contiguous to Lot 16 and across the common area from Lot 7, depicted Lot 8A as contiguous to Lots 16 and 7A and across the common area from Lot 8, depicted Lot 9A as contiguous to Lot 18 and across the common area from Lot 9, and depicted Lot 10A as contiguous to Lot 17 and across the common area from Lot 10.

**Initial Purchase, Encumbrance, And Development Of Fox Hollow Property As An Apartment Complex**

48. The Sinclairs purchased the Fox Hollow Property in November 1988 after obtaining approval from the City of Turlock to construct a 35-unit townhouse apartment complex, and obtained a construction loan in the face amount of $1,492,500 from Stockton Savings & Loan Association ("Stockton S&L"), secured by a first deed of trust against the Fox Hollow Property, that was recorded on November 7, 1988 (the "Stockton Construction Loan").

49. Construction of the apartment complex on the Fox Hollow Property started in 1989 and was completed in late 1990 or early 1991. The apartment complex consisted of two rows of buildings along the east and west sides of the property facing each other, with a swimming pool at the south end, and access to 20th Century Boulevard at the northern boundary.

50. The buildings included three (3) detached single-family dwellings with one-car garage, nine (9) duplexes with attached one-car garages, and seven (7) duplexes with detached one-car garages.

51. The Sinclairs stopped making payments on the Stockton Construction Loan in July 1992, and Stockton S&L recorded a Notice of Default on August 11, 1993, asserting a default in the amount of $172,525.92.

**Entitlements Obtained From The City Of Turlock To Subdivide And Convert The Fox Hollow Property Into A Twenty (20) Lot Planned Unit Development With Homeowner's Association**

52. On or about the summer of 1992, Defendant Richard Sinclair made a preliminary proposal to the Community Development Department of the City of Turlock (the "Turlock Development Department") to subdivide the Fox Hollow Property and convert the property to a planned unit development.

53. On or about August 10, 2002, the Turlock Building Department responded to the preliminary proposal in writing, by letter sent to Richard Sinclair, in which the Turlock Building Department advised Defendant Sinclair that: The creation of a multi-lot subdivision from the existing apartment complex would require a formal submittal of applications for rezone, a planned development permit, a tentative subdivision map, and a conditional use permit; Mr. Sinclair's proposal to promote ownership of individual lots with multi-unit structures tended to promote a pattern of absentee owners sharing little beyond their investment; the City would require a complete building code analysis report of existing building construction and proposed property lines and would require construction modifications so that units were structurally and architecturally independent of each other prior to the recording of a final subdivision map; and under the circumstances, staff did not support the proposal as presented because of concerns about the proposal creating major challenges for a successful residential development.

54. On or about September 17, 1992, Defendant Richard Sinclair confirmed in writing in a letter sent to the Director of the Turlock Development Department that he agreed to implement the conditions for approval of the project into CC&Rs for the property "to protect the general public's welfare and safety in perpetuity," and that he had proceeded to have the CC&Rs and homeowners documents redrafted accordingly.

55. On or about February 2, 1993, Defendant Richard Sinclair as "Applicant" and "Owner" applied to the City of Turlock for a conditional use permit, planned unit development, rezoning and vesting tentative map, to subdivide the Fox Hollow Property into nineteen

11

1    (19) lots, and a common area, and to convert the apartment complex to a planned unit

2    development with a homeowners association owning and being responsible for the

3    maintenance of the common area and certain aspects of the individual lots (the "Project").

4    56. As part of the application for approval of the Project, Defendant Richard Sinclair

5    represented through his engineer on the Vesting Tentative Map of Fox Hollow submitted

6    to the City of Turlock on or about February 5, 1993, that the garages that were detached

7    from the dwelling units are denoted as Lots with a number followed with the capital letter

8    "A" and that the relationship between those "A" lots and the dwelling units was that a

9    garage lot corresponded to the dwelling unit with the same numeric lot number, as for

10    example as stated on the Vesting Tentative Map "GARAGE LOT 6A CORRESPONDS

11    TO DWELLING UNIT LOT 6."

12    57. On or about March 4, [1993], the Turlock Community Development Department issued a

13    letter to Defendant Richard Sinclair confirming that a complete building code analysis of

14    the existing building construction would be required, that any modifications to the existing

15    structures that were required to meet current standards for subdivided lots would need to

16    be accomplished prior to recording the final subdivision map, that the existing landscaping

17    must be repaired prior to recording of a final map, and that appropriate CC&Rs needed to

18    be recorded to ensure the continued maintenance of the development.

19    58. The Project was approved by the Turlock City Planning Commission on or about April 1,

20    1993, and by the Turlock City Council on or about May 25, 1993, subject to various

21    conditions, including among others:

22    * * *

23    4. Prior to recordation of a final map(s) the applicant shall:

24    a) Provide the City of Turlock a complete building codes analysis of the existing
buildings and facilities; and

25    b) All modifications necessary to insure compliance with the Turlock Municipal

26    Code and the Uniform Building Code shall be completed. [Building Department]

27    * * *

28    11. Upon any subdivision of the site, a homeowners association shall be formed
and responsible for the maintenance of all common areas, roadway, parking,

fencing and landscaping in accordance with Exhibit C. [Planning Department]

59. Defendant Richard Sinclair applied to and obtained approval of the Project from the City of Turlock on the basis that the Project involved thirty-five (35) town homes with one car garages on 1.76 acres and was "creating [a] 20 lot subdivision consisting of 3 detached single family dwellings, 7 detached duplexes, 9 duplexes attached by garages, and 1 lot for common area, pool, driveways, [and] parking."

60. A structural building code compliance analysis for the Fox Hollow Property as required under Condition 4 a) was performed by an architect retained by Defendant Richard Sinclair and submitted to and approved by the City of Turlock in or about December 1993. The structural work specified in the analysis to meet current standards for individually owned lots included installing twenty-seven (27) firewalls for the garages, three (3) fire walls in the units, eliminating six (6) roof overhangs, removing seven (7) windows, and adding two (2) roof vents.

61. In January 1994, Defendant Richard Sinclair submitted an application to the Turlock Community Development Department, for a modification to Condition 4 b) to the conditions of approval for the Project so that the work required to bring the existing buildings into compliance with current standards be deferred until sometime after the recording of a final map for the Project (the "Modification Application").

62. Defendant Richard Sinclair was advised in a letter sent on or about February 7, 1994, from the Turlock Community Development Department, that after further discussion involving the City Engineer, City Attorney's Office, and the building official and the senior planner of the Community Development Services, they were unable to develop an option that would ensure no City involvement in completion of the project in the event the property owners failed to fulfill their obligations in the matter after recording the final map, and accordingly, the options available were to: Complete the original conditions of the vesting map, file multiple final maps and completing the conditions covering the portion of the property subject to each final map, or re-subdividing the property as a condominium project.

63. On or about February 17, 1994, the Turlock Planning Commission denied the Modification Application and thereby continued to require that all modifications to meet current standards for individually owned lots be completed prior to recording the final map.

64. Thereafter, on or about April 29, 1994, Defendant Richard Sinclair notified the Planning Department of the City of Turlock in writing that he would be completing multiple maps for the subdivision and that: "There are sufficient funds within the Homeowner's Association to replace and maintain said [common area] lighting." Said statement was false when made in that no homeowners association had been created nor were there funds within a homeowner association to replace and maintain lighting or otherwise maintain the common area.

65. On or about June 8, 1994, Defendant Richard Sinclair filed a Voluntary Petition under Chapter 11 of the Bankruptcy Code on behalf of himself and his spouse, with the United States Bankruptcy Court, Eastern District of California, Case No. 94-92271-A-11 (the "Sinclair Bankruptcy Case").

**Defendants Lose Fox Hollow Property In Late 1994 Through Foreclosure And Then Reacquire Fox Hollow Property In October 1995**

66. The Sinclairs lost the Fox Hollow Property to Stockton S&L through a non- judicial foreclosure on the Stockton Construction Loan on or about December 13, 1994.

67. On or about the summer of 1995, Defendant Richard Sinclair contacted Defendant Flake and Defendant Mauchley; and discussed with each of them reacquiring the Fox Hollow Property from the lender, and continuing to pursue the Project.

68. Pursuant to such discussions, Defendant Richard Sinclair formed a trust for Defendant Mauchley in August 1995 called "Mauctrst", and Defendant Stanley Flake, as Trustee of The Julie Insurance Trust, purchased the Fox Hollow Property from the lender (which had been renamed Stockton Federal Bank) on or about October 31, 1995, for approximately $1.27 million that Defendant Flake, as trustee of the F. Hanse Trust, had advanced for the purchase.

**Fox Hollow CC&Rs Recorded In September 1996**

69. On or about September 16, 1996, Defendant Flake, as trustee of the Julie Insurance Trust, executed as the declarant, and Defendant Sinclair caused to be recorded as Document No. 96-0078121-00 in the Official Records of Stanislaus County, California, a Declaration of Covenants, Conditions and Restrictions for the Fox Hollow Property (the "Fox Hollow CC&Rs").

70. Article I, Section 16 of the Fox Hollow CC&Rs, defines "Association" as the "Fox Hollow of Turlock Owners' Association, a non-profit mutual benefit corporation, membership in which shall be limited to owners (as hereinafter defined) and in which all owners have a membership interest."

71. Article I, Section 11 of the Fox Hollow CC&Rs, defines "Owner" and "Owners" as "the record owner or owners, whether one or more persons or entities, of a fee simple title to a lot. . . ."

72. Article I, Section 11, defines "Lots" as "Those certain parcels of land, together with the single family residential improvements attached thereto, described on the map of Fox Hollow subdivision, as Lots 1-19, County of Stanislaus, State of California."

73. Defendant Flake, as trustee of the Julie Insurance Trust, declared in Article II, Section 1, that the Fox Hollow Property was subject to the Fox Hollow CC&Rs.

74. Pursuant to the Fox Hollow CC&Rs: Defendant Flake, as trustee of the Julie Insurance Trust, was required to convey to the Association fee title to the common area for the Fox Hollow Property free and clear of all liens and encumbrances "prior to the conveyance of title to the first lot" and to appoint the initial Board of the Association consisting of three (3) Directors (Art.III, §§ 3 & 6); the Association was charged with the duty to repair and maintain the common area and certain aspects of the Lots (Art. IV § 1); and the Board of the Association was mandated to "establish regular monthly assessments for operations and maintenance of the Project . . . payable in monthly installments on the first day of each month commencing on the first day of the first month following conveyance of the first Lot." (Art. V, § 2).

75. Article V, Section 1 of the Fox Hollow CC&Rs provides in part that: "Declarant hereby

15

1    covenants and agrees for each Lot owned by it within the Project, and each Owner of any

2    Lot by acceptance of a deed is deemed to covenant and agree, to pay to the Association the

3    dues levied pursuant to this Article."

4    76. Defendants reaffirmed in the Fox Hollow CC&Rs that the "A" lots were not separate from

5    their corresponding dwelling units in that among other things: (a) Article V provides that

6    the monthly assessments for operations and reserves shall be charged to the residential

7    units on the Lots; and (b) the easements for ingress and egress over the common area under

8    Article VI are "for the benefit of the Lots and Lot Owners."

9    **Defendants' Five (5) Loan Fraudulent Financing Scheme In February 1997**

10    77. On or about early 1997, Defendants Richard Sinclair, Mauchley and Flake carried out

11    fraudulent record title churning and financing transactions involving Fox Hollow, by

12    creating the false appearance of a planned unit development with a homeowners

13    association and the false appearance of an arms length transaction between Defendants

14    Flake and Mauchley in order to borrow more than $1.4 million against the Fox Hollow

15    Property.

16    78. Defendant Richard Sinclair established the price for the conveyance of Lots 1, 11, 18 and

17    19, and the remainder of the Fox Hollow Property, from Defendant Flake, as trustee of the

18    Julie Insurance Trust, to Defendant Mauchley at $1.9 million.

19    79. As part of the scheme, Defendant Flake, as trustee of the Julie Insurance Trust, conveyed

20    record title to Lots 1, 11, 18, 19, and the balance of the Fox Hollow Property, to Defendant

21    Mauchley, by five separate deeds accepted by Defendant Mauchley, and recorded in the

22    Official Records of Stanislaus County, California on February 26, 1997.

23    80. Also, as part of the scheme, Defendant Richard Sinclair assisted Defendant Mauchley in

24    obtaining loans on Lots 1, 11, 18 and 19, each in the amount of $119,000, and an

25    additional loan in the amount of $1 million against the balance of the Fox Hollow

26    Property, from GMAC Mortgage Corporation ("GMAC"), secured by first deeds of trust in

27    favor GMAC, also recorded in the Official Records of Stanislaus County, California, on

28    February 26, 1997.

81. Also, as part of the scheme, the $1.9 million price for Fox Hollow was paid to Defendant Flake from the proceeds on the five (5) loans from GMAC and by a Deed of Trust in favor of Defendant Flake, as trustee of the Capstone Trust, against the Fox Hollow Property, executed on or about February 21, 1997, by Defendant Mauchley, and recorded on or about March 3, 1997, that purportedly secured an obligation in the amount of $444,888, and provided that Defendant Flake, as trustee of the Capstone Trust will provide lot releases for the fifteen (15) lots being created (the lots other than Lots 1, 11, 18 and 19) for the payment of $37,037 per lot, and lot releases on Lots 1, 11, 18 and 19 for the payment of $16,447.33 per lot.

82. Defendant Mauchley represented and promised in the "Planned Unit Development Rider" included in the deeds of trust in favor of GMAC that were recorded against Lots 1, 11, 18 and 19, on or about February 26, 1997, that:

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in covenants, conditions and restrictions of record (the "Declaration").

The Property is a part of a planned unit development known as Fox Hollow . . . [and] the Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common area and facilities of the PUD (the "Owners Association"), and the uses, benefits and proceeds of Borrower's interest. PUD COVENANTS. In addition to the covenants, and agreements made in the security instrument, Borrower and Lender further covenant and agree as follows: [¶] A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's constituent documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or equivalent document which creates the Owners Association; and (iii) any by laws or other rules or regulations of the Homeowners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

83. Said representations and promises in the Planned Unit Development Riders were false when made. The true facts known by Defendants Richard Sinclair, Mauchley and Flake, and concealed by them from GMAC, were that: there was no homeowners association or equivalent entity to own or manage the common area and facilities of the PUD; title to the common area had not been transferred to a homeowners association; and Defendants Richard Sinclair, Mauchley and Flake, and each of them, had no intention at that time to form a homeowners association, to transfer title to the common area to a homeowners

1    association, or to charge and collect dues and assessment to maintain the common area and

2    lots, all as required of them in the Fox Hollow CC&Rs and by the conditions of approval

3    by the City of Turlock for the Project.

4    84. Defendants Richard Sinclair, Mauchley and Flake, and each of them, also concealed from

5    GMAC that the corresponding one car garage for Lot 18 was on Lot 18A, that the

6    corresponding one car garage for Lot 18 was not included in the legal description under the

7    deed of trust for the loan on lot 18, that the corresponding one car garage for Lot 18 was

8    left as additional collateral for Defendant Flake to receive the balance of the sales price

9    from the creation of the other fifteen(15) lots, and that the corresponding one car garage for

10    Lot 18 was left out as part of the deal between Defendants Richard Sinclair, Mauchley and

11    Flake.

12    85. GMAC made said loans in reliance upon said representations and promises, and had it

13    known the true facts and concealed facts, it would not have completed said loans without

14    compliance with the Fox Hollow CC&Rs and City of Turlock conditions for the Project,

15    and without including the corresponding one car garage on Lot 18A in the legal description

16    in the deed of trust for the loan on Lot 18.

17    **Defendants' Fifteen (15) Loan Fraudulent financing Scheme In July 1998**

18    86. Defendants Richard Sinclair, Mauchley and Flake, continued the fraudulent record title

19    churning and financing scheme for Fox Hollow in 1998.

20    87. As part of the scheme, Defendant Richard Sinclair, in the name of Defendant Mauchley,

21    filed applications for loans against each of the fifteen (15) remaining lots at Fox Hollow

22    and continued to process Fox Hollow Subdivision Map # 2, for purpose of obtaining said

23    loans.

24    88. Each of said loans was conditioned on the filing of Fox Hollow Subdivision Map # 2 to

25    create the lots, and each of said loans was based on each of the lots being individually

26    saleable.

27    89. As part of said scheme, by early 1998, Defendants Richard Sinclair, Mauchley and Flake

28    planned to transfer record title to the lots at Fox Hollow to an entity to be called Mauctrst

1    LLC immediately after such loans funded. Pursuant to such plan: Defendant Mauchley

2    executed an "Option & Operating Agreement For Real Property And Contracts" on or

3    about January 1, 1998, individually, as "Mauctrst" and as member manager of Mauctrst

4    LLC, that provided among other things that Defendant Richard Sinclair would be paid a

5    monthly fee of $10,000 for overseeing the management and control of various properties

6    including Fox Hollow; Defendant Richard Sinclair executed and caused to be filed with the

7    California Secretary of State "Articles of Organization" for Mauctrst LLC on or about

8    April 28, 1998; Defendant Richard Sinclair prepared, Defendant Mauchley executed,

9    Defendant Mauctrst accepted and Defendant Richard Sinclair caused to be recorded in the

10    Official Records of Stanislaus County, California, a grant deed conveying record title to

11    Lots 1 through 19 to Mauctrst on or about July 29, 1998 (only seven (7) days after the July

12    1998 loans closed); and Defendant Richard Sinclair prepared and Defendants Mauctrst and

13    Mauchley executed a deed of trust from Mauctrst LLC dated July 23, 1998 and recorded

14    on December 3, 1998 against Lots 1 through 19, that purportedly secured an obligation in

15    the amount of $271,000, and provided that Defendant Flake, as trustee of the Capstone

16    Trust would provide lot releases for lots 8, 10, 16 upon the payment of $7,742.85 per lot,

17    and for Lots 1-7 , 9, 11-15, and 17-19 upon the payment of $15,485.70 per lot (the "July

18    1998 Flake Lot Release Trust Deed").

19    90. As part of said scheme, Defendant Mauchley, on or about July 9, 1998, executed loan

20    applications for each of such loans, describing the property by unit number or numbers,

21    and representing that the property had been acquired in 1995.

22    91. On or about July 22, 1998, Defendant Mauchley, after he had recorded Fox Hollow

23    Subdivision Map # 2, creating fifteen (15) more lots with duplexes or single family

24    townhouses, closed the fifteen (15) new loans secured by a first deed of trust against the

25    each lot. The total amount of these loans was more than $1.8 million.

26    92. Each town home at Fox Hollow was assigned a unit number by the U.S. Post Office with

27    the even numbered units generally were located along the east side of the property, and the

28    odd numbered units were generally located along the west side of the property. The

19

ADDENDUM A
Page 19

following table correlates lot number, unit number, lender and loan amount for the February 1997 and July 1998 loans at Fox Hollow [the banks and finance companies that loaned money to Defendant Mauchley in 1997 and 1998 are not parties in this case and are collectively referred to as "Lenders"]:

| Lot No. | Unit No. | Lender Abbreviation | Loan Amount |
|---|---|---|---|
| 1 | 133 & 135 | GMAC | $119,000 |
| 2 | 129 & 131 | Oceanmark / Bank One | $130,000 |
| 3 | 125 & 127 | Granite Bay / Allied American Funding / Conti | $130,000 |
| 4 | 121 & 123 | Alternative / Bank One | $135,000 |
| 5 | 117 & 119 | Oceanmark / Bank One | $130,000 |
| 6 | 113 & 115 | Alternative / HFC | $135,000 |
| 7 | 109 & 111 | Granite Bay / Allied American Funding / Conti | $130,000 |
| 8 | 107 | Oakmont / HFC | $74,000 |
| 9 | 101 & 103 | Granite Bay / Allied American Funding / Conti | $130,000 |
| 10 | 105 | Oakmont / HFC | $74,000 |
| 11 | 130 & 132 | GMAC | $119,000 |
| 12 | 126 & 128 | Alternative / Norwest Bank | $135,000 |
| 13 | 122 & 124 | Oceanmark / Ocwen | $130,000 |
| 14 | 118 & 120 | Granite Bay / Allied American Funding / Conti | $130,000 |
| 15 | 114 & 116 | Oceanmark / Bank One | $130,000 |
| 16 | 108 | Oakmont / HFC | $74,000 |
| 17 | 110 & 112 | Alternative / Chase | $135,000 |
| 18 | 100 & 102 | GMAC | $119,000 |
| 19 | 104 & 106 | GMAC | $119,000 |
| | | Total | $2,278,000 |

93. A portion of the proceeds on the July 1998 loans was used to pay off the $1 million loan

1   from GMAC, and to pay Defendant Flake the amount remaining due on the deed of trust

2   he received at the time of the sale of the Fox Hollow Property to Defendant Mauchley in

3   February 1997, as well as other advances he made, in the amount of approximately

4   $575,000.

5   94. Defendant Mauchley represented and promised in the "Planned Unit Development Rider"

6   included in the deeds of trust securing the loans on Lots 3, 4, 6, 7, 8, 9, 10, 12, 14, 16

7   and17, and that were recorded on or about July 22, 1998, that:

8   The Property includes, but is not limited to, a parcel of land improved with a
    dwelling, together with other such parcels and certain common areas and facilities,
9   as described in covenants, conditions and restrictions of record (the "Declaration").

10  The Property is a part of a planned unit development known as Fox Hollow . . .
    [and] the Property also includes borrower's interest in the homeowners association
11  or equivalent entity owning or managing the common area and facilities of the
    PUD (the "Owners Association"), and the uses, benefits and proceeds of
12  Borrower's interest.

13  PUD COVENANTS. In addition to the covenants, and agreements made in the
    security instrument, Borrower and Lender further covenant and agree as follows:
14  [¶] A. PUD Obligations. Borrower shall perform all of Borrower's obligations
    under the PUD's constituent documents. The "Constituent Documents" are the: (i)
15  Declaration; (ii) articles of incorporation, trust instrument or equivalent document
    which creates the Owners Association; and (iii) any by laws or other rules or
16  regulations of the Owners Association. Borrower shall promptly pay, when due, all
    dues and assessments imposed pursuant to the Constituent Documents.
17
18  95. Said representations and promises in the Planned Unit Development Riders were false

19  when made. The true facts known by Defendants Richard Sinclair, Mauchley and Flake,

20  and concealed by them from each of such lenders, were: there was no homeowners

21  association or equivalent entity to own or manage the common area and facilities of the

22  PUD; title to the common area had not been transferred to a homeowners association; and

23  Defendants Richard Sinclair, Mauchley and Flake, and each of them, had no intention at

24  that time to form a homeowners association, to transfer title to the common area to a

25  homeowners association, or to charge and collect dues and assessment to maintain the

26  common area and lots, all as required of them in the Fox Hollow CC&Rs and by the

27  conditions of approval by the City of Turlock for the Project.

28  96. Defendants Richard Sinclair, Mauchley and Flake, and each of them, concealed from each

1      of the lenders that the corresponding one car garages for Lots 2, 6, 7, 8, 9 and 10, were on

2      Lots 2A, 6A, 7A, 8A, 9A and 10A; that the corresponding one car garages for Lots 2, 6, 7,

3      8, 9 and 10, were not included in the legal description in the deed of trust for the loan on

4      each such lot; and that the corresponding one car garages for Lots 2, 6, 7, 8, 9 and 10, were

5      left as additional collateral for Defendant Flake and were left out as part of the deal

6      between Defendants Richard Sinclair, Mauchley and Flake in 1997.

7    97. Defendants Richard Sinclair, Mauchley, Flake and Mauctrst, and each of them, concealed

8        from the lenders on such loans that they had not, despite being required to do so in the

9        Turlock City conditions for approval of the Project, made the modifications to the

10       structures as required in the building code analysis and had not relocated utilities so that

11       each lot was individually served by electricity, telephone, gas and cable television, and

12       thereby prevented such lots from being individually saleable even though each lot was

13       provided as collateral for one of the loans and the value of the lot as collateral was based

14       upon the lot being individually saleable.

15   98. As part of said July 1998 loans, Granite Bay Funding, closed the loans to Defendant

16       Mauchley secured by first deeds of trust against lots 3, 7, 9 and 14, each securing a loan in

17       the amount of $130,000, and then for value received completed the sale, transfer and

18       assignment of such loans to CEMG's processor, Allied American Funding, on or about

19       August 1998, who that in turn, sold, transferred and assigned said loans to CEMG's

20       predecessor, Conti Mortgage Corporation on or about August 1998. Granite Bay Funding,

21       Allied American Funding, and Conti Mortgage Corporation shall be collectively referred

22       to hereinafter as "Conti" and Lots 3, 7, 9 and 14 shall be referred to collectively as the

23       "Conti Lots."

24   99. Each of said lenders (including without limitation Conti) made said loans and purchased

25       said loans in reliance upon said representations and promises, and had they known the true

26       facts and concealed facts, they each would not have made and purchased said loans as

27       alleged herein without compliance with the Fox Hollow CC&Rs and City of Turlock

28       conditions, and without including the corresponding one car garages on Lots 2A, 6A, 7A,

1    8A, 9A and 10A, in the legal description in the deed of trust for the loan on Lots 2, 6, 7, 8,

2    9 and 10.

3    100.    Defendant Flake in his various capacities, advanced approximately $1.27 million to

4    purchase the Fox Hollow Property in October 1995, and as a result of the February 1997

5    financing scheme, received approximately $1.4 million in cash in February 1997, and as a

6    result of the July 1998 financing scheme received approximately $545,000 in cash in July

7    1998 and the July 1998 Flake Lot Release Trust Deed.

8    **Defendants Use Their Refusal And Failure To Complete The Requirements To Subdivide**

9    **The Fox Hollow Property To Try To Force The Lenders To Sell The Loans To Defendants**

10   **At A Substantial Discount**

11   101.    On or about July 1, 1999, and after Defendant Mauchley had gone into default on

12   each of the loans obtained as part of the financing scheme in February 1997 and July 1998,

13   Defendant Richard Sinclair, in the name of Mauctrst, filed a Voluntary Petition under

14   Chapter 11 of the Bankruptcy Code, with the United States Bankruptcy Court, Eastern

15   District of California, Case No. 99-28903-C-11 (the "Mauctrst Bankruptcy Case").

16   102.    Defendants continued to conceal their failure to comply with the requirements of

17   the City of Turlock for the subdivision and conversion to a planned unit development for

18   the Fox Hollow Property until at least on or about November 18, 1999, when they started

19   disclosing some of the information in an effort to try to renegotiate or purchase at a

20   substantial discount the loans on the Lots at Fox Hollow Property.

21   103.    The first of such disclosure was made by Defendants Mauctrst, Richard Sinclair,

22   and Mauchley, on or about November 18, 1999, in a First Amended Disclosure Statement

23   filed in the Mauctrst Bankruptcy Case, in which they admitted:

24       At the time that the 19 loans were put into place on Fox Hollow . . . 19 appraisals
         were obtained valuing the 16 duplexes at $185,000 each with the other 3 single
25       family residences valued at $93,500 each. One of the duplex appraisals is attached
         as Exhibit "F" and incorporated herein by reference. The total appraised value at
26       the time was $3,240,500, subject to final completion of the subdivision firewalls
         and underground relocation of utilities to accommodate individual ownership in
27       this planned united development.

28   104.    Defendants Mauctrst, Richard Sinclair and Mauchley made the same admission in

1    their Second Amended Disclosure Statement filed in the Mauctrst Bankruptcy Case on

2    December 17, 1999.

3    105.    Prior to the time the loans closed, Defendants Richard Sinclair, Mauchley and

4    Flake believed that the value of Fox Hollow would be enhanced upon completion of the

5    requirements of the City of Turlock so that the lots would be individually saleable.

6    Moreover, Defendant Richard Sinclair was aware that completion of such requirements

7    was material in that he was aware during the Sinclair Bankruptcy Case, that the appraised

8    value for Fox Hollow as an apartment complex was approximately $1.7 million dollars

9    while he placed the value of Fox Hollow with individually saleable lots at approximately

10    $3 million.

11    106.    The schedules filed by Defendants Richard Sinclair, Mauchley and Mauctrst in the

12    Mauctrst Bankruptcy Case on or about September 7, 1999 and amended schedules filed on

13    or about December 8, 1999, also disclosed that Mauctrst had paid Defendant Richard

14    Sinclair over the period of twelve (12) months proceeding the filing of the Bankruptcy

15    Case, approximately $160,000.

16    107.    Defendants Mauctrst, Richard Sinclair and Mauchley also admitted in such

17    schedules and amended schedules filed in the Mauctrst Bankruptcy Case, that Conti

18    Mortgage Corporation was the successor to and held an undisputed security interest on the

19    July 1998 loans against Lots 3, 7, 9 and 14.

20    108.    On or about December 9, 1999, the trustee in the Mauctrst Bankruptcy Case filed a

21    motion for authority to abandon various real property, including the Fox Hollow Property,

22    on the ground that such property was substantially over-encumbered.

23    109.    On or about January 14, 2000, the Bankruptcy Court approved the abandonment by

24    the bankruptcy trustee of the Fox Hollow Property back to Mauctrst.

25    110.    On or about January 25, 2000, Defendant Richard Sinclair, on behalf of

26    Defendants, disclosed in writing in letters mailed to representatives of the lenders holding

27    the July 1998 deeds of trusts on Lots 2, 3, 4, 5, 7, 9, 13, 14 and 15, in an effort to purchase

28    their loans for $80,000 (when the amount then due exceeded $130,000):

Currently, this property cannot be sold as a duplex or single family residence. The subdivision has not been completed. Underground electrical work, relocation of utilities and individual meters are among the requirements still to be completed for the City of Turlock. . . .

* * *

Only someone who controls all properties can complete these requirements. I have a client who is willing to do this and would complete the purchase quickly.

111.     On or about October 12, 2000, Defendant Richard Sinclair, purportedly on behalf of the homeowners association for the Fox Hollow Property, sent a fax to the escrow holder handling escrow for the sale of lots 2, 4 and 15 at Fox Hollow, stating:

Please allow this letter to serve as notice to Chicago Title and PMZ that title to the lots cannot be transferred at the present time. A few of the reasons are as follows:

(1) The subdivision requirements to sell lots has not been completed. The City of Turlock has a number of requirements including, but not limited to, the movement of the electrical and other utility lines to each individual lot. You will have to obtain permission from the other lot owners to re-route those utility lines and from the Homeowners Association and receive approval from the City of Turlock for the balance of the subdivision improvements and requirements prior to offering the property for sale or transferring title.

(2) Additionally, firewalls between lots in the garages and on the back of each duplex must be installed. New permits will have to be obtained and go through the permit application process with respect to each unit.

(3) Each lot has additional individual requirements for corrections and improvements before those lots can be offered for sale.

* * *

(5) The deeds of trust may not have included security on some or all of the garages, particularly the detached ones. Therefore, title to those garages may remain in the name of the former owner. Restrictions regarding sale and use without garages should be explored both with the City of Turlock and with the recorded CC&Rs and Homeowners Association documents.

112.     While Defendants, as alleged above, began disclosing their failure to meet certain of the requirements of the City of Turlock to subdivide the Fox Hollow Property and convert it into a planned unit development, they continued to conceal their failure to comply with other requirements until at least late 2000 including the requirements to: (a) Form the homeowners association; (b) convey the common area to the homeowners association; (c) appoint a board of directors for the homeowners association; and (d) commence the assessment of monthly dues sufficient to fund the operation and

1    maintenance of the Fox Hollow Property in accordance with the Fox Hollow CC&Rs.

2    **Defendants Fraudulent HOA Dues And Assessments Billing Scheme In 2000 and Early 2001**

3    113.    The lenders (or their successors) who had made the loans as hereinabove alleged in

4    February 1997 and July 1998 began completing the foreclosures on those loans in June

5    2000 after the Fox Hollow Property was abandoned by the Mauctrst Bankruptcy trustee

6    back to Mauctrst.

7    114.    The foreclosures were completed with the recording of trustee's deeds upon sale on

8    Lot 7 on May 22, 2000, on Lot 4 on July 31, 2000, on Lots 1, 11, 18 and 19 on September

9    29, 2000, on Lots 5 and 15 on October 5, 2000, on Lot 2 on October 23, 2000, on Lot 17

10    on October 31, 2000, on Lot 12 on February 9, 2001, on Lot 13 on April 2, 2001, on Lot

11    16 on January 8, 2002, on Lot 10 on January 14, 2002, on Lots 6 and 8 on January 17,

12    2002, on Lot 3 on May 22, 2003, on Lot 9 on May 30, 2003, and on Lot 14 on June 25,

13    2003. Mauctrst was the record title holder of each of Lots 1 through 19 from July 29, 1998,

14    and until the date the trustees deed upon sale for the lot was recorded, as alleged herein.

15    115.    As a part of the ongoing misuse of the homeowners association and their efforts to

16    defraud the lenders, Defendants Richard Sinclair, Mauchley and Brandon Sinclair,

17    purportedly as the Board of Directors of Fox Hollow HOA (even though the articles of

18    incorporation for Fox Hollow HOA had not been filed with the California Secretary of

19    State), started on or about August 1, 2000, to send through the U.S. mail written dues

20    statements to the various lenders on the Lots at Fox Hollow, demanding payment of $300

21    per month per lot, including without limitation, as follows: On Lot 1 to GMAC from

22    September 21, 2000 through December 31, 2000; on Lot 2 to Bank One from October 1,

23    2000 through January 31, 2001; on Lot 4 to Bank One from August 1, 2000 through

24    January 31, 2001; on Lot 5 to Bank One from October 1, 2000 through January 31, 2001;

25    on Lot 7 to Conti Mortgage from August 1, 2000 through January 31, 2001; on Lot 11 to

26    GMAC from September 21, 2000 through December 31, 2000; on Lot 15 to Bank One

27    from October 1, 2000 through January 31, 2001; on Lot 18 to GMAC from September 21,

28    2000 through December 31, 2000; and on Lot 19 to GMAC from September 21, 2000

1   through December 31, 2000.

2   116.    On or about November 2000, Defendant Richard Sinclair, purportedly on behalf of

3   the homeowners association, sent a letter to an attorney for Bank One National

4   Association, as trustee, formerly FKA First National Bank of Chicago as trustee ("Bank

5   One"), demanding payment of dues for October and November on Lots 2, 4, 5 and 15, and

6   stating in the "PS" "A number of people have inquired about purchasing the duplexes that

7   your clients owns. Please advise us of the price as-is, where-is, so we may pass along the

8   information." (D348.)

9   117.    Defendants Richard Sinclair, Mauchley and Brandon Sinclair, on or about

10  December 2000, pursued foreclosures on various lots for failure to pay assessments, and

11  recorded on December 19, 2000, and caused to be sent through the U.S. mail notices of

12  delinquent assessment in the name of Fox Hollow HOA, for lots 1, 2, 4, 5, 11, 15, 18 and

13  19.

14  118.    Thereafter, on or about January 22, 2001, Defendants Richard Sinclair, Mauchley

15  and Brandon Sinclair recorded and caused to be sent through the U.S. mail notices of

16  delinquent assessment in the name of Fox Hollow HOA, for lots 2, 4, 5, 7 and 15.

17  119.    Defendants Richard Sinclair, Mauchley and Brandon Sinclair, represented in each

18  such dues statement, letter and notice of delinquent assessment that there was a

19  homeowners association, that Brandon Sinclair was president of the homeowners

20  association, and that dues of $300 per lot per month were due and owing to the

21  homeowners association starting August 1, 2000.

22  120.    Said representations were false when made. The true facts known by Defendants

23  Richard Sinclair, Mauchley, and Brandon Sinclair, and concealed by them from each of

24  such lenders were that: (1) Defendants had failed and refused to form Fox Hollow HOA as

25  a non-profit mutual benefit corporation until on or about December 6, 2000; (2)

26  Defendants had failed and refused to collect any dues and assessments from themselves;

27  and (3) Defendants intended to and did use payments of association dues and assessments

28  to finance lawsuits they had initiated against various lenders seeking to enjoin and delay

1   the foreclosures on their loans.

2   121.     Each of said lenders, including without limitation GMAC, made dues payments to

3   said Defendants in reliance upon said representations, and had they known the true facts

4   and concealed facts, they each would not have made such payments.

**The Foreclosure Delay Litigation**

6   122.     Defendant Richard Sinclair prepared and filled in the names of Defendants

7   Mauctrst and Mauchley, as plaintiffs therein, seven (7) lawsuits over the period March 22,

8   2000 and July 21, 2000, in the Stanislaus County Superior Court (Case Nos. 253769,

9   254996, 269907, 269969, 270025, 271066 and 271115), against various lenders on Lots at

10  Fox Hollow, seeking to enjoin the foreclosures (the "Foreclosure Delay Cases").

11  123.     Although Defendants Richard Sinclair, Mauctrst and Mauchley succeeded in using

12  Foreclosure Delay Cases to delay the foreclosures on the various lots without making any

13  further payments on any of the loans, said Defendants lost six (6) of the lawsuits and

14  settled the remaining case against GMAC involving Lots 1,11, 18 and 19 as more

15  specifically alleged below.

**Bank One Obtains A Receiver In Early 2001 For The Fox Hollow HOA**

17  124.     On January 30, 2001, Bank One (who had already foreclosed on Lots 5, 5 and 15),

18  filed suit against Fox Hollow HOA, Stanislaus County Superior Court Case No. 287128,

19  seeking a property inspection and appointment of a receiver for the Fox Hollow HOA. By

20  order of the court, Michael McGranahan was appointed as inspector and was required to

21  report back on February 22, 2001.

22  125.     Mr. McGranahan received his order of appointment to conduct the inspection of the

23  Fox Hollow HOA and Fox Hollow Property on or about February 9, 2001, and sent a letter

24  to Defendant Richard Sinclair via telecopier enclosing the order and demanding he turn

25  over the records of the Fox Hollow HOA. On or about February 12, 2001, Brandon

26  Sinclair delivered to Mr. McGranahan's office certain files and financial records for Fox

27  Hollow HOA.

28  126.     On or about February 13, 2001, Mr. McGranahan sent a second letter to Defendant

Richard Sinclair requesting documents and information that had not been delivered in accordance with the previous written request and court order. Despite Mr. McGranahan's request, Defendant Richard Sinclair did not provide any additional documents, and in particular, Defendant Richard Sinclair did not provide any bank statements or cancelled checks.

127.    Defendant Richard Sinclair responded by fax sent to Mr. McGranahan on or about February 14, 2001 asserting in part: "The lots were created but no party ever decided to complete the task that would prepare the subdivision for sale of individual lots and the property was and continues to be operated as an apartment complex. The property changed hands many times being kept as an apartment complex in bulk."

128.    Mr. McGranahan submitted his report of inspection to the court on February 22, 2001, explaining that when he inspected the property on or about February 2, 2001, the property was "in very poor condition, littered with garbage, old discarded furniture, disabled vehicles and shopping carts."

129.    Mr. McGranahan also reported that according to a summary provided to him by Defendant Richard Sinclair, Defendant Mauchley had paid dues on the lots at Fox Hollow from August 2000 through February 2001, in the amount of $23,000, but: "These alleged payments are not supported by any receipts, cancelled checks or bank records."

130.    Mr. McGranahan further explained that according to the information provided by Defendant Richard Sinclair, the Fox Hollow HOA paid Defendant Richard Sinclair attorney's fees in the amount of $15,266.99, paid management fees of $5,020 (including $350 to Brandon Sinclair), and paid $2,920 for insurance in which the Association was not even named as an insured. There was no accounting for the balance of $3,513.95.

131.    The court, on March 22, 2001, appointed Mr. McGranahan to serve as a receiver and he did so until he was relieved by Order of the court filed April 12, 2002.

132.    Mr. Rubenstein replaced Mr. McGranahan as a receiver for Fox Hollow HOA until he was released in October 2002 and the case was dismissed without prejudice on November 26, 2002.

133.      The cost and expenses to the Fox Hollow HOA for the receivership proceeding

included $22,609.95 for receiver's fees and $5,655.33 for the receivers' attorney's fees.

**Defendants' Fraudulent Financing Scheme Continues In 2001 With Two (2) More Loans On**

**Lots At Fox Hollow And With Rent And Tenant Deposit Skimming On Lots That They Had**

**Lost Through Foreclosure By Lenders**

134.      On or about May 2001, Defendants Mauchley and Flake, as trustee of the Capstone

Trust, entered into a settlement agreement with GMAC, of the lawsuit commenced by

Mauchley and Mauctrst, Stanislaus County Superior Court Case No. 269907, in which

Defendant Mauchley agreed to drop said lawsuit, and Defendant Flake, as a purported

junior lien holder on Lots 1, 11, 18 and 19, agreed to purchase said lots for $114,750 each

($459,000 total) in cash, with possession of said lots "delivered to Capstone at close of

escrow."

135.      Defendants Richard Sinclair, Mauchley and Flake concealed from GMAC during

the negotiations of said agreement, at the time said agreement was executed by the parties,

and thereafter through at least July 2002, that they had agreed among themselves to use

Capstone Trust as a straw buyer who would immediately upon purchase of a lot from

GMAC, transfer title to such lot to Defendant Richard Sinclair in a second escrow as part

of Defendant Richard Sinclair obtaining a loan against such lot in an amount substantially

in excess of the amount paid to GMAC, and Defendants Richard Sinclair and Flake would

split among themselves the net loan proceeds in excess of closing costs and the amount

paid to GMAC.

136.      Pursuant to such fraudulent scheme, Defendant Flake, as trustee of the Capstone

Trust, closed escrow on the purchase of Lot 19 from GMAC on or about August 1, 2001,

and then immediately conveyed title to said lot to Defendant Richard Sinclair by Grant

Deed recorded on or about August 2, 2001, who simultaneously obtained a loan from Long

Beach Mortgage Company, in the amount of $152,000, secured by a first deed of trust

against Lot 19 that was also recorded on or about August 2, 2001, with the proceeds from

such loan used to pay GMAC the purchase price of $114,750 and the closing costs, and the

1    balance of the net loan proceeds in the amount of approximately $31,420 distributed to

2    Defendants Richard Sinclair and Flake.

3    137.    Also, pursuant to such fraudulent scheme, Defendant Flake, as trustee of the

4    Capstone Trust, closed escrow on the purchase of Lot 1 from GMAC on or about

5    December 10, 2001, and then immediately conveyed title to said lot to Defendant Brandon

6    Sinclair by Grant Deed recorded on or about December 10, 2001, who simultaneously

7    obtained a loan from Decision One Mortgage Company, in the amount of $142,500,

8    secured by a first deed of trust against Lot 1 that was also recorded on or about December

9    10, 2001, with the proceeds from such loan used to pay GMAC the purchase price of

10    $114,750 and the closing costs, and the balance of the net loan proceeds of approximately

11    $18,452.14 distributed to Defendants Richard Sinclair and Flake.

12    138.    Pursuant to the Fox Hollow Scheme, Defendant Richard Sinclair conveyed title to

13    Lot 19 to Lairtrust by Grant Deed recorded on or about February 4, 2002, and Defendant

14    Brandon Sinclair conveyed title by Grant Deed to Lot 1 to Capstone LLC, also recorded on

15    or about February 4, 2002.

16    139.    Had Defendants Richard Sinclair and Flake disclosed the true facts to GMAC,

17    Long Beach Mortgage Company, and Decision One Mortgage Company, GMAC would

18    not have completed the sales of Lots 1 and 19, and Long Beach Mortgage Company and

19    Decision One Mortgage Company would not have closed said loans.

20    140.    While the purchase of said lots was pending, Defendant Richard Sinclair, by

21    facsimile, sent to GMAC, on or about June 27, 2002, asked for access to the units for

22    purposes of inspection. Unknown to GMAC, and despite said statement as well as the term

23    in the settlement agreement that possession shall transfer upon close of escrow, Defendants

24    Richard Sinclair, Brandon Sinclair and Mauctrst had continued to rent out and collect rents

25    on units on Lots 1, 11, 18 and 19, following completion of the foreclosure of the same on

26    September 29, 2000. Defendants Brandon Sinclair, Richard Sinclair and Lairtrust collected

27    rents on said lots during times they did not own said lots, through August 1, 2001, as to Lot

28    19, December 10, 2001 as to Lot 1, and June 25, 2002, as to Lots 11 and 18, in an amount

31

1    according to proof at trial, all while failing to pay homeowner association dues and failing

2    to maintain said property.

3    141.    Defendants Richard Sinclair for Lairtrust and Capstone LLC also entered in to

4    written leases on units 104, 133 and 135 with tenants and then refused the demands for

5    return of first month's rent and security deposits in the amounts of $1,825, $1,850 and

6    $1,895 respectively which such rights of the tenants have been assigned to Plaintiff

7    CEMG.

8    142.    Despite losing title to Lot 7 through foreclosure on June 6, 2000, Defendants

9    Richard Sinclair and Mauctrst continued to lease out and collect rents on units on said lot

10   in an amount according to proof at trial, until on or about February 2003, all while failing

11   to pay homeowner association dues and failing to maintain said property.

12   143.    With respect to Lot 19, Defendant Flake, as trustee of the Capstone Trust was the

13   record title holder on August 1 and 2, 2001, Defendant Richard Sinclair was record title

14   holder from August 2, 2001 to February 4, 2002, and Defendant Lairtrust LLC was record

15   title holder from February 4, 2002 to March 14, 2004, each having accepted the deed of

16   conveyance in which he or it became record title holder.

17   144.    With respect Lot 1, Defendant Flake, as trustee of the Capstone Trust, was the

18   record title holder on December 10, 2001, Defendant Brandon Sinclair was the record title

19   holder from December 10, 2001 to February 4, 2002, and Defendant Capstone LLC was

20   record title holder from February 4, 2002 through March 14, 2004, each having accepted

21   the deed of conveyance in which he or it became record title holder.

22   **CEMG Acquires The Lots And Loans At Fox Hollow Property**

23   145.    Plaintiff CEMG obtained fee simple title to Lots 2, 4, 5, 13 and 15 by a deed

24   executed by Bank One, which deed was recorded on May 17, 2002, in the official records

25   of Stanislaus County, California (the "Bank One Lots"). Plaintiff CEMG has continued up

26   to the present time to own and control of the Bank One Lots, and all improvements located

27   thereon.

28   146.    Plaintiff CEMG obtained fee simple title to Lots 11 and 18, by a deed executed by

GMAC, which deed was recorded June 25, 2002, in the Official Records, Recorder of Stanislaus County, California (the "GMAC Lots"). Plaintiff CEMG has continued up to the present time to own and control the GMAC Lots, and all improvements located thereon.

147.     Plaintiff CEMG obtained fee simple title to Lots 12, and 17, by deeds dated July 31, 2001, and recorded August 30, 2002, in the official records of Stanislaus County, California (the "Absher-Avanta Lots"). Plaintiff CEMG has continued up to the present time to own and control of the Absher-Avanta Lots, and all improvements located thereon.

148.     On September 13, 2002, CEMG entered into a written agreement with Conti Mortgage Corporation by Fairbanks Capital, its attorney-in-fact ("Conti Mortgage"), to purchase the promissory notes and deeds of trusts for the loans recorded against Lots 3, 7, 9 and 14, on July 22, 1998, and all legal and equitable claims, known or unknown, thereunder. CEMG and Conti Mortgage entered into an amendment of such agreement on or about October 29, 2002, to include the sale of Lot 7 to CEMG.

149.     CEMG completed the purchase of the loans on Lots 3 and 7, and the purchase of Lot 7 from Conti Mortgage on or about January 14, 2003. Plaintiff CEMG has continued up to the present time to own and control Lot 7, and all improvements located thereon.

150.     CEMG completed the purchase of the loans on Lots 9 and 14 from Conti Mortgage, on or about May 27, 2003.

151.     Plaintiff CEMG completed the foreclosures and trustees deeds upon sale were recorded on Lot 3 on May 21, 2003, on Lot 9 on May 30, 2003 and on Lot 14 on June 25, 2003. CEMG has continued up to the present time to own and control of Lots 3, 9, 14 and all improvements located thereon.

152.     As part of the purchase of the notes and deeds of trust on Lots 3, 7, 9 and 14, and the purchase of Lot 7, Conti Mortgage also transferred, sold and assigned to and Plaintiff CEMG accepted from Conti Mortgage all legal and equitable claims, known or unknown, under the subject notes and deeds and trust.

153.     Plaintiff CEMG obtained fee simple title to Lots 6, 8, 10 and 16, by a deed executed by Merle Alldrin, Rachel Alldrin, Gary Alldrin, and Lisa Alldrin (the "Alldrin

1    Lots"), which deed was recorded August 1, 2003, in the Official Records, Recorder of

2    Stanislaus County, California. Plaintiff CEMG has continued up to the present time to own

3    and control of the Alldrin Lots, and all improvements located thereon.

4    **Plaintiffs Rehabilitate Fox Hollow Property**

5    154.    On or about September 30, 2002, Mr. Rubenstein, as receiver for the Fox Hollow

6    HOA, provided notice of a meeting of the owners and of the board of directors of the Fox

7    Hollow HOA for October 15, 2002.

8    155.    At the meeting of owners for the Fox Hollow HOA on October 15, 2002, the

9    owners elected Andrew Katakis, Gary Alldrin and Dave B. Konecny, as directors for the

10    Fox Hollow HOA.

11    156.    On January 10, 2003, the Fox Hollow HOA Board held a noticed meeting. The

12    Board decided to hire professionals to assist with the problems facing Fox Hollow,

13    including among others, a construction consultant - Todd Smith & Association - to assist in

14    matters related to project renovation and code compliance.

15    157.    Mr. Smith conducted an extensive inspection of the property and contacted the City

16    of Turlock and various contractors to assess what needed to be done and the costs to do the

17    work.

18    158.    On July 21, 2003, the Fox Hollow HOA provided notice to the owners of a meeting

19    on July 31, 2003. The agenda for the July 31, 2003 meeting included notice that there

20    would need to be a special assessment and noted: "The project encompasses significant

21    deferred maintenance issues, pending code compliance issues with the City of Turlock

22    building department, health and safety issues and overall project beautification."

23    159.    On July 31, 2003, the Fox Hollow HOA Board of Directors held its meeting and

24    decided to move forward with the renovation and improvements to the common area and

25    completing the requirements of the City of Turlock for the Project, and approved a special

26    assessment of approximately $9,500 against each of the lots to fund the project.

27    160.    Over the period of mid 2003 through 2004, extensive work at substantial expense

28    was performed on the Fox Hollow Property. This work included completing the

1  requirements of the City of Turlock for separate ownership of the lots, and also a complete

2  renovation of the exteriors and interiors of many of the units that were no longer habitable.

3  161.　　The outside work included among other work, installing twenty-four (24) fire walls

4  in garages and six (6) fire walls in units, and cutting twelve (12) roof overhangs. Separate

5  underground utilities including electricity, gas, cable, television and telephone, were also

6  run to fifteen (15) of the units. This work was required under the original City of Turlock

7  approval to be completed prior to recordation of the final subdivision map.

8  162.　　The total cost to the Fox hollow HOA for such work was more than $300,000.

9  163.　　Plaintiff CEMG expended a total of more than $1 million on the rehabilitation that

10  included paying dues and special assessments to Fox Hollow for the work, as well as

11  additional work on the units.

12  **Defendants Continue To Falsely Assert Ownership In And A Right Of Possession To Garage**

13  **Lots And Common Area**

14  164.　　Defendants have continued and threaten to continue their misconduct as alleged

15  herein.

16  165.　　Defendants, from and after the commencement of this action up to the present time

17  have failed and refused to convey record clear title to the "A" Lot to Plaintiff CEMG,

18  despite demand having been made and accordingly, Plaintiff CEMG has been prevented

19  from obtaining approval of the subdivision through the California Department of Real

20  Estate, and from receiving profits form selling the individual single-family residences and

21  duplexes during on or about 2005 and 2006 at a time when market values were

22  substantially higher than they are currently.

23  166.　　On or about June 26, 2007, Defendant Richard Sinclair caused to be recorded a

24  quitclaim deed purportedly transferring title to Lots 2A, 6A, 7A, 8A, 9A, 10A, and 18A,

25  from Defendant Mauchley to Defendant Lairtrust, as Instrument No. 2007-0084538-00,

26  Official Records of Stanislaus County, California.

27  167.　　On or about April 17, 2008, Defendant Richard Sinclair as "Member/Manager for

28  Mauctrst LLC", served by U.S. Mail on Plaintiffs and on the tenants at the Fox Hollow

35

ADDENDUM A

Page 35

1        Property of unit number 131 and garage lot 2A, unit number 113 and garage lot 6A, unit

2        number 109 and garage lot 7A, unit number 111 and garage lot 7A, unit number 107 and

3        garage lot 8A, unit number 101 and garage lot 9A, unit number 103 garage lot 9A, unit

4        number 105 and garage lot 10A, unit number 100 and garage lot 18A, and unit number 102

5        and garage lot 18A, a "Notice of Termination of Tenancy/Occupancy And Use Of

6        Premises" demanding on behalf of the owner, Defendants Mauctrst and Mauchley, or their

7        predecessor Stanley Flake, Trustee, that such tenants and Plaintiffs remove themselves

8        from and deliver up possession, occupancy and use of the reference garage lot, as for

9        example "Garage Lot Unit 2A Located at 152 20th Century Blvd., Turlock, California

10       95380", on or before May 19, 2008, and stating that the notice is given "to terminate your

11       tenancy, occupancy and use of the premises of the above described property."

12    168.       Thereafter, on or about May 22, 2008, Defendant Richard Sinclair, again on behalf

13       of Defendants Mauchley and Mauctrst, or their predecessor-in-interest, Stanley Flake,

14       Trustee, wrote to CEMG and demanded that CEMG and its tenants vacate the garages on

15       lots 2A, 6A, 7A, 8A, 9A, 10A and 18A, and if they failed to do so by 5:00 p.m. on May 28,

16       2008, unlawful detainer action would follow.

17    169.       On or about July 2, 2008, Defendant Richard Sinclair commenced unlawful

18       detainer actions in the names of Mauctrst and Lairtrust, in the Superior Court of California,

19       County of Stanislaus, Case Nos. 628615 and 62852, against CEMG and its tenants for lots

20       9A and 2A respectively, in which Defendants Mauctrst and Lairtrust asserted they are the

21       owners of such garage lots, and sought to evict CEMG and its tenants from such garage

22       lots.

23    170.       On or about August 22, 2008, pursuant to motion by CEMG in such actions, such

24       actions were stayed pending the outcome of this action.

25    171.       On or about April 17, 2008, Defendant Richard Sinclair as "Member/Manager for

26       Mauctrst LLC", also served by U.S. Mail on the tenants of each of the thirty-five (35) units

27       at Fox Hollow and on Plaintiffs, a "Notice of Termination of Tenancy/Occupancy And Use

28       Of Premises" for the "Driveway and Common Area Located at 152 20th Century Blvd.,

1    Turlock, California 95380," demanding on behalf of the owner, Defendants Mauctrst and

2    Mauchley, or their predecessor Defendant Stanley Flake, Trustee, that such tenants and

3    Plaintiffs remove themselves from and deliver up possession, occupancy and use of the

4    premises described above, on or before May 19, 2008, and stating that the notice is given

5    "to terminate your tenancy, occupancy and use of the premises of the above described

6    property."

7    **Count One Fraud**

8    172.    The Plaintiffs asserting this count are Fox Hollow HOA and CEMG, and this count

9    is being asserted against Defendants Mauctrst, Richard Sinclair, Brandon Sinclair,

10   Mauchley, Flake, Lairtrust and Capstone LLC ("Defendants"). For purposes of this count,

11   and this count only, "Plaintiffs" and "Defendants" shall be limited to those parties.

12   173.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1

13   through 146 as if fully set forth herein.

14   174.    As set forth above, Plaintiff CEMG is the assignee of all claims of Conti arising out

15   of or related to the July 1998 loans on Lots 3, 7, 9 and 14.

16   175.    The Defendants, and each of them, knew that said representations and promises

17   were false at the time they were made, and Defendants, and each of them, concealed said

18   facts and made the representations and promises with the intent to induce said lenders to

19   make said loans and dues payments, and with the intent to defraud and deceive said

20   lenders, including without limitation, Conti.

21   176.    Defendants Richard Sinclair, Mauchley and Flake, commencing on or about 1995,

22   and continuing until at least 2003 and according to proof at trial, knowingly agreed,

23   colluded and conspired with each other and among themselves to fraudulently create the

24   false appearance of a homeowners association and individually saleable lots at Fox Hollow

25   in order to obtain loans secured by portions of Fox Hollow and to enrich themselves at the

26   expense of the lenders, the successors to the lenders and the homeowners association, by

27   skimming off loan proceeds, dues collected in the name of the homeowners association,

28   and rental income and tenant deposits, all while concealing their scheme and attempting to

1    shield themselves from individual liability by creating shell companies and churning

2    record title to the property (the "Fox Hollow Scheme").

3    177.    Defendant Mauctrst joined in, agreed to and become a part of Fox Hollow Scheme

4    by on or about April 1998; Defendant Lairtrust joined in, agreed to and become a part of

5    Fox Hollow Scheme on or about May 2000; Defendant Brandon Sinclair joined, agreed to

6    on and become a part of Fox Hollow Scheme by in or about June 2000; and Defendant

7    Capstone LLC joined in, agreed to and become a part of Fox Hollow Scheme by on or

8    about December 2001.

9    178.    Defendants agreed to, participated in, aided and abetted, and committed acts in

10   furtherance of and in pursuance to the Fox Hollow Scheme from on or about 1995 and to

11   the present, in that, among other things: Defendant Flake, as trustee of the Julie Insurance

12   Trust, purchased the Fox Hollow Property from Stockton Savings Bank on or about

13   October 31, 1995, with Defendant Flake, as trustee of the F. Hanse Trust proving the funds

14   for the purchase; Defendant Richard Sinclair contacted the architect for the Project on or

15   about November 1995, to let him know Defendant Flake would be paying the bills;

16   Defendant Flake met with the architect for the Project and thereafter, on or about

17   November 18, 1995, started paying the architect for his prior work on the Project;

18   Defendant Flake continued to pay for architectural services with respect to the Fox Hollow

19   Subdivision including, without limitation, on December 15, 1995; Defendant Richard

20   Sinclair assisted Defendant Flake with respect to the subdivision; Defendant Flake, as

21   trustee of the Julie Insurance Trust, signed the final map for Fox Hollow Lots 1, 11, 18 and

22   19 on or about November 10, 1995; Defendant Sinclair filed an unlawful detainer

23   proceeding on January 18, 1996, in the Stanislaus County Municipal Court, Case No.

24   74645, on behalf of himself and Defendant Flake, as "Owner", on unit 103 at Fox Hollow;

25   Defendant Richard Sinclair communicated with the City of Turlock and worked with the

26   civil engineer and architect for the Project to complete the final map for Fox Hollow Lots

27   1, 11, 18 and 19 and caused Fox Hollow Subdivision Map #1 to be recorded, on or about

28   March 6, 1996; Defendant Richard Sinclair revised and Defendant Flake as trustee of the

1   Julie Insurance Trust, signed the Fox Hollow CC&Rs in September 1996; Defendant

2   Richard Sinclair caused the Fox Hollow CC&Rs to be recorded, on or about September 16,

3   1996 and returned to "Mauctrst"; Defendant Sinclair filed an unlawful detainer proceeding

4   on November 8, 1996, in the Stanislaus County Municipal Court, Case No. 81879, on

5   behalf of himself and Defendant Flake, as "Owner", on unit 109 at Fox Hollow; Defendant

6   Richard Sinclair assisted Defendant Mauchley in obtaining financing from GMAC in or

7   about February 1997 for the Project as more specifically alleged herein; Defendant Flake

8   in or about February 1997 requested and received an extension of time from the City of

9   Turlock for one year to complete various improvements on the Fox Hollow Property with

10  respect to the subdivision; Defendant Richard Sinclair facilitated the transfer of title of the

11  Fox Hollow Property from Defendant Flake, as trustee of the Julie Insurance Trust, to

12  Defendant Mauchley on February 26, 1997 as more specifically alleged herein; Defendant

13  Richard Sinclair communicated with the City of Turlock and worked with the civil

14  engineer and architect for the Project to complete a final map for the remaining Fox

15  Hollow lots; Defendant Mauchley signed Fox Hollow Subdivision Map # 2 on or about

16  February 27, 1998; Defendant Richard Sinclair signed and filed limited liability company

17  articles of organization in the name of Mauctrst LLC with the California Secretary of State

18  on or about April 28, 1998; Defendant Richard Sinclair assisted Mr. Mauchley over the

19  period from on or about February 1998 to on or about July 1998 in obtaining fifteen (15)

20  loans from several lenders against lots at the Fox Hollow Property as more specifically

21  alleged herein; Defendant Sinclair sent a facsimile to the City of Turlock on February 20,

22  1998, forwarding an assignment from Defendant Flake to Defendant Mauchley; Defendant

23  Sinclair sent a letter via facsimile to Mr. Sessions of GMAC Mortgage in Hawaii, on or

24  about May 5, 1998, providing financial information concerning Mr. Mauchley; Defendant

25  Richard Sinclair caused Fox Hollow Subdivision Map # 2 to be filed in the Official

26  Records of Stanislaus County, California, on July 21, 1998; Mr. Mauchley signed the loan

27  documents for the July 1998 loans on or about July 9, 1998, including without limitation,

28  the loan applications, promissory notes and deeds of trust that were recorded in the Official

1    Records of Stanislaus County, on July 22, 1998; Defendant Richard Sinclair prepared and

2    Mr. Mauchley signed a deed conveying title to the Fox Hollow Lots 1 through 19 to

3    Mauctrst that was recorded in the Official Records of Stanislaus County, California, on or

4    about July 29, 1998; Defendant Sinclair prepared, filed and prosecuted unlawful detainer

5    actions on behalf of himself and Mr. Mauchley as "Owner" in the Stanislaus County

6    Superior Court, on unit 121 at Fox Hollow on or about October 5, 1998 (Case No.

7    182407), on unit 119 at Fox Hollow on February 1, 1999 (Case No. 1851990), on unit 127

8    at Fox Hollow on February 1, 1999 (Case No. 185201), on unit 121 at Fox Hollow on

9    March 25, 1999 (Case No. 186532), on unit 127 at Fox Hollow on June 4, 1999 (Case No.

10   228301), on unit 105 at Fox Hollow on June 16, 1999 (Case No. 228676), on unit 131 at

11   Fox Hollow on February 14, 2000 (Case No. 252225), on unit 125 at Fox Hollow on

12   March 17, 2000 (Case No. 253689), on unit 117 at Fox Hollow on October 1, 2000 (Case

13   No. 274533), on unit 116 at Fox Hollow on October 18, 2000 (Case No. 274549), and on

14   unit 127 at Fox Hollow on March 6, 2001 (Case No. 288094); in September 1999 and

15   again in December 1999, Defendant Richard Sinclair filed schedules in the Mauctrst

16   Bankruptcy Case on behalf of Mauctrst and Mr. Mauchley, stating under penalty of perjury

17   that Mauctrst was owned fifty percent (50%) by Defendant Mauchley and fifty percent

18   (50%) by his spouse, when Mr. Mauchley denies his spouse had any ownership interest in

19   Mauctrst; Defendant Richard Sinclair in the name of Mauctrst and Mauchley, filed at least

20   six (6) lawsuits in the Stanislaus Superior Court between March 22, 2000 and July 21,

21   2000 (Case Nos. 253769, 254996, 269907, 270025, 271066 and 271115) and obtained

22   preliminary relief delaying foreclosures on various lots at the Fox Hollow Property, and

23   then lost all those case; in one of those cases (Case No. 254996), Defendant Richard

24   Sinclair in the name of Mauctrst and Mauchley, obtained a preliminary injunction

25   enjoining the foreclosure on lots 9 and 14, and also claimed the preliminary injunction

26   pertained to lots 3 and 7, that was conditioned upon them making the required monthly

27   payments on the promissory notes as they come due, and then failed and refused to make a

28   single payment and enjoyed the benefit of the injunction until 2003; Defendant Richard

40

ADDENDUM A
Page 40

1   Sinclair prepared and filed with the California Secretary of State articles of organization

2   for Defendant Lairtrust, on or about May 26, 2000; Defendant Richard Sinclair prepared

3   documents that purported to be minutes of Fox Hollow homeowner's association board

4   meetings over the period June through December 2000, that stated Mr. Mauchley was in

5   attendance, when Mr. Mauchley denied attending any board meetings; Defendant Richard

6   Sinclair and Defendant Brandon Sinclair signed a letter dated August 1, 2000 in which the

7   Fox Hollow HOA purportedly waived any conflict of interest arising by reason of

8   Defendant Richard Sinclair's representation of the homeowner's association while also

9   representing Brandon Sinclair and Mr. Mauchley in other matters, including matters

10   against lenders who were foreclosing on and owned lots at the Fox Hollow Property;

11   Defendant Richard Sinclair and Brandon Sinclair signed and mailed out dues statements,

12   letters and notices of delinquent assessments to lenders over the period August 1, 2000,

13   through January 31, 2001, in the name of Fox Hollow HOA, asserting dues of $300 per

14   month per lot were due and payable to the homeowners association; on or about May 2001,

15   Defendant Richard Sinclair negotiated and Defendants Mauchley and Flake signed a

16   settlement agreement with GMAC under which Defendant Flake as Trustee of the

17   Capstone Trust, would purchase lots 1, 11, 18 and 19, and then Defendants Richard

18   Sinclair, Brandon Sinclair and Flake set up secret double escrows and concealed material

19   facts from GMAC and the lenders as herein alleged; Defendant Brandon Sinclair signed

20   and Defendant Richard Sinclair caused articles of organization for Defendant Capstone

21   LLC to be prepared and filed with the California Secretary of State on or about December

22   3, 2001; Defendants Richard Sinclair transferred title to Lot 19 to Lairtrust on or about

23   February 4, 2002; Defendants Brandon Sinclair transferred title to Lot 1 to Capstone LLC

24   on or about February 4, 2002; Defendant Richard Sinclair prepared, Defendant Mauchley

25   executed and Defendant Richard Sinclair caused to be recorded in 2007, a deed conveying

26   record title to the "A" lots to Defendant Lairtrust; Defendant Richard Sinclair, on behalf of

27   Defendants Mauchley, Mauctrst and Flake sent Notices of Termination of

28   Tenancy/Occupancy And Use Of Premises to Plaintiffs and the tenants at Fox Hollow in

1    April 2008, purportedly to evict them from the common area and the "A' Lots at Fox

2    Hollow; and Defendant Richard Sinclair filed in the names of Mauctrst and Lairtrust

3    unlawful detainer actions in state court in July 2008 to evict CEMG and its tenants from

4    the garages on Lots 2A and 9A.

5    179.     Defendants, and each of them, attempted to and intended to perfect and carry out

6    the Fox Hollow Scheme so that they could continue the scheme described above, or

7    abandon the same at any time, and all loss would fall on Bank One, GMAC, Conti,

8    Absher-Avanta, HFC Beneficial, Plaintiffs and other lenders and members of the public

9    who might be induced to make loans on, invest in or purchase lots and units at Fox

10   Hollow, while Defendants retained their profits from such scheme.

11   180.     As a proximate result of the fraudulent conduct of Defendants as hereinabove

12   alleged, Conti Mortgage completed a foreclosure on and Lot 7 on or about June 6, 2000 for

13   a credit bid of only $85,000 when $144,595.85 was due and owing on the loan at the time,

14   and was thereby damaged in the amount of approximately $50,000 and according to proof

15   at trial, and sold Lot 7 and the loans on Lots 3, 7, 9 and 14 to Plaintiff CEMG for a loss of

16   more than $500,000 and according to proof at trial.

17   181.     Further, Plaintiff CEMG as a proximate result of such fraudulent conduct, in

18   addition to the claims assigned to it by Conti, was required to and did incur expenses in

19   correcting and remedying the failure to complete the requirements for the subdivision map

20   and otherwise rehabilitate Lots 3, 7, 9 and 14 in an amount in excess of $280,000 and

21   according to proof at trial, and otherwise incurred expenses and lost profits relating the

22   individual lots at Fox Hollow.

23   182.     Further, Plaintiff Fox Hollow HOA as a proximate result of such fraudulent

24   conduct, was required to and did: incur and pay receivers fees and receivers attorneys fees

25   in the amount of $28,265.28, incur and pay expenses in correcting and remedying the

26   failure to complete the requirements for the subdivision map and otherwise rehabilitate the

27   common area in an amount in excess of $300,000 and according to proof at trial and was

28   deprived of homeowners dues collected and retained by defendants in an amount according

1   to proof at trial.

2   183.    In doing the things alleged herein, Defendants, and each of them, acted willfully

3   and with the intent to cause injury to Bank One, GMAC, Conti, Absher-Avanta, HFC-

4   Beneficial, Plaintiff CEMG as assignee of the claims of Conti, and Plaintiffs individually,

5   and in conscious disregard of the rights of Bank One, GMAC, Conti, Absher-Avanta,

6   HFC-Beneficial, Plaintiff CEMG as assignee of the claims of Conti, and Plaintiffs

7   individually, thereby warranting an assessment of punitive damages in an amount

8   appropriate to punish Defendants, and each of them, and to deter others from engaging in

9   similar misconduct.

10  **Count Two RICO**

11  184.    The Plaintiffs asserting this count are Fox Hollow HOA and CEMG, and this count

12  is being asserted against Defendants Mauctrst, Richard Sinclair, Brandon Sinclair,

13  Mauchley, Flake, Lairtrust and Capstone LLC ("RICO Defendants"). For purposes of this

14  count, and this count only, "Plaintiffs" and "Defendants" shall be limited to those parties.

15  185.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1

16  through 157 as if fully set forth herein.

17  186.    As set forth above, CEMG is the assignee of all claims of Conti arising out of or

18  related to the loans on the Conti Lots.

19  187.    At all relevant times, Defendants Mauchley, Richard Sinclair, Flake, Brandon

20  Sinclair were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(c).

21  188.    At all relevant times herein from and after April 28, 1998, Defendant Mauctrst was

22  a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

23  189.    At all relevant times from and after December 6, 2000, Fox Hollow HOA was the

24  "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c), and an

25  "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

26  190.    At all relevant times from and after May 26, 2000, Defendant Lairtrust was a

27  "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c).

28  191.    At all times relevant herein from at least on and after December 3, 2001, Defendant

43

1    Capstone LLC was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and

2    1964(c).

3    192.    At all times relevant herein from and after on or about 1995, Defendants Richard

4    Sinclair, Mauchley and Flake formed an association-in-fact to own and operate Fox

5    Hollow and divide among themselves money and benefits derived therefrom. This

6    association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

7    193.    At all times relevant herein from and after April 1998, Defendant Mauctrst joined

8    said association-in-fact. This association-in-fact was an "enterprise" within the meaning of

9    RICO, 18 U.S.C. § 1961(4).

10    194.    At all times relevant herein from and after May 2000, Defendant Lairtrust joined

11    said association-in-fact. This association-in-fact was an "enterprise" within the meaning of

12    RICO, 18 U.S.C. § 1961(4).

13    195.    At all times relevant herein from and after June 2000, Defendant Brandon Sinclair

14    joined said association-in-fact. This association-in-fact was an "enterprise" within the

15    meaning of RICO, 18 U.S.C. § 1961(4).

16    196.    At all times relevant herein from and after December 2001, Defendant Capstone

17    LLC joined said association-in-fact. This association-in-fact was an "enterprise" within the

18    meaning of RICO, 18 U.S.C. § 1961(4).

19    197.    At all relevant times, said enterprises were engaged in, and their activities affected,

20    interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

21    198.    The RICO Defendants, for purposes of executing such scheme and artifice to

22    defraud and for obtaining money, loans and property by means of a false or fraudulent

23    pretense, representation and promise, and attempting to do so, transmitted and caused to be

24    transmitted by means of wire communications in interstate or foreign commerce writings

25    and signals ("Wiring"), and also deposited, caused to be deposited and authorized the

26    following materials and things to be placed in any post office or authorized depository, or

27    deposited or caused to be deposited the following matters or things to be sent or delivered

28    by private or commercial interstate carrier ("Mailing"): Wiring and/or Mailing loan

1    applications and other loan documents for the February 1997 loans; Wiring and/or Mailing

2    demands for payments into the escrows relating to the February 1997 loans; causing the

3    funds from the lender to be Wired or Mailed into and disbursed from the five (5) escrows

4    for the February 1997 loans; Wiring and/or Mailing the loan applications and other loan

5    documents for the July 1998 loans; Wiring and/or Mailing demands for payments into the

6    escrows relating to the July 1998 loans; causing the funds to be Wired and/or Mailed into

7    and disbursed from the fifteen (15) escrows for each of the July 1998 loans; Mailing dues

8    statements to the lenders over the period of August through December 2000 as hereinabove

9    alleged; Mailing the notices of delinquent assessment to the lenders on or about December

10   19, 2000 and on or about January 22, 2001, as hereinabove alleged; Wiring and/or Mailing

11   the settlement agreement with GMAC as herein alleged; Wiring and/or Mailing the loan

12   application and other loan documents relating to the loan on Lot 19 that closed on or about

13   August 2, 2001, and on Lot 1 that closed on or about December 10, 2001; Wiring and/or

14   Mailing demands for payments into the escrows relating to the loan on Lot 19 that closed

15   on or about August 2, 2001, and on Lot 1 that closed on or about December 10, 2001;

16   causing the funds to be to be Wired or Mailed into and disbursed from the escrow for the

17   loan on Lot 19 on or about August 2, 2001 and for the loan on Lot 1, on or about

18   December 10, 2001.

19   199.    At all times relevant herein, RICO Defendants conducted or participated, directly

20   or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering

21   activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18

22   U.S.C. § 1962(c).

23   200.    Specifically, at all relevant times, RICO Defendants engaged in "racketeering

24   activity" within the meaning of RICO, 18 U.S.C. § 1961(1), by engaging in the acts set

25   forth above. The acts set forth above constitute a violation of one or more of the following

26   statutes: 18 U.S.C. § 1341 (mail fraud); and 18 U.S.C. § 1343 (wire fraud). RICO

27   Defendants each committed and/or aided and abetted the commission of two or more of

28   these acts of racketeering activity.

201.     The acts of racketeering activity referred to in the previous paragraph constitute a

"pattern of racketeering activity", within the meaning of 18 U.S.C. § 1961(5). The acts

alleged were related to each other by virtue of common participants, common victims and

a common method of commission, and the common purpose and common result of

defrauding the lenders and Fox Hollow HOA and enriching the Defendants at the expense

of the lenders and Fox Hollow HOA while concealing Defendants fraudulent activity.

202.     At all relevant times, the RICO Defendants each were associated with the

enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), in that they agreed to

conduct and participate, directly and indirectly, in the conduct of affairs of the enterprise

through a pattern of racketeering activity, as alleged herein, in violation of 18 U.S.C. §

1962(d).

203.     The RICO Defendants committed and caused to be committed a series of overt acts

in furtherance of such conspiracy and to affect the objects thereof, including but not

limited to the acts set forth above.

204.     As a result of RICO Defendants' violations of 18 U.S.C. §§ 1962(c) and (d) and

each of them, the Fox Hollow HOA incurred expenses and has been damaged as herein

alleged in an amount according to proof at trial, including, but not limited to, receivers fees

and receivers attorneys fees, expenses in correcting and remedying the failure to complete

the requirements for the subdivision map and otherwise rehabilitating the property, and for

homeowners dues collected and retained by defendants.

205.     As a result of RICO Defendants' violations of 18 U.S.C. §§ 1962(c) and (d) and

each of them, Plaintiff CEMG has incurred expenses and been damaged as alleged herein,

and according to proof at trial, including, but not limited to, losses suffered by Conti on the

foreclosure on Lot 7 and on the sale of loans on Lots 3, 7, 9 and 14 to CEMG, the costs

and expenses incurred in correcting and remedying the failure to complete the

requirements for the subdivision map and otherwise rehabilitate Lots 3, 7, 9 and 14, loans

made to Fox Hollow HOA to cover a portion of the fees and expenses incurred by it as a

result of the conduct of Defendants as alleged herein, expenses incurred and profits lost

1    relating the individual lots at Fox Hollow, and the payments of deposits to tenants that

2    Defendants wrongfully withheld.

3    206.    Pursuant to RICO, 18 U.S.C. § 1964(c), Fox Hollow HOA and CEMG are entitled

4    to recover three-fold their damages plus costs and attorneys' fees from the RICO

5    Defendants.

6    **Count Three Unjust Enrichment**

7    207.    The Plaintiffs asserting this count are Fox Hollow HOA and CEMG, and this count

8    is being asserted against Defendants Mauctrst, Richard Sinclair, Brandon Sinclair,

9    Mauchley, Flake, Lairtrust and Capstone LLC. For purposes of this count, and this count

10    only, "Plaintiffs" and "Defendants" shall be limited to those parties.

11    208.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1

12    through 157 as if fully set forth herein.

13    209.    As a result of the conduct of Defendants, they have been unjustly enriched at the

14    expense of Plaintiffs and the law thereby implies a contract by which Defendants must pay

15    to Plaintiffs the amount by which, in equity and good conscience, the Defendants have

16    been unjustly enriched at the expense of Plaintiffs.

17    **Count Four Accounting**

18    210.    The Plaintiffs asserting this count are Fox Hollow HOA and CEMG, and this count

19    is being asserted against Defendants Mauctrst, Richard Sinclair, Brandon Sinclair,

20    Mauchley, Flake, Lairtrust and Capstone LLC. For purposes of this count, and this count

21    only, "Plaintiffs" and "Defendants" shall be limited to those parties.

22    211.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1

23    through 157 as if fully set forth herein.

24    212.    Defendants, as alleged herein, collect dues and assessments on behalf of the

25    homeowners association, paid themselves funds rightfully belonging to the homeowners

26    association, and collected rents and deposits from tenant of units at Fox Hollow at times

27    when such Defendants did own the units.

28    213.    The amount of money due from Defendants to Plaintiffs is unknown to Plaintiffs

1    and cannot be ascertained without an accounting of such dues, assessments, payments,

2    rents and deposits.

3    **Count Five Constructive Trust Re: Garage Lots**

4    214.    The Plaintiff asserting this count is CEMG, and this count is being asserted against

5    Defendants Richard Sinclair, Mauctrst, Mauchley, Lairtrust and Flake, Trustee. For

6    purposes of this count, and this count only, "Plaintiff" and "Defendants" shall be limited to

7    those parties.

8    215.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1

9    through 157 as if fully set forth herein.

10    216.    The lenders who made the February 1997 loans and July 1998 loans commissioned

11    appraisals of the unit or units identified in each loan application, and received appraisals

12    listing each unit as having a one car garage.

13    217.    On or September 15, 1998, Defendant Mauctrst filed with the California

14    Department of Real Estate a Notice of Intention (Common Interest) on Fox Hollow of

15    Turlock ("Notice"). The Notice, at page 3, Section 2.L, provides that the improvements at

16    Fox Hollow of Turlock will contain one "1 car garage for each residential unit, and

17    common area parking spaces."

18    218.    The legal description in the deeds of trust executed by Defendant Mauchley for the

19    February 1997 and July 1998 loans were prepared, at least in part, by employees of the title

20    company retained in connection with each particular transaction and were ambiguous in

21    that they included the unit number or numbers as a description of the property and also

22    included a lot number for Lots 2, 6, 7, 8, 9, 10 and 18 without including the "A" lot for the

23    corresponding one garage for the unit or units described in the deed of trust.

24    219.    Defendant Mauchley, by virtue of applying for such loans based upon unit numbers

25    and under the circumstances as alleged herein, agreed either expressly or impliedly to

26    include as collateral for and is estopped from denying that the collateral for such loans did

27    not include, the corresponding one-car garage for each unit.

28    220.    The failure to include the corresponding "A" lot in the legal descriptions in said

48

ADDENDUM A

Page 48

1  deeds of trust and therefore in the trustee's deeds upon the foreclosures under said deeds of

2  trust was the result of the mutual mistake of the parties, the unilateral mistake of the lender

3  that was known or should have been know by Defendants and/or the fraud of Defendants.

4  221.    By virtue of the agreement to include the corresponding garage for each unit as

5  collateral and/or the mistake and/or fraud as herein alleged, Defendants hold such "A" lots

6  as constructive trustee for Plaintiff's benefit.

7  **Count Six Declaratory And Injunctive Relief Re: Garage Lots**

8  222.    The Plaintiff asserting this count is CEMG, and this count is being asserted against

9  Defendants Richard Sinclair, Mauctrst, Mauchley, Lairtrust and Flake, Trustee. For

10  purposes of this count, and this count only, "Plaintiff" and "Defendants" shall be limited to

11  those parties.

12  223.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1

13  through 157 as if fully set forth herein.

14  224.    An actual controversy has arisen and now exists between Plaintiff and Defendants

15  in that Plaintiff contends that Plaintiff CEMG is entitled to and Defendants are estopped

16  from claiming ownership in and the right of possession to the "A" Lots, whereas

17  Defendants contend that they own and have a right of possession to the "A" Lots to the

18  exclusion of Plaintiff CEMG and its tenant at Fox Hollow.

19  225.    Plaintiffs request a declaratory judgment, declaring the rights and obligations of the

20  parties with respect to the "A" Lots at Fox Hollow, and declaring that Plaintiff CEMG is

21  entitled to ownership in and the right of possession to the "A" Lots to the exclusion of

22  Defendants and each of them.

23  226.    A judicial declaration is necessary and appropriate at this time under the

24  circumstances such that the parties herein will know their rights in and to the "A" Lots and

25  in order to avoid a multiplicity of actions and the disruption of the peaceable use and

26  enjoyment of the "A" Lots by Plaintiff CEMG and it tenants at the Fox Hollow Property.

27  227.    Defendants have and threaten to continue to claim ownership in the "A" Lots at the

28  Fox Hollow Property and to harass the tenants thereon, and accordingly, an injunction

1    should issue enjoining and restraining Defendants and each of them from asserting,

2    claiming or communicating to tenants at the Fox Hollow Property that they, or any of

3    them, hold or claim any ownership in and to such any such "A" Lots, or otherwise to

4    interfere with the use and enjoyment of such "A" Lots by Plaintiffs and any tenants at Fox

5    Hollow.

6    **Count Seven Fox Hollow HOA Claim For Delinquent Assessments, Late Charges, And**

7    **Interest**

8    228.     The Plaintiff asserting this count is Fox Hollow HOA, and this count is being

9         asserted against Defendants Mauctrst, Richard Sinclair, Mauchley, Stanley Flake as

10        Trustee of the Capstone Trust, Brandon Sinclair, Lairtrust and Capstone LLC. For

11        purposes of this count, and this count only, "Plaintiff" and "Defendants" shall be limited to

12        those parties.

13   229.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1

14        through 146 as if fully set forth herein.

15   230.     At the times herein mentioned from and after September 6, 1996 and through

16        February 2004, the Fox Hollow CC&Rs were in effect in accordance with their terms.

17   231.     The covenants, conditions and restrictions contained in the Fox Hollow CC&Rs

18        constitute equitable servitudes under Civil Code section 1354 that inure to the benefit of,

19        and are binding on, all owners of lots within the development and the association,

20        including Plaintiff and Defendants.

21   232.     In or about August 2000, Defendants Richard Sinclair, Mauchley and Brandon

22        Sinclair purportedly as the board for the homeowners association: (1) levied a regular

23        monthly assessment in the amount of $300 on each lot of the Fox Hollow Property for the

24        purpose of "paying the joint bills of the Homeowners Association and to begin to gather

25        and prepare to comply with all the requirements so that the property could be operated"

26        and adopted the Fox Hollow of Turlock Owners' Association Delinquent Assessment

27        Collection Policy, that provided that assessments were due and payable on the first day of

28        each month of each year and become delinquent if not paid on or before the 15th day of

1    each month, that if a regular or special assessment becomes delinquent, a late charge equal

2    to the greater of $10.00 or ten percent (10%) of the delinquent amount shall be charged,

3    and interest at a rate of twelve percent (12%) per annum shall be assessed against all

4    delinquent assessments, late charges and reasonable costs of collection commencing thirty

5    (30) days after the due date of the delinquent assessment.

6    233.    Mr. McGranahan, as receiver for the Fox Hollow HOA, on or about August 15,

7    2001, approved the Fox Hollow HOA Delinquent Assessment Collection Policy that

8    provided that all assessments were due and payable on the first day of each month of each

9    year and become delinquent if not paid on or before the thirtieth (30th) day of each month

10   of each year, a late charge equal to the greater of $10.00 or ten percent (10%) of the

11   delinquent amount shall be charged, and that interest at a rate of twelve percent (12%) per

12   annum shall be assessed against all delinquent assessments, late charges and reasonable

13   costs of collection commencing thirty (30) days after the due date of the delinquent

14   assessment.

15   234.    Pursuant to Article V, Section 1 of the Fox Hollow CC&Rs each assessment,

16   together with interest, attorneys fees and costs of collection, shall also be a separate,

17   distinct and personal obligation (debt) of the Owner of a Lot at the time when the

18   assessment is levied.

19   235.    Pursuant to Article V, Section 1, the declarant and each Owner vested in the

20   Association the right to bring all actions for the collection of assessments.

21   236.    Pursuant to Article IV, Subsection 2.5, the Board is empowered and obligated to

22   enforce the provisions of the Fox Hollow CC&Rs as well as the Bylaws and Rules for the

23   Association.

24   237.    The Defendants named in this claim failed and refused to pay regular and special

25   assessment to Fox Hollow HOA and owe the following amounts for assessments and late

26   charges for their respective property interests set forth below, plus interest on such

27   amounts at a rate of twelve (12) % per annum from thirty (30) days after each assessment

28   and late charge was due, and until paid: Defendants Mauctrst, Richard Sinclair and

1  Mauchley in the amount of $49,305.14 on Lots 1 through 19 prior to the foreclosures by

2  the lenders; Defendants Brandon Sinclair and Capstone LLC in the amount of at least

3  $15,730 on Lot 1; and Defendants Richard Sinclair and Lairtrust LLC in the amount of at

4  least $16,930 on Lot 19.

5  **Count Eight Specific Performance Re: Common Area**

6  238.     The Plaintiff asserting this count is the Fox Hollow HOA, and this count is being

7  asserted against Defendants Richard Sinclair, Mauchley, Mauctrst and Flake, Trustee. For

8  purposes of this count, and this count only, "Plaintiff" and "Defendants" shall be limited to

9  those parties.

10  239.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1

11  through 146 as if fully set forth herein.

12  240.     The consideration of the mutual benefits and burdens for the declarant and Owners

13  set forth in the Fox Hollow CC&Rs was fair and reasonable at the time the Fox Hollow

14  CC&Rs were recorded and at the times Defendants recorded the subdivision maps,

15  conveyed and accepted title to various Lots at Fox Hollow and obtained the loans secured

16  by Lots at the Fox Hollow Property, all as alleged hereinabove.

17  241.     Plaintiff has performed all of the conditions, covenants and promises required of it

18  on its part to be performed in accordance with the Fox Hollow CC&Rs for Defendants and

19  each of them to be obligated to convey title to the common area for the Fox Hollow

20  Property to the Fox Hollow HOA, except as excused by Defendants' failure to satisfy

21  conditions precedent and prior breaches waived by Defendants, and for which Defendants

22  are estopped from asserting.

23  242.     On or about March 20, 2003, Fox Hollow HOA made written demand on

24  Defendants to execute and deliver to the Fox Hollow HOA in recordable form, a deed

25  conveying title to the common area of the Fox Hollow Property that was described by the

26  legal description for the Fox Hollow Property, excepting out the Lots shown on Fox

27  Hollow Subdivision Map # 1 and Fox Hollow Subdivision Map # 2 (the "Fox Hollow

28  Common Area").

1    243.    Defendants, and each of them, at all times alleged herein were obligated to convey

2            title to the Fox Hollow Common Area to the Fox Hollow HOA under the Fox Hollow

3            CC&Rs as hereinabove alleged, but have failed and refused to do so and thereby breached

4            the Fox Hollow CC&Rs.

5    Count Nine Declaratory And Injunctive Relief Re: Common Area

6    244.    The Plaintiffs asserting this count are Fox Hollow HOA and CEMG, and this count

7            is being asserted against Defendants Richard Sinclair, Mauchley, Mauctrst, and Flake,

8            Trustee. For purposes of this count, and this count only, "Plaintiffs" and "Defendants"

9            shall be limited to those parties.

10   245.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1

11           through 146 and 215 through 218 as if fully set forth herein.

12   246.    Defendant Flake, as trustee of the Julie Insurance Trust, despite being obligated to

13           do so, failed and refused to form a homeowners association for the Fox Hollow Property

14           and to convey title to the common area for the Fox Hollow Property to the Fox Hollow

15           HOA at any time from and after filing Fox Hollow Subdivision Map # 1 in March 1996

16           and conveying title of Lots 1, 11, 18 and 19 to Defendant Mauchley on or about February

17           26, 1997, and up to the present time.

18   247.    An actual controversy has arisen and now exists between Plaintiffs and Defendants

19           in that Plaintiffs contend that Plaintiff Fox Hollow HOA is entitled to ownership in and the

20           right of possession to the Fox Hollow Common Area, whereas Defendants contend that

21           they own and have a right of possession to the Fox Hollow Common Area to the exclusion

22           of Plaintiffs and the tenants of CEMG at the Fox Hollow Property.

23   248.    Plaintiffs request a declaratory judgment, declaring the rights and obligations of the

24           parties with respect to the Fox Hollow Common Area, and declaring that Plaintiff Fox

25           Hollow HOA is entitled to ownership in and the right of possession to the Fox Hollow

26           Common Area and that Defendants and each of them have no ownership of or right to

27           exclude Plaintiffs and the tenants of CEMG at the Fox Hollow Property from the Fox

28           Hollow Common Area.

249.    A judicial declaration is necessary and appropriate at this time under the circumstances such that the parties herein will know their rights in and to the Fox Hollow Common Area and in order to avoid a multiplicity of actions and the disruption of the peaceable use and enjoyment of the Fox Hollow Common Area by Plaintiffs and the tenants of CEMG at the Fox Hollow Property.

250.    Defendants have and threaten to continue to claim ownership in the Fox Hollow Common Area and to harass the tenants of CEMG at the Fox Hollow Property, and accordingly, an injunction should issue enjoining and restraining Defendants and each of them from asserting, claiming or communicating to tenants at the Fox Hollow Property that they, or any of them, hold or claim any ownership in and to the Fox Hollow Common Area, or otherwise from interfering with the use and enjoyment of the Fox Hollow Common Area by Plaintiffs and any tenants at the Fox Hollow Property.

**III. Findings of Fact from the Prove Up Hearing**

251.    On September 13, 2002, Plaintiff CEMG purchased Lots 3, 7, 9, and 14 from Conti for $61,250 each. Ex. 11, pages 3 and 4.  The price of Lots 9 and 14 were reduced to $52,500 in light of legal challenges raised by Defendants. Doc. 1237, Transcript, 31:32-33:5. Ex. 11, Addendum.

252.    The amount owing on the loans at the time Conti sold them was $193,678.11 for Lot 3, $144,595.85 for Lot 7, $199,995.14 for Lot 9, and $199,370.55 for Lot 14. Exs. 13, 14, and 15; Doc. 1237, Transcript, 34:17-36:6.  Conti suffered a total loss of $510,139.65 due to selling the loans for less than the outstanding loan balance. Ex. 16; Doc. 1237, Transcript, 36:18-37:14.

253.    In order for the subdivision of Fox Hollow to be approved by the City of Turlock, improvements had to be made, including "installing twenty-seven (27) firewalls for the garages, three (3) fire walls in the units, eliminating six (6) roof overhangs, removing seven (7) windows, and adding two (2) roof vents." Doc. 410, CAC, ¶¶ 35-38.  Plaintiffs hired architect Vernon Fergel to determine what needed to be done on Fox Hollow to

1    permit subdivision. Doc. 1237, Transcript, 48:11-21. The building code analysis by Fergel

2    recommended installing firewalls for garages, installing firewalls for certain units,

3    eliminating certain roof overhangs, and checking or adding smoke detectors. Ex. 18.

4    254.    The physical condition of the Fox Hollow project, both structures and grounds, in

5    late 2002 was poor. Ex. 17; Doc. 1237, Transcript, 38:1-46:19. In rehabilitating its Lots,

6    Plaintiff CEMG, substantially replaced the interior of the buildings, leaving only the

7    foundations, studs, and sheetrock. Doc. 1237, Transcript, 50:17-23.

8    255.    The total cost of rehabilitating was $75,068.08 for Lot 3, $69,348.75 for Lot 7, $78,

9    781.16 for Lot 9, and $68,955.14 for Lot 14 for a total of $292.153.13. Ex. 20; Doc. 1237,

10    Transcript, 53:16-54:5.

11    256.    Plaintiff Fox Hollow HOA rehabilitated the common areas. Doc. 1237, Transcript,

12    49:12-50:6. Plaintiff Fox Hollow HOA spent a total of $350,110.95 in 2003 and 2004 on

13    these projects. Doc. 1237, Transcript, 80:4-82:7; Exs. 24-25.

14    257.    Plaintiff CEMG planned to sell the Lots after remodeling them. Doc. 1237,

15    Transcript, 58:1-3. However, California's Department of Real Estate would not give the

16    necessary approval because "one of the issues had to do with the common ownership of the

17    - - the road. And there was some garage lots that were retained by Mr. Sinclair's group, so

18    he basically held those captive. Therefore, not allowing us to finalize the DRE white

19    report." Doc. 1237, Transcript, 58:6-20; See Ex. 36. The dispute over ownership of the

20    common areas and the garage lots prevented the Lots from being sold to the general public.

21    258.    Katakis estimates that had the issues with ownership of the garage lots and the

22    common areas not arisen, Plaintiff CEMG would have been able to get approval from the

23    Department of Real Estate within weeks and been able to sell the units on the Lots from

24    "very late 2004, all the way into mid 2005." Doc. 1237, Transcript, 61:17-25. Katakis

25    states that the real estate market for condominium units in the Turlock area was very

26    favorable to sellers in late 2004, early 2005. Doc. 1237, Transcript, 62:10-19.

27    259.    Plaintiff CEMG had a real estate appraisal of their Fox Hollow Lots done in 2004.

28    The report of December 12, 2004 by W.G. Bartha & Associates estimated that the Lots

1   would sell for a total of $6,350,000. Ex. 37.  Katakis estimated that in that time frame, each

2   duplex was worth $410,000 and each single family unit was worth $205,000 for a total of

3   $6,355,000. Doc. 1237, Transcript, 66:8-19; Ex. 38, page 2.  In contrast, Katakis estimated

4   that as of May 28, 2015, each duplex was worth $253,746.91 and each single family unit

5   was worth $141,751.25 for a total of $3,977,710.47. Doc. 1237, Transcript, 66:20-67:5;

6   Ex. 38, page 1.  After taking into the cost of marketing and actual sales, Katakis estimates

7   that Plaintiff CEMG lost $2,353,516.63 in not being able to sell the Lots in 2004-2005.

8   Doc. 1237, Transcript, 67:19-25.  Delay in the sale of the Lots cost Plaintiff CEMG

9   $2,353,516.63.

10   260.    Lawrence Rubenstein and Michael McGranahan were appointed Receivers for

11   Plaintiff Fox Hollow HOA from March 2001 to October 2002. Doc. 410, CAC, ¶¶ 106-

12   107.  They, and their attorneys, charged Plaintiff Fox Hollow HOA a total of $28,277.28

13   for their services. Doc. 1237, Transcript, 25:24-26:2; Exs. 4, 5, 6, and 8.

14   261.    Plaintiff Fox Hollow HOA, before its incorporation, paid Defendant Richard

15   Sinclair $15,266.99 in attorney's fees between August 2000 and January 2001. Ex.7,

16   McGranahan Report, page 4, Exs. A and C.  During this time Lender GMAC paid $5,200

17   to this entity. Doc. 1237, Transcript, 28:5-19.

18   262.    Plaintiffs reached a settlement with Defendant Mauchley. Doc. 1237, Transcript,

19   68:21-22.  To settle the CAC part of their dispute, Defendant Mauchley agreed to transfer

20   to Plaintiffs three pieces of property worth a total of $460,000 and a $50,000 promissory

21   note. Ex. 42.  Katakis stated that the promissory note is worthless as it was discharged in

22   bankruptcy. Doc. 1237, Transcript, 70:19-25.  The total amount set aside to settle the

23   claims contained in the CAC is $460,000.

24   263.     Plaintiffs reached a settlement with Flake Defendants. Doc. 1179.  To settle the

25   CAC part of their dispute these Defendants agreed to pay Plaintiffs $2,625,000 (70% of the

26   total settlement amount of $3,750,000). Doc. 1237, Transcript, 72:8-10.  Katakis stated that

27   a part of that amount was spent on attorney's fees, leaving $2,297,793 to settle the

28   substantive claims contained in the CAC. Doc. 1237, Transcript, 72:11-73:5; Ex. 44.

1

2    **IV. Motion for Reconsideration**

3    264.        Defendant Richard Sinclair sought to file 108 Exhibits in support of his opposition

4            to the motion for default judgment.  However, they were submitted late, on May 3, 2016,

5            one week before the prove up hearing.  Defendant Richard Sinclair also filed an ex parte

6            motion to postpone the hearing for 90 as his license had been suspended until the end of

7            May. Doc. 1217.  The motion was denied and Defendant Richard Sinclair was directed to

8            find alternative transportation. Doc. 1219.  On the morning of the hearing, Defendant

9            Richard Sinclair called the court seeking to participate telephonically; his request was

10           denied.  The lateness of the filing, together with Defendant Richard Sinclair's absence at

11           the hearing, resulted in the striking of his declaration and exhibits. Doc. 1220

12   265.        Defendant Richard Sinclair filed a motion for reconsideration, asserting that there

13           were "new or different facts and circumstances." Doc. 1222, Motion for Reconsideration,

14           1:23-25.  The substance of the briefing does not follow through on that assertion.  Instead

15           of presenting new facts explaining why his submissions were late and why he failed to

16           attend the hearing, Defendant Richard Sinclair continues to focus his argument on why this

17           court must honor the earlier settlement agreement the state courts have found

18           unenforceable, how Andrew Katakis has orchestrated a criminal conspiracy against him,

19           and how Plaintiffs' counsel must be disqualified. See Doc. 1223.  These arguments have

20           been consistently rejected by this court for years. See, e.g. Doc. 642 (denying motion to

21           disqualify Plaintiffs' counsel), Doc. 860 (denying motion to disqualify Plaintiffs' counsel),

22           Doc. 1184 (refusing to reinstate settlement agreement that the California courts have

23           determined unenforceable and refusing to find that Plaintiffs perpetrated fraud on the

24           courts in the State Court Action).  Without any concrete, detailed explanations for why he

25           did not file his exhibits in a timely manner and failed to show up at the prove up hearing,

26           Defendant Richard Sinclair's motion for reconsideration is denied.

27   / / /

28

1    **V. Conclusions of Law**

2    266.    This court has jurisdiction over this action based on 28 U.S.C. § 1331 federal

3    question jurisdiction and 28 U.S.C. § 1367(a) supplemental jurisdiction.

4    267.    Factors which may be considered by courts in exercising discretion as to the entry

5    of a default judgment include: (1) the possibility of prejudice to the plaintiff, (2) the merits

6    of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money

7    at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether

8    the default was due to excusable neglect, and (7) the strong policy underlying the Federal

9    Rules of Civil Procedure favoring decisions on the merits. Eitel v. McCool, 782 F.2d 1470,

10    1471–72 (9th Cir. 1986).

11    268.    "Upon the entry of default, well-pleaded factual allegations regarding liability are

12    taken as true, but allegations regarding the amount of damages must be proven. Pope v.

13    United States, 323 U.S. 1, 65 S. Ct. 16, 22, 89 L. Ed. 3, 102 Ct. Cl. 846 (1944); see also

14    Geddes v. United Financial Group, 559 F.2d 557, 560 (9th Cir. 1977); Domanus v.

15    Lewicki, 742 F.3d 290, 303 (7th Cir. 2014) ("Any allegations in the complaint relating to

16    liability are considered true, but allegations going to damages are not").  In addition,

17    'necessary facts not contained in the pleadings, and claims which are legally insufficient,

18    are not established by default.' Cripps v. Life Ins. Co. of North Am., 980 F.2d 1261, 1267

19    (9th Cir. 1992) (citing Danning v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978))."

20    Anderson v. Riverwalk Holdings, Ltd., 2016 U.S. Dist. LEXIS 174477, *2-3 (E.D. Cal.

21    Dec. 15, 2016).

22    269.    Plaintiffs have stated that "Both Mr. Sinclair and Brandon Sinclair are adults and

23    neither is subject to any legal determination of incompetence….Neither Mr. Sinclair nor

24    Brandon Sinclair is subject to the Servicemen Civil Relief Act." Doc. 1205, Durbin

25    Declaration, 2:17-21.

26

27    **A. Sufficiency Of The Claims**

28    270.    In the CAC, Plaintiffs have raised claims of fraud; civil RICO; unjust enrichment;

1    accounting; and breach of the Fox Hollow Covenants, Conditions, and Restrictions

2    ("CC&Rs").  For damages, Plaintiffs seek money, constructive trust, specific performance,

3    declaratory relief, and injunctive relief. See Doc. 410, CAC, ¶¶ 147-225.

4    271.    In the motion for default judgment (Doc. 1203) and proposed FOFCOL (Doc.

5    1226-1), Plaintiffs only address some of the counts included in the CAC.  The court finds

6    that Plaintiffs intended them to be support for the actual causes of action prosecuted.

7    272.    First, Plaintiffs do not treat the fraud claim as an independent cause of action.  In

8    fact, rather than discuss fraud as a claim under California law, Plaintiffs instead discuss the

9    fraud allegations in the context of mail and wire fraud which constitute predicate acts

10    under RICO. See Doc. 1203, Motion, 19:5-26:19.  Plaintiffs do not seek any damages from

11    fraud independent of RICO. See Doc. 1226-1, Proposed FOFCOL.  Consequently, the

12    court need not rule on the sufficiency of the fraud cause of action.

13    273.    Similarly, in later filings, Plaintiffs have not treated their accounting claim as a

14    separate cause of action.  California courts have recognized that rather than being a truly

15    independent claim "the nature of a cause of action in accounting is unique in that it is a

16    means of discovery." Teselle v. McLoughlin, 173 Cal. App. 4th 156, 180 (Cal. App. 3d

17    Dist. 2009).  Consequently, the court need not rule on the sufficiency of the accounting

18    cause of action.

19

20    **1. RICO**

21    274.    "[P]leading requirements should be enforced strictly when default judgments are

22    sought under RICO. Not only is the monetary penalty for failure to answer greatly

23    enhanced by the provisions for treble damages, but a defendant's reputation may be

24    stigmatized." Alan Neuman Productions, Inc. v. Albright, 862 F.2d 1388, 1393 (9th Cir.

25    1988), citations omitted.  In light of this admonition, Plaintiffs' RICO claim is read

26    narrowly to focus on the more specific factual assertions.

27    275.    Plaintiffs summarize the nature of the RICO claim as Defendants "knowingly

28    agreed, colluded and conspired with each other and among themselves to fraudulently

1    create the false appearance of a homeowners association and individually saleable lots at

2    Fox Hollow in order to obtain loans secured by portions of Fox Hollow and to enrich

3    themselves at the expense of the lenders, the successors to the lenders and the homeowners

4    association, by skimming off loan proceeds, dues collected in the name of the homeowners

5    association, and rental income and tenant deposits, all while concealing their scheme and

6    attempting to shield themselves from individual liability by creating shell companies and

7    churning record title to the property." Doc. 410, CAC, ¶ 151.  The specific actions

8    Plaintiffs cite as constituting the heart of the RICO claim are set out in detail in Paragraph

9    153. Doc. 410, CAC, ¶ 153.

10    276.    One part of the scheme was obtaining mortgages for the various Fox Hollow lots in

11    1997-98 while making misrepresentations and withholding material information from the

12    lenders.  To borrow the money, Defendants created the false appearance of an arms length

13    transaction between Defendants Flake and Mauchley. Doc. 410, CAC, ¶ 52.  The Fox

14    Hollow CC&Rs were executed and recorded on September 16, 1996 by Defendants Flake

15    and Richard Sinclair. Doc. 410, CAC, ¶ 44.  It spelled out the operation and rules of the

16    Fox Hollow HOA. Doc. 410, CAC, ¶¶ 45-50.  In particular, it required transfer to the HOA

17    of "fee title to the common area for the Fox Hollow Property free and clear of all liens and

18    encumbrances 'prior to the conveyance of title to the first lot.'" Doc. 410, CAC, ¶ 49.  The

19    deeds of trust for these mortgages also included a Planned Unit Development Rider which

20    specified that the loan also included an interest in the HOA and that Defendant Mauchley

21    as the borrower promised to abide by the articles of incorporation of the HOA. Doc. 410,

22    CAC, ¶¶ 57 and 69.  The mortgages were conditioned upon the Lots being individually

23    saleable. Doc. 410, CAC, ¶ 63.  However, Defendants did not incorporate the Fox Hollow

24    HOA until December 6, 2000. Doc. 410, CAC, ¶ 95.  There is still a cloud over the title of

25    the common areas as Defendants refused to transfer them to Fox Hollow HOA.  At the

26    time Defendant Mauchley obtained the loans "there was no homeowners association or

27    equivalent entity to own or manage the common area and facilities of the PUD; title to the

28    common area had not been transferred to a homeowners association; and Defendants

1   Richard Sinclair, Mauchley and Flake, and each of them, had no intention at that time to

2   form a homeowners association, to transfer title to the common area, or to charge and

3   collect dues and assessment to maintain the common area and lots, all as required of them

4   in the Fox Hollow CC&Rs and by the conditions of approval by the City of Turlock for the

5   Project." Doc. 410, CAC, ¶¶ 58 and 70.  Plaintiffs allege that Defendants concealed these

6   facts from the Lenders. Doc. 410, CAC, ¶ 58.  In obtaining the loans, Defendants used

7   mails and/or interstate phone calls or electronic communications. Doc. 410, CAC, ¶ 173.

8   Properties on a Fox Hollow development that did not have an HOA and have been

9   subdivided to be individually saleable are worth less than properties in a project that have

10  those tasks completed.  Defendants were aware that whether a Lot was individually

11  saleable was an important distinction in determining the worth of the Properties.  In 2000,

12  Defendants sent the Lenders letters through the mail that revealed these problems in a bid

13  to buy back the deeds of trust from the Lenders for less than the amount outstanding on the

14  loans. Doc. 410, CAC, ¶¶ 77 and 85.  By misrepresenting the state of the Fox Hollow

15  development when initially obtaining the mortgages, Defendants defrauded the Lenders. A

16  related matter is ownership of the garages associated with the Lots.  In obtaining the

17  mortgages, Defendants "concealed from each of the lenders that the corresponding one car

18  garages" for Lots 2, 6, 7, 8, 9, 10, and 18 were "not included in the legal description in the

19  deed of trust for the loan." Doc. 410, CAC, ¶¶ 59 and 71.  Again, this would act to

20  decrease the value of the Lots.  Defendants continue to use the state of subdivision and

21  question over title to the garages to frustrate Plaintiff CEMG's attempts to sell the Lots it

22  owns.

23  277.    Another part of the scheme involved misusing the name of Fox Hollow HOA to

24  fraudulently obtain money from the Lenders.  The Lenders (and their successors)

25  foreclosed on the various Fox Hollow Lots in 2000-2003. Doc. 410, CAC, ¶ 89.  Yet

26  starting on August 1, 2000 (before the HOA's incorporation), Defendants Richard Sinclair,

27  Mauchley, and Brandon Sinclair represented themselves as the Board of Directors of the

28  Fox Hollow HOA and through the mail demanded monthly dues of $300 upon the Lenders

1  who successfully foreclosed. Doc. 410, CAC, ¶ 90.   GMAC paid the amounts Defendants,

2  representing themselves as Fox Hollow HOA, demanded. Doc. 410, CAC, ¶ 96.

3  278.      "Any person injured in his business or property by reason of a violation of section

4  1962 of this chapter [18 U.S.C. § 1962] may sue therefor in any appropriate United States

5  district court and shall recover threefold the damages he sustains and the cost of the suit,

6  including a reasonable attorney's fee." 18 U.S.C. § 1964(c).  Plaintiffs assert that

7  Defendants' actions violated 18 U.S.C. § 1962(c) and (d). Doc. 410, CAC, ¶ 180.  Under

8  federal RICO law, "(c) It shall be unlawful for any person employed by or associated with

9  any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

10  to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs

11  through a pattern of racketeering activity or collection of unlawful debt.  (d) It shall be

12  unlawful for any person to conspire to violate any of the provisions of subsection (a), (b),

13  or (c) of this section." 18 U.S.C. § 1962(c) and (d).  "To state a claim under § 1962(c), a

14  plaintiff must allege '(1) conduct (2) of an enterprise (3) through a pattern (4) of

15  racketeering activity.'" Odom v. Microsoft Corp., 486 F.3d 541, 547 (9th Cir. 2007),

16  citations omitted.

17  279.      An "'enterprise' includes any individual, partnership, corporation, association, or

18  other legal entity, and any union or group of individuals associated in fact although not a

19  legal entity." 18 U.S.C. § 1961(4).  "[A]n association-in-fact enterprise must have at least

20  three structural features: a purpose, relationships among those associated with the

21  enterprise, and longevity sufficient to permit these associates to pursue the enterprise's

22  purpose." Boyle v. United States, 556 U.S. 938, 946 (2009).  "[B]are assertions of a pattern

23  of racketeering activity do not establish an enterprise." Doan v. Singh, 617 Fed. Appx.

24  684, 686 (9th Cir. 2015).  Plaintiffs' factual allegations in the CAC adequately describe

25  conduct of an enterprise consisting of "an association-in-fact to own and operate Fox

26  Hollow and divide among themselves money and benefits derived therefrom" with

27  activities connecting Defendants with the enterprise taking place between 1995 and 2001.

28  Doc. 410, CAC, ¶ 167.  Each of the Defendants participated and took action on behalf of

1    the association-in-fact.

2    280.    A "'pattern of racketeering activity' requires at least two acts of racketeering

3    activity, one of which occurred after the effective date of this chapter and the last of which

4    occurred within ten years (excluding any period of imprisonment) after the commission of

5    a prior act of racketeering activity." 18 U.S.C. § 1961(5).    "RICO defines as racketeering

6    activity only acts that are 'indictable' (or, what amounts to the same thing, 'chargeable' or

7    'punishable') under one of the statutes identified in §1961(1)." <u>RJR Nabisco, Inc. v.</u>

8    <u>European Cmty.</u>, 136 S. Ct. 2090, 2102 (2016).  Section 1961(1) includes "any act which

9    is indictable under any of the following provisions of title 18, United States Code:…

10   section 1341 (relating to mail fraud), section 1343 (relating to wire fraud)." 18 U.S.C. §

11   1961(1)(B).  Plaintiffs allege multiple acts of mail and wire fraud undertaken by the

12   association-in-fact between 1997 and 2001. Doc. 410, CAC, ¶ 173.  Mail fraud is defined

13   as "Whoever, having devised or intending to devise any scheme or artifice to defraud, or

14   for obtaining money or property by means of false or fraudulent pretenses, representations,

15   or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or

16   furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or

17   other article, or anything represented to be or intimated or held out to be such counterfeit

18   or spurious article, for the purpose of executing such scheme or artifice or attempting so to

19   do, places in any post office or authorized depository for mail matter, any matter or thing

20   whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited

21   any matter or thing whatever to be sent or delivered by any private or commercial

22   interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly

23   causes to be delivered by mail or such carrier according to the direction thereon, or at the

24   place at which it is directed to be delivered by the person to whom it is addressed, any such

25   matter or thing, shall be fined under this title or imprisoned not more than 20 years, or

26   both." 18 U.S.C. § 1341.  Wire fraud is defined as "Whoever, having devised or intending

27   to devise any scheme or artifice to defraud, or for obtaining money or property by means

28   of false or fraudulent pretenses, representations, or promises, transmits or causes to be

1    transmitted by means of wire, radio, or television communication in interstate or foreign

2    commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing

3    such scheme or artifice, shall be fined under this title or imprisoned not more than 20

4    years, or both." 18 U.S.C. § 1343.  "Sections 1341 and 1343 reach any scheme to deprive

5    another of money or property by means of false or fraudulent pretenses, representations, or

6    promises." Carpenter v. United States, 484 U.S. 19, 27 (1987).  "[C]auses to be delivered"

7    and "causes to be transmitted" is interpreted broadly. United States v. Garner, 663 F.2d

8    834, 838 (9th Cir. 1981), citing United States v. Maze, 414 U.S. 395, 399 (1974) ("the

9    government may prove the use of the mails for the purpose of executing a scheme to

10   defraud by showing that a defendant acted knowing that the use of the mails would follow

11   in the ordinary course of business, or that, even when not intended, such use was

12   reasonably foreseeable. In addition, the mailings need not be an essential part of the

13   contemplated scheme, they need only be made for the purpose of executing the scheme").

14   Plaintiffs have alleged multiple acts of mail and/or wire fraud in connection with their

15   scheme.  Each of the Defendants intended to participate in the scheme to defraud the

16   Lenders.

17   281.    These activities affected interstate commerce.  "A minimal effect on interstate

18   commerce satisfies this jurisdictional element." United States v. Bagnariol, 665 F.2d 877,

19   892-93 (9th Cir. 1981) (noting that "interstate telephone calls" could suffice).  Plaintiffs

20   specifically alleged that Defendant Richard Sinclair sent a letter via facsimile to Mr.

21   Sessions of GMAC Mortgage in Hawaii on May 5, 1998 providing financial information

22   on Defendant Mauchley in support of the mortgage application. Doc. 410, CAC, ¶ 153.

23   282.    Plaintiffs have stated RICO claims against all the Defaulted Defendants.

24

25   **2. Unjust Enrichment**

26   283.    "The elements of unjust enrichment are 'receipt of a benefit and unjust retention of

27   the benefit at the expense of another.' This equitable test does not turn merely on the

28   transfer of money or other benefits from one party to another — it requires injustice."

1  Berger v. Home Depot USA, Inc., 741 F.3d 1061, 1070 (9th Cir. 2014), citing Lectrodryer

2  v. SeoulBank, 77 Cal. App. 4th 723, 726 (Cal. App. 2d Dist. 2000) and Doe I v. Wal-Mart

3  Stores, Inc., 572 F.3d 677, 684 (9th Cir. 2009).  In the CAC, Plaintiffs refer to the general

4  facts alleged and do not specifically state what constitutes unjust enrichment. See Doc.

5  410, CAC, ¶¶ 182-184.  Plaintiffs do not explain what allegations fit an unjust enrichment

6  claim in their motion for default judgment. See Doc. 1203.  In their later briefing, Plaintiffs

7  suggest that their unjust enrichment cause of action is based on the failure to return

8  security deposits to tenants in 2002; Plaintiffs noted that the tenants had assigned their

9  rights to Plaintiff CEMG. See Doc. 1226-1, Proposed FOFCOL, ¶¶ 176-183, citing Doc.

10  410, CAC, ¶¶ 1, 89, 111, 112, 115, 116, 118, 119, 121, and 151.  The most pertinent

11  allegations in the CAC state that Defendants "entered in to written leases on units 104, 133

12  and 135 with tenants and then refused the demands for return of first month's rent and

13  security deposits in the amounts of $1,825, $1,850 and $1,895 respectively which such

14  rights of the tenants have been assigned to Plaintiff CEMG." Doc. 410, CAC, ¶ 116.

15  Plaintiff alleges that Defendants did not actually hold title to these properties at the time

16  they rented them out. Doc. 410, CAC, ¶ 115.  If Defendants did not have actual authority

17  to lease out the property, the lease agreements were voidable. See Lafountaine v.

18  Grobstein, 2016 Bankr. LEXIS 2218, *11 n.8 (B.A.P. 9th Cir. June 7, 2016).  As Plaintiffs

19  appear to be seeking to enforce the terms of the lease, namely the return of the security

20  deposit, these allegations fail to state a claim for unjust enrichment as it appears there was

21  an agreement which defined the rights of the parties.

22  284.    However, "unjust enrichment is an action in quasi-contract, which does not lie

23  when an enforceable, binding agreement exists defining the rights of the parties." Paracor

24  Fin., Inc. v. GE Capital Corp., 96 F.3d 1151, 1167 (9th Cir. 1996).  In the rental context, a

25  lease agreement provides for damages based on breach of contract. See Western Gen. Ins.

26  Co. v. Encino Exec. Plaza, Ltd., 2005 Cal. App. Unpub. LEXIS 3895, *20-21 (Cal. App.

27  2d Dist. Apr. 29, 2005) ("Landlord fails to explain whether equitable relief is available in

28  this situation. If Tenant had withheld payment of the increased operating costs, Landlord

65

1  might have been limited to seeking standard contract damages as opposed to equitable

2  relief"). Based upon CAC's factual allegations that the renters and the Defendants had a

3  written lease agreement, no unjust enrichment claim has been stated.

4

5  **3. Constructive Trust**

6  285.    Plaintiff CEMG owns Lots 2, 6, 7, 8, 9, 10, and 18 (on which stand the main

7  residential structures) while there is controversy over who owns the associated garages.

8  Doc. 410, CAC, ¶¶ 120, 121, 123, 124, 125, 126, and 128. Plaintiffs assert in counts five

9  and six that Defendants hold these garages in a constructive trust for CEMG's benefit and

10  seek declaratory and injunctive relief to have ownership over the garages formally

11  transferred. Doc. 410, CAC, ¶¶ 189-202. Federal and California courts have determined

12  that "a constructive trust is an equitable remedy, not a cause of action." Rasmussen v.

13  Dublin Rarities, 2015 U.S. Dist. LEXIS 24260, *36 (N.D. Cal. Jan. 22, 2015); Lawson v.

14  CitiCorp Trust Bank, FSB, 2011 U.S. Dist. LEXIS 86780 (E.D. Cal. Aug. 5, 2011); PCO,

15  Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP, 150 Cal. App. 4th

16  384, 398 (Cal. App. 2d Dist. 2007). The same is true of the request for declaratory and

17  injunctive relief. Plaintiffs have not stated a cause of action for these two counts. The

18  remedy requested is addressed below.

19

20  **4. Fox Hollow CC&Rs**

21  286.    Under California law, CC&Rs "shall be enforceable equitable servitudes, unless

22  unreasonable, and shall inure to the benefit of and bind all owners of separate interests in

23  the development. Unless the declaration states otherwise, these servitudes may be enforced

24  by any owner of a separate interest or by the association, or by both." Cal Civ. Code §

25  5975(a), formerly codified as Cal. Civ. Code § 1354(a) (repealed 2014).

26  287.    "[T]he association shall levy regular and special assessments sufficient to perform

27  its obligations under the governing documents and this act." Cal. Civ. Code § 5600(a),

28  formerly codified as Cal. Civ. Code § 1366(a) (repealed 2014). The Fox Hollow CC&Rs

1  set out that the HOA would "establish regular monthly assessments for operations and

2  maintenance of the Project…payable in monthly installments on the first day of each

3  month." Doc. 410, CAC, ¶ 49.  Plaintiffs allege that Defendants failed to pay the

4  assessments of the Fox Hollow HOA. Doc. 410, CAC, ¶ 212.

5  288.        The Fox Hollow CC&Rs also required Defendant Flake, as trustee of the Julie

6  Insurance Trust, "to convey to the [HOA] fee title to the common area for the Fox Hollow

7  Property free and clear of all liens and encumbrances 'prior to the conveyance of title to

8  the first lot.'" Doc. 410, CAC, ¶ 49.  On March 20, 2003, Plaintiff Fox Hollow HOA

9  demanded that Defendants deliver a deed transferring title over the common area to the

10  HOA. Doc. 410, CAC, ¶ 217.  Defendants have refused to do so. Doc. 410, CAC, ¶ 218.

11  289.        Plaintiff Fox Hollow HOA has stated a cause of action based on breach of the Fox

12  Hollow CC&Rs.

13

14  **B. Eitel Factors**

15  290.        Factors which may be considered by courts in exercising discretion as to the entry

16  of a default judgment include: (1) the possibility of prejudice to the plaintiff, (2) the merits

17  of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money

18  at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether

19  the default was due to excusable neglect, and (7) the strong policy underlying the Federal

20  Rules of Civil Procedure favoring decisions on the merits. Eitel v. McCool, 782 F.2d 1470,

21  1471–72 (9th Cir. 1986).

22  291.        Regarding the first and sixth factors, default was entered because Defendants

23  Richard Sinclair, Brandon Sinclair, Lairtrust, and Capstones consistently violated court

24  orders and repeatedly refused to fulfill their responsibilities to participate in discovery.

25  Doc. 1070.  Defendant Richard Sinclair declared that due to his lack of assets, monetary

26  sanctions could not induce him to obey court orders. Doc. 982.  This case was first filed in

27  federal court in 2003.  A plaintiff suffers prejudice if they "would be denied the right to

28  judicial resolution of the claims presented, and would be without other recourse for

1    recovery." <u>Warner Bros. Home Entm't v. Jimenez</u>, 2013 U.S. Dist. LEXIS 97139, *9 (C.D.

2    Cal. July 8, 2013), quoting <u>Electra Entm't Grp. Inc. v. Crawford</u>, 226 F.R.D. 388, 392

3    (C.D.Cal.2005).  Plaintiffs in this case would suffer prejudice if default judgment is not

4    entered.  As default was ordered by the court at the end of a series of sanctions, there was

5    no excusable neglect by Plaintiffs.

6    292.        The second and third factors are related and often analyzed together. See <u>DR JKL</u>

7    <u>Ltd. v. HPC IT Educ. Ctr.</u>, 749 F. Supp. 2d 1038, 1048 (N.D. Cal. 2010).  The discussion

8    above has established that Plaintiffs have sufficiently stated causes of action against the

9    Defaulted Defendants.  In examining the merits of the claim, defendants may present

10   evidence but must do so in opposition to the motion for default judgment to be deemed

11   timely. See <u>NewGen, LLC v. Safe Cig, LLC</u>, 840 F.3d 606, 616 n.7 (9th Cir. 2016).  In

12   this case, Defendant Richard Sinclair's submissions were untimely submitted and stricken

13   from the record for his failure to appear at the hearing. Doc. 1220.  The evidence submitted

14   by Plaintiffs supports the merits of their substantive claims.  Defendant Richard Sinclair

15   has raised the concern that Defendant Brandon Sinclair was a minor during at least part of

16   the time period over which the events of this case took place.  Defendant Brandon

17   Sinclair's birth date is July 16, 1978. Exhibit 49, Response to Interrogatories Signed by

18   Richard Sinclair, page 3.  He turned 18 in 1996, before the main part of the RICO

19   violations occurred.  Defendant Brandon Sinclair personally took part in the RICO scheme

20   in 2000.  Further, the overall case law on the actions of minors suggests that as long as

21   Defendant Brandon Sinclair took active part in the RICO violations, he can be found

22   financially liable.  In a criminal RICO case, the Ninth Circuit stated that "Nothing in the

23   [Juvenile Delinquency Act] or in any other statute suggests that Congress intended to

24   create a loophole resulting in no rehabilitation or punishment whatsoever for persons who

25   indisputably committed a serious continuing crime, merely because the crime happened to

26   span the defendant's eighteenth birthday…. we adopt the prevailing view that, for

27   prosecution of a defendant indicted at age 18, 19, or 20, pre-majority acts may be admitted

28   as substantive proof of a continuing crime such as the substantive RICO count here."

1    <u>United States v. Camez</u>, 839 F.3d 871, 875-76 (9th Cir. 2016).  Looking at related non-

2    RICO law, invites the same conclusion.  In one fraud case, parents passed funds through

3    their minor children's account to try to hide the monies during a bankruptcy; the district

4    court found both the parents and the children jointly and severally liable for repaying the

5    bankruptcy estate.  <u>Boyer v. Belavilas</u>, 474 F.3d 375, 377 (7th Cir. 2007).  The Seventh

6    Circuit modified the judgment, finding the minor persons not personally liable on the basis

7    that "§ 17(c) of the [Uniform Transfers to Minors Act] addresses the problem of lifetime

8    liability arising from events a minor cannot control: 'A minor is not personally liable for an

9    obligation arising from ownership of custodial property or for a tort committed during the

10    custodianship unless the minor is personally at fault.' The children's obligation to return

11    the fraudulent conveyance is one 'arising from ownership of custodial property'. Unless a

12    minor is 'at fault'--and the bankruptcy judge held that neither Angelo nor Nickolas bears

13    any fault--all obligations that relate to the UTMA account must be satisfied either from the

14    custodial assets under § 17(a) or by the custodian." <u>Boyer v. Belavilas</u>, 474 F.3d 375, 378-

15    39 (7th Cir. 2007).  In litigation, costs may be taxed against a minor. <u>Petri v. Kestrel Oil &</u>

16    <u>Gas Props., L.P.</u>, 2013 U.S. Dist. LEXIS 8695, *20 (S.D. Tex. Jan. 17, 2013).  The fact

17    that Brandon Sinclair was a minor until 1996 would not affect this judgment.

18    293.    For the fourth factor, "Default judgment is disfavored when a large amount of

19    money is involved or is unreasonable in light of the defendant's actions." <u>Joe Hand</u>

20    <u>Promotions, Inc. v. Burleson</u>, 2011 U.S. Dist. LEXIS 119191, *9 (E.D. Cal. Oct. 14,

21    2011).  This is a RICO case in which the Defendants are alleged to have undertaken a

22    coordinated scheme of defrauding Lenders and owners of the Lots over multiple years.

23    However, Plaintiffs request over $10 million in damages and "a large amount of money

24    weighs against default judgment." <u>Chong's Produce, Inc. v. Pushpak Rests., Inc.</u>, 2017

25    U.S. Dist. LEXIS 36498, *9 (N.D. Cal. Feb. 27, 2017).  This factor weighs against default

26    judgment.  However, courts have the authority to reduce the award for default judgment.

27    See <u>Hanover Ins. Co. v. Realty Bancorp Equities, LLC</u>, 2016 U.S. Dist. LEXIS 140831, *9

28    (C.D. Cal. Oct. 7, 2016); <u>Joe Hand Promotions, Inc. v. Be</u>, 2011 U.S. Dist. LEXIS 124057,

1  *7 (N.D. Cal. Oct. 26, 2011) ("Where a plaintiff's request for damages is excessive, the

2  court may mitigate the impact of this factor by reducing the amount awarded").

3  294.       The fifth factor is the possibility of dispute concerning material facts.  "Because all

4  allegations in a well-pleaded complaint are taken as true after the court clerk enters default

5  judgment, there is no likelihood that any genuine issue of material fact exists." Elektra

6  Entm't Group, Inc. v. Crawford, 226 F.R.D. 388, 393 (C.D. Cal. 2005).  This conclusion is

7  further reinforced by the fact that Defaulted Defendants have "submitted nothing to

8  contradict the well-pled allegations." Joe Hand Promotions, Inc. v. Burleson, 2011 U.S.

9  Dist. LEXIS 119191, *10-11 (E.D. Cal. Oct. 14, 2011).

10  295.       The seventh factor is the strong policy that favors decisions on the merits.  The

11  factor is not dispositive but must be considered alongside the other factors. Maxum Indem.

12  Co. v. Court Servs., 2012 U.S. Dist. LEXIS 79956, *12 (E.D. Cal. June 8, 2012).

13  296.       On balance, the factors weigh in favor of granting the motion for default judgment.

14  Striking answers to the CAC was a litigation sanction arrived at after a years-long process

15  whereby the court has unsuccessfully tried to make Defendants Richard Sinclair, Brandon

16  Sinclair, Lairtrust, and Capstone comply with court orders.  Defendant Richard Sinclair

17  especially has taken multiple opportunities to frustrate the process of this case, preventing

18  it from reaching a conclusion.  At this point, default judgment appears to the only way to

19  resolve this case.

20

21  **C. Money Damages**

22  **1. RICO**

23  297.       "Any person injured in his business or property by reason of a violation of section

24  1962 of this chapter [18 U.S.C. § 1962] may sue therefor in any appropriate United States

25  district court and shall recover threefold the damages he sustains and the cost of the suit,

26  including a reasonable attorney's fee." 18 U.S.C. § 1964(c).  The trebling of civil RICO

27  damages is mandatory. See Allstate Ins. Co. v. Nassiri, 2013 U.S. Dist. LEXIS 98348, *5-6

28  (D. Nev. July 15, 2013) ("Having reviewed 18 U.S.C. § 1964(c), the court finds that it is

70

ADDENDUM A

Page 70

1    required to treble damages"); <u>Beneficial Standard Life Ins. Co. v. Madariaga</u>, 851 F.2d

2    271, 277 (9th Cir. 1988) ("the treble damages mandated by RICO").  Section 1964(c)

3    "requires the plaintiff to establish proximate cause in order to show injury 'by reason of' a

4    RICO violation." <u>Bridge v. Phoenix Bond & Indem. Co.</u>, 553 U.S. 639, 654 (2008).  Civil

5    RICO allows for joint and several liability. See <u>Beneficial Standard Life Ins. Co. v.</u>

6    <u>Madariaga</u>, 851 F.2d 271, 272 (9th Cir. 1988) (noting that the district court issued a

7    judgment finding defendants joint and severally liable); <u>Fleischhauer v. Feltner</u>, 879 F.2d

8    1290, 1301 (6th Cir. 1989) ("the nature of the RICO offense mandates joint and several

9    liability").

10    298.    As part of the purchase of Lots 3, 7, 9, and 14, Plaintiff CEMG acquired from

11    Conti an assignment of all associated legal and equitable claims. Doc. 1237, Transcript,

12    33:6-16; Ex. 11, pages 3 and 4. "[F]ederal courts have consistently held that parties may

13    assign RICO claims." <u>HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co.</u>, 2006 U.S. Dist.

14    LEXIS 97002, *14 (C.D. Cal. June 9, 2006), citing <u>Lerman v. Joyce Int'l</u>, 10 F.3d 106,

15    112-13 (3rd Cir. 1993) and <u>In re National Mortg. Equity Corp. Mortg. Pool Certificates</u>

16    <u>Sec. Litigation</u>, 636 F. Supp. 1138, 1156 (C.D. Cal. 1986).  For these Lots, Plaintiff CEMG

17    (standing in the shoes of Conti) is the proper party to seek RICO damages.  Granite Bay

18    Funding was the original lender on the mortgages secured by first deeds of trust for Lots 3,

19    7, 9, and 14 in July 1998; Conti acquired those loans from Granite Bay Funding in August

20    1998. Doc. 410, CAC, ¶ 73.  Granite Bay kept the loans for only a month.  There is no

21    indication that Granite Bay suffered any financial repercussions due to Defendants' fraud.

22    Defendants concealed the failure to complete the subdivision through November 18, 1999.

23    Doc. 410, CAC, ¶¶ 77 and 85.  When Conti sold Lots 3, 7, 9, and 14 to Plaintiff CEMG in

24    2002, Defendants had already defaulted on the mortgages.  Conti sold the loans to Plaintiff

25    CEMG for less than the amount owed.  Conti suffered a financial loss of $510,139.65 due

26    to Defendants' actions. Ex. 16.  The trebled amount is $1,530,418.95.

27    299.    Plaintiff CEMG claims $292,153.13 in "compliance/rehab costs" for Lots 3, 7, 9,

28    and 14. Ex. 20.  Defendant Richard Sinclair objected to this category of damages as much

71

1    of the money was spent "to spruce up a 20+ year old building." Doc. 1208, Opposition to

2    Motion for Default Judgment, pages 89-90.  At the prove up hearing, Katakis testified that

3    the rehabilitation of those Lots was extensive: "We replaced almost everything inside.

4    When I say everything, I mean everything, from Sheetrock to all flooring, to electrical, all

5    outlets, all cabinetry, all hard surfaces, tile work, all plumbing, all light fixtures, just go on

6    and on. The only things that weren't replaced for the most part were the foundations and

7    studs and Sheetrock. Everything else had to be replaced." Doc. 1237, Transcript, 50:17-23.

8    The report by the architect Fergel, who evaluated what was required for the "Proposed

9    Planned Development (P.D.) zoning to convert existing apartments to duplexes and single

10    units" did not call for redoing the interiors; instead, the report recommended installing

11    firewalls for garages, installing firewalls for certain units, eliminating certain roof

12    overhangs, and checking or adding smoke detectors. Ex. 18.  Plaintiffs stated that the rehab

13    "included completing the requirements of the City of Turlock for separate ownership of the

14    lots, **and also** a complete renovation of the exteriors and interiors of many of the units that

15    were no longer habitable." Doc. 401, CAC, ¶ 135, emphasis added.  Thus the total figure

16    Plaintiff CEMG requests includes monies expended to make corrections necessary to

17    subdivide Fox Hollow as well as funds spent on other improvements.  The evidence

18    presented does not allow for clarifying which expenditures are which.  Failing to keep up

19    with general repairs on the individual Lots is not part of Plaintiffs' RICO claim. See Doc.

20    410, CAC, ¶ 153.  Plaintiff CEMG has not provided sufficient evidence to determine how

21    much it spent to complete the changes required to gain approval for subdivision.  This

22    request for damages is denied.

23    300.    Plaintiff CEMG has owned 17 of the 19 Fox Hollow Lots (all but Lots 1 and 19)

24    since 2003. Doc. 410, CAC, ¶¶ 120-128.  Plaintiff CEMG was prevented from selling the

25    Lots to individual buyers due to Defendants' failure to transfer certain garage spaces to

26    Plaintiff CEMG and the common areas to Plaintiff Fox Hollow HOA.  As a consequence,

27    Plaintiff CEMG could not sell their Lots in late 2004, early 2005 when real estate prices

28    were high.  Plaintiff CEMG has suffered a loss of $2,353,516.63 due to the delay.  Doc.

1    1237, Transcript, 67:19-25.  The trebled amount is $7,060,549.89.

2    301.      Plaintiff Fox Hollow HOA spent $350,110.95 in 2003 and 2004 rehabilitating Fox

3    Hollow. Doc. 1237, Transcript, 80:4-82:7; Exs. 24-25.  But as with Plaintiff CEMG,

4    Plaintiff Fox Hollow HOA has not explained how much of the expense was to make

5    changes required to gain approval for subdivision and how much was general

6    improvement.  There is insufficient evidence to determine how much was spent to make

7    the necessary changes.  This request for damages is denied.

8    302.      Plaintiff Fox Hollow HOA paid Rubenstein, McGranahan, and their attorneys a

9    total of $28,277.28 for their services which lasted from March 2001 to October 2002. Doc.

10    1237, Transcript, 25:24-26:2; Exs. 4, 5, 6, and 8.  Plaintiffs seek to recover sum but have

11    not established how this is a result of Defendants' RICO violations.  The receivers took

12    control of the HOA and managed its operations.  Plaintiffs have not provided evidence as

13    to how Defendants' fraudulent actions necessitated these fees.  This request for damages is

14    denied.

15    303.      Before Plaintiff Fox Hollow HOA was formally incorporated, it paid Defendant

16    Richard Sinclair $15,266.99 in attorney's fees between August 2000 and January 2001.

17    Ex.7, McGranahan Report, page 4, Exs. A and C.  Plaintiff Fox Hollow HOA seeks to

18    recover $5,200 of this amount. Doc. 1226-1, Proposed FOFCOL, 41:16-24 and 64:25-65:2.

19    Fraudulently demanding dues on behalf of a nonexistent HOA was part of Defendants'

20    RICO scheme.  Lender GMAC paid $5,200 in response to those demands. Ex. 9.  In this

21    circumstance, GMAC is the proper party to seek relief rather than Plaintiff Fox Hollow

22    HOA.  "To determine whether an injury is 'too remote' to allow recovery under RICO and

23    the antitrust laws, the Court applies the following three-factor 'remoteness' test: (1)

24    whether there are more direct victims of the alleged wrongful conduct who can be counted

25    on to vindicate the law as private attorneys general; (2) whether it will be difficult to

26    ascertain the amount of the plaintiff's damages attributable to defendant's wrongful

27    conduct; and (3) whether the courts will have to adopt complicated rules apportioning

28    damages to obviate the risk of multiple recoveries." <u>Oregon Laborers-Employers Health &</u>

1    Welfare Trust Fund v. Philip Morris, Inc., 185 F.3d 957, 963 (9th Cir. 1999), citing

2    Holmes v. Securities Investor Protection Corporation, 503 U.S. 258, 269-70 (1992).

3    GMAC is the direct victim; there was no obligation for GMAC to pay as the HOA did not

4    yet exist.  This request for damages is denied.

5

6    **2. Fox Hollow CC&Rs**

7    304.        Plaintiffs have presented the testimony of Casey Johnson, a certified public

8    accountant who has reviewed the dues, late charges, special assessments, and finance

9    charges of the Fox Hollow HOA. Doc. 1237, Transcript, 85:15-21.

10   305.        Johnson specified that he was testifying to the total amount of HOA dues and

11   charges that Defendants failed to pay, from August 1, 2000 onward. Doc. 1237, Transcript,

12   86:11-14.  As part of their RICO claim, Plaintiffs have specifically asserted that the

13   demand for HOA dues "over the period of August through December 2000" was

14   fraudulent. Doc. 410, CAC, ¶ 173.  That is because "Defendants had failed and refused to

15   form Fox Hollow HOA as a non-profit mutual benefit corporation until on or about

16   December 6, 2000." Doc. 410, CAC, ¶ 95.  Plaintiffs have consistently asserted that Fox

17   Hollow HOA did not form until that time. See Doc. 1227, Supplemental Briefing ("When

18   Fox Hollow HOA was created in December 2000…").  The theory of the RICO violation

19   is that the non-existence of Fox Hollow HOA before incorporation is what made the

20   demands for HOA dues fraudulent.  Thus, Plaintiffs' request for HOA dues or late fees

21   from Defendants based on the time before the Fox Hollow HOA formed is disallowed.

22   306.        Johnson presented Exhibit 47, which contains two alternate summaries of total

23   charges due using simple or compound interest.  Johnson also presented Exhibit 48 which

24   laid out who owned the Lots at any given time.  Johnson's testimony and the exhibits

25   provide evidence to support a modified award of monetary damages.

26   307.        Johnson concludes, using simple interest, that Capstone owes $40,384.26 due to

27   ownership of Lot 1 and Lairtrust owes $40,384.20 due to ownership of Lot 19. Doc. 1237,

28   Transcript, 93:4-9 and 15-18.  Exhibit 48 shows that Johnson's conclusion was based upon

1    ownership in the February 4, 2002 to March 15, 2004 period. Ex. 48, pages 1 and 19.

2    These amounts do not include any HOA dues from 2000.

3    308.    Johnson concludes that Mauctrst owes $142,318.06 due to ownership of Lots 1, 2,

4    3, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, and 19. Doc. 1237, Transcript, 93:10-14.

5    However, some of that is based on HOA dues from August-December 2000.  Examining

6    Exhibits 47 and 48 reveals that the amounts owed for Lots 1, 2, 5, 11, 15, 17, 18, and 19

7    are completely based on HOA dues assessed in 2000.  These amounts are not recoverable.

8    The exhibits also show that the amounts owed for Lots 3, 6, 8, 9, 10, 12, 13, 14, and 16 are

9    partially based on HOA dues assessed in 2000.  The figures provided by Johnson must be

10    modified.  Defendants levied a $300 monthly assessment on the first of the month with a

11    10% penalty for failure to pay by the end of the month.  Defendants started levying on

12    August 1, 2000 and Fox Hollow HOA was not formed until December 6, 2000.  Thus, the

13    levies for August, September, October, November, and December were invalid, for a total

14    of ($300 + $30) x 5 = $1,650.  The amount owed Johnson set out for Lots 3, 6, 8, 9, 10, 12,

15    13, 14, and 16 must be reduced by $1,650 each.  Johnson's analysis also calculated finance

16    charges for nonpayment at a rate of 12% annual interest.  His summary broke the finance

17    charges out into three periods running (1) August 1, 2000 to March 1, 2011, (2) March 1,

18    2011 to November 24, 2014, and (3) November 24, 2014 to May 10, 2016. Ex. 47.  This

19    information does not allow the finance charges for the HOA dues from 2000 to be stripped

20    out.  Similarly, the figures provided in Johnson's full report does not set out the

21    information in a manner which would allow that sum to be readily calculated. See Ex. 46.

22    Consequently, no finance charges are awarded.   Damages for unpaid HOA assessments

23    are set at $7,590 for Lot 3, $3,960 for Lot 6, $1,320 for Lot 8, $8, 550 for Lot 9, $1,320 for

24    Lot 10, $660 for Lot 12, $960 for Lot 13, $8,580 for Lot 14, and $1,155 for Lot 16, which

25    totals $34,095.

26

27    **D. Declaratory Relief**

28    **1.Constructive Trust**

1    309.    Plaintiffs request that the garages associated with Lots 2, 6, 7, 8, 9, 10, and 18 be

2    transferred to CEMG. Doc. 410, CAC, ¶ 193.  As part of the RICO claim, Plaintiffs have

3    asserted that Defendants committed fraud by misleading the Lenders who thought the

4    garages were part of the Lots that they provided mortgage loans for; instead the garages

5    "were not included in the legal description in the deed of trust for the loan on each such

6    lot…and were left out as part of the deal between Defendants Richard Sinclair, Mauchley

7    and Flake in 1997." Doc. 410, CAC, ¶¶ 59 and 71.  In 2008, Defendant Richard Sinclair,

8    on behalf of Defendants Mauchley and Mauctrst, demanded that Plaintiff CEMG and the

9    tenants of Lots 2, 6, 7, 8, 9, 10, and 18 vacate the garages. Doc. 410, CAC, ¶¶ 142 and 143;

10    Ex. 41.  In 2007, Defendant Mauchley quitclaimed his interest in the garages in favor of

11    Defendant Lairtrust. Doc. 410, CAC, ¶ 141.

12    310.    The structure and organization of the Fox Hollow project leads to the natural

13    assumption that the garages, even though physically separated from the corresponding

14    residences, are automatically part of the associated Lots.  For example, the Fox Hollow

15    CC&Rs only provided access easements over the common areas "for the benefit of Lots

16    and Lot Owners" with "Lots" defined as "Lots 1-19." Doc. 410, CAC, ¶¶ 47 and 51.  If the

17    garage units were to be treated as independent units, their owners would have no easement

18    to access them under the Fox Hollow CC&Rs.

19    311.    "One who gains a thing by fraud, accident, mistake, undue influence, the violation

20    of a trust, or other wrongful act, is, unless he or she has some other and better right thereto,

21    an involuntary trustee of the thing gained, for the benefit of the person who would

22    otherwise have had it." Cal. Civ. Code § 2224.  "To properly allege the remedy of the

23    imposition of a constructive trust, a pleading requires: (1) facts constituting the underlying

24    cause of action, and (2) specific identifiable property to which the defendant has title."

25    <u>Jaffee v. Carryl</u>, 2016 U.S. Dist. LEXIS 83224, *9 (C.D. Cal. June 27, 2016), citing

26    <u>Michaelian v. State Comp. Ins. Fund</u>, 50 Cal. App. 4th 1093, 1114 (Cal. App. 5th Dist.

27    1996).  "A plaintiff seeking imposition of a constructive trust must show: (1) the existence

28    of a res (property or some interest in property); (2) the right to that res; and (3) the

1    wrongful acquisition or detention of the res by another party who is not entitled to it."

2    Mattel, Inc. v. MGA Entm't, Inc., 616 F.3d 904, 909 (9th Cir. 2010), citing Communist

3    Party v. 522 Valencia, Inc., 41 Cal. Rptr. 2d 618, 623 (Cal. App. 1st Dist. 1995).

4    "Constructive trusts are creatures of equity. In dealing with them, equity will disregard

5    mere form, and will ascertain and act on the substance of things, regarding that as done

6    which should have been done. The determination of whether a particular transaction is

7    unconscionable is not governed by hard and fast rules, but is committed largely to the

8    enlightened conscience of the individual judge, subject to the revisionary action of

9    appellate tribunals." United States v. Pegg, 782 F.2d 1498, 1501 (9th Cir. 1986), quoting

10   60 Cal. Jur. 3d Trusts § 287 (1980).

11   312.    Plaintiffs have identified the real property at issue.  The garages were meant to

12          have been attached to the deeds of trust securing Lots 2, 6, 7, 8, 9, 10, and 18.  Defendants

13          have retained an interest in the garages through misrepresentation.  A constructive trust is

14          properly imposed on the garages for the benefit of Plaintiff CEMG.

15

16   **2. Fox Hollow CC&Rs**

17   313.    Plaintiffs also request that the common areas be transferred to the Fox Hollow

18          HOA.  The CAC alleges that Defendants violated the Fox Hollow CC&R by refusing to

19          turn over the common areas. Doc. 410, CAC, ¶¶ 217 and 218.

20   314.    In response, Defendant Richard Sinclair claims that the common areas were

21          "already deeded to Plaintiffs." Doc. 1208, Opposition to Motion for Default Judgment,

22          page 93.  However, Plaintiffs have asserted that Defendants continue to claim ownership

23          over those areas.  In 2008, Defendant Richard Sinclair, on behalf of Defendant Mauctrst,

24          demanded that Plaintiffs and Fox Hollow tenants stop using the common areas including

25          the driveway. Doc. 410, CAC, ¶ 146; Ex. 40.  At the prove up hearing, Katakis specifically

26          testified that Defendant Richard Sinclair had attempted to interfere with Plaintiffs' and

27          their tenants' use of the common area. Doc. 1237, Transcript, 59:12-23.

28   315.    Declaratory relief is needed to affirm that the common areas of the Fox Hollow

project properly belong to the HOA per the Fox Hollow CC&R.

## VI. Order

316.     Default judgment is granted in favor of Plaintiffs CEMG and Fox Hollow HOA against the Defaulted Defendants for civil RICO and in favor of Plaintiff Fox Hollow HOA against the Defaulted Defendants for breach of the Fox Hollow CC&Rs.

317.     Defaulted Defendants' RICO violations caused Conti $510,139.65 in damages and Plaintiff CEMG of $2,353,516.63 in damages.  Conti has assigned its rights to Plaintiff CEMG.  Treble damages apply.  Plaintiff CEMG would be awarded $8,590,968.84 against the Defaulted Defendants, jointly and severally.

318.     The settlement with Defendant Mauchley and the Flake Defendants has yielded $460,000 and $2,297,793 respectively in funds available to satisfy this judgment.  The total sum of $2,757,793 shall be used to offset the RICO award.  Thus, the amount awarded to Plaintiff CEMG against the Defaulted Defendants is reduced to $5,833,175.84.

319.     Defendants Capstone, Lairtrust, and Mauctrst violated the Fox Hollow CC&Rs by failing to pay HOA dues.  Plaintiff Fox Hollow HOA is awarded $40,384.26 against Capstone, $40,384.20 against Lairtrust, and $34,095 against Mauctrst.

320.     Defaulted Defendants' fraudulent conduct resulted in a cloud over the title of certain garage lots.  Plaintiff CEMG is entitled to and owns and holds the right to possession of Lots 2A, 6A, 7A, 8A, 9A, 10A and 18A of the Fox Hollow property according to Fox Hollow, a subdivision, recorded in the Official Records of Stanislaus County, California, on March 6, 1996, in Book 37 of Maps, Page 37, and Fox Hollow No. 2, a subdivision, recorded in the Official Records of Stanislaus County, California, on July 21, 1998, in Book 38 of Maps, Page 19 (the "detached garage lots") as of the commencement of the action in April 2003, and such Defaulted Defendants and each of them have no ownership of or right to exclude Plaintiffs or any of the tenants at Fox Hollow from any such detached garage lots.  Defendants Richard Sinclair, Mauctrst, and Lairtrust, and each of them, and their agents, servants, and employees, and all other

1    persons acting under, in concert with or for them, are permanently enjoined from asserting,

2    claiming or communicating to tenants at the Fox Hollow property (located at 152 20th

3    Century Boulevard, Turlock, Stanislaus County, California) that they or any of them hold

4    or claim any ownership or right to possession for the detached garage lots or otherwise

5    from interfering with the use and enjoyment of any of the detached garage lots by Plaintiffs

6    and the tenants at the Fox Hollow property.

7    321.    Defaulted Defendants' fraudulent conduct resulted in a cloud over the title of the

8    common areas.  Plaintiff Fox Hollow HOA is entitled to ownership in and the right to

9    possession of the Common Area and Access Easement and Public Utility Easement

10    depicted on Fox Hollow No. 2 subdivision map filed of record in Stanislaus County,

11    California, on July 21, 1998, in Book 38, Page 19 (the "Fox Hollow Common Area") as of

12    the commencement of the action in April 2003, and such Defaulted Defendants and each of

13    them have no ownership of or right to exclude Plaintiffs or any of the tenants at Fox

14    Hollow from the Fox Hollow Common Area.  Defendants Richard Sinclair and Mauctrst,

15    and each of them, and their agents, servants, and employees, and all other persons acting

16    under, in concert with or for them, are permanently enjoined from asserting, claiming or

17    communicating to tenants at Fox Hollow that they or any of them hold or claim any

18    ownership or right to possession for the Fox Hollow Common Area or otherwise from

19    interfering with the use and enjoyment of the Fox Hollow Common Area by Plaintiffs and

20    the tenants at the Fox Hollow property.

21    322.    Plaintiffs may file a motion for attorney's fees and cost bill in accord with Local

22    Rules 292 and 293.

23    323.    The remainder of this action is dismissed in its entirety with prejudice.

24

IT IS SO ORDERED.

25

26    Dated:  March 31, 2017    _____

27    SENIOR  DISTRICT  JUDGE

28

# ADDENDUM "B"

## STATE COURT DECISION FINDINGS AND CONCLUSIONS

1.　　"In April 1994, Mr. Sinclair wrote to the City of Turlock to advise them that there were sufficient funds in the HOA. (D022.) Mr. Sinclair testified that he never told the City that there was an HOA before 1998 (687:5-15) and that there was no HOA before 2000. (689:6-9.) Mr. Sinclair's 1994 letter to the City of Turlock that there was an HOA was false."

State Court Decision, ¶ 1 at 6:13.5 to 16.5; Dckt. 73. (The page references are to the page number of the State Court Decision itself.)

2.　　"From November 1995 through February 1997, Mr. Sinclair and Mr. Flake worked closely together to develop Fox Hollow. (D337 to D382; D390; D391.) Yet, Mr. Flake testified he had no involvement with Mr. Sinclair during this time. Clearly, this was not true."

*Id.*, ¶ 2 at 6:17.5-19.

3.　　"In March 1996, [Defendant-Sinclair] subdivided Fox Hollow by recording Map No. 1. (J011.) The City required as a condition that a homeowner's association be formed. (DO10.) In September 1996, Plaintiffs recorded the CC&Rs. (D013.) The CC&Rs required formation of an HOA. [Defendant-Sinclair] did not do this."

*Id.*, ¶ 3 at 6:20-22.

4.　　"In February 1997, Mr. Flake sold Fox Hollow to Mr. Mauchley by selling four separate lots through four separate deeds. (J014, J017, J019, J021.) Although the CC&Rs required him to convey the common area to the HOA before doing this, he did not do it."

*Id.*, ¶ 4 at 6:22.5-24.

5.　　"In 1998, Mr. Sinclair worked to secure financing at Fox Hollow. Mr. Mauchley testified that Mr. Sinclair handled this work and that he, Mr. Mauchley, "didn't talk to any lenders." Mr. Sinclair testified that Mr. Mauchley was "arranging for the most part the financing.""

*Id.*, ¶ 5 at 6:25-26.

6.　　"On or about July 21, 1998, [Defendant-Sinclair] caused Subdivision Map No.2 to be recorded creating an additional 15 lots. (J031.) [Defendant-Sinclair] knew that they had failed to complete the conditions imposed by the City for recording such a map. (D010, D012, D013.) [Defendant-Sinclair] also knew that the City had previously rejected their request to complete the required work after the map was recorded. (D016, D018, D021.)"

*Id.*, ¶ 6 at 6:27.5-28, 7:1-2.5.

7.　　"In July 1998, immediately upon recording Map No.2, [Defendant-Sinclair] caused 15 loans to be placed against the 15 new lots. Mr. Mauchley signed fifteen deeds of trust (J032, J033, J034, J035, J037, J039, J041, J043 to J050) that contained Planned Unit Development riders representing that there was a HOA. Yet, "there was no intention to start it then." (687:5-15.)"

*Id.*, ¶ 7 at 7:3.5-5.

8.      "In July 1998, [Defendant-Sinclair] obtained these 15 new loans based on values that were "subject to final completion of subdivision firewalls and underground relocation of utilities to accommodate individual ownership . . . " (J349; 4:11-14.) This material information was not disclosed to the lenders. [Defendant-Sinclair's] secured these loans was on a false premise."

*Id.*, ¶ 8 at 7:6-8.

9.      "In late 1998 and early 1999, [Defendant-Sinclair] began defaulting on the loans and were further encumbering the property with a $300,000 loan. (J064.) Mr. Mauchley testified he knew that [Defendant-Sinclair] were late on a more than a couple of payments, but Mr. Sinclair insisted that he had made wire transfers or other sorts of direct payments, but later recanted this testimony."

*Id.*, ¶ 9 at 7:9-11.

10.      "In April, May and June of 1999, lenders began to record notices of default on the July 1998 loans. (J066, J067, J068.)  On July 1, 1999, Mauctrst LLC filed bankruptcy. [Defendant-Sinclair] claimed that the bankruptcy filing had nothing to do with the pending non-judicial foreclosures and "that wasn't the consideration at all." (724:7-12.)"

*Id.*, ¶ 10 at 7:12-14.

11.      "In July 1999, Mr. Sinclair filed bankruptcy for Mauctrst LLC representing that it was owned 50% by Mr. Mauchley and 50% by Mrs. Mauchley. Mr. Mauchley testified at trial these statements were false. Richard Sinclair and Gregory Mauchley then had recently filed unlawful detainer actions verifying under oath that they owned the property. Since July 1999, [Defendant-Sinclair] have asserted that the automatic stay of the Mauctrst LLC bankruptcy should prevent Fox Hollow lenders from pursuing collection efforts even though (1) Richard Sinclair and Gregory Mauchley, not Mauctrst LLC, owned the property, (2) Mr. Mauchley, not Mauctrst LLC, was the obligor on the notes and deeds of trust."

*Id.*, ¶ 11 at 7:15-19.

12.      "Mr. Sinclair has testified in deposition, at trial and in letters that he sent that he is a member/manager of Mauctrst LLC and that member/manager means owner. Mr. Sinclair has divulged that he directly benefitted in the amount of $160,000 from the Fox Hollow endeavor in the year before the July 1, 1999. Yet, he continues to claim he has no ownership interest in it."

*Id.*, ¶ 12 at 7:20-22.5.

13.      "In January 2000, [Defendant-Sinclair] began to attempt to negotiate significant discounts on their loans by drawing the lenders attention -- 18 months after they obtained the loans -- to the fact that their collateral was impaired for reasons solely attributable to [Defendant-Sinclair's] misconduct. (D057, D058, D065, D067.)"

*Id.*, ¶ 13 at 7:23.5-25.5.

14.      "In February 2000, lenders filed additional notices of default regarding Fox Hollow. (J079 to J084.) In March 2000, [Defendant-Sinclair] began suing lenders and seeking restraining orders to delay those foreclosures. (E.g. J215.) In total, they filed seven lawsuits

1    and lost nearly all of them."

2    *Id.*, ¶ 14 at 7:26.5-28.

3         15.    "On June 6, 2000, [Defendant-Sinclair] obtained a preliminary injunction which
         listed Lots 9 and 14 at Fox Hollow, but which they have claimed also pertained to Lots 3 and
4        7. (J232.) The injunction was conditioned on [Defendant-Sinclair] making "the required
         monthly payments on the promissory note as it comes due". Plaintiffs failed to make a single
5        payment and enjoyed the benefit of the injunction until 2003."

6    *Id.*, ¶ 15 at 8:1.5-4.

7         16.    "Although [Defendant-Sinclair] prepared HOA minutes indicating that Mr. Mauchley
         was present at the first two HOA meetings (P002), Mr. Mauchley testified that he did not
8        attend meetings. Plaintiffs' minutes indicate work was being done on and Mr. Sinclair billed
         Fox Hollow for doing work on Articles of Incorporation (P001) during the time period of
9        August 2000 to December 2000. Yet, the Articles of Incorporation were signed and
         completed in July 2000, but simply not filed with the Secretary of State until December
10       2000. (D069.)"

11   *Id.*, ¶ 16 at 8:5-8.

12        17.    "In October 2000, [Defendant-Sinclair] provided the outstanding dues to escrow and
         volunteered to escrow that "title to the lots cannot be transferred at the present time". (D067.)
13       Mr. Sinclair provided a declaration under penalty of perjury to the Court that this letter was
         sent "[o]ut of courtesy to the new owners and to elicit their cooperation". (J285, ¶ 17.) This
14       is not credible. A month later, [Defendant-Sinclair] sent out a HOA dues statement with a
         note at the bottom that there were potential purchasers interested in purchasing the lots at
15       their "as is where is" price. (D348.)"

16   *Id.*, ¶ 17 at 8:9-12.5.

17        18.    "In February 2001, a receiver was appointed over [Defendant-Sinclair's] objection.
         (J285; J291.) The receiver appointment hearing reflects [Defendant-Sinclair's] misleading
18       conduct. (J289.)"

19   *Id.*, ¶ 18 at 13.5-14.5.

20        19.    "In May 2001, [Defendant-Sinclair] entered a settlement agreement with GMAC that
         they secretly set up as a double escrow without disclosing to GMAC that the Sinclairs were
21       the actual purchasers. In July 2001, [Defendant-Sinclair] failed to close with GMAC. Mr.
         Sinclair informed Mr. Mauchley that they missed the deadline. Mr. Sinclair even wrote
22       correspondence acknowledging that the escrow "must close" within a time certain. (D093.)
         However, [Defendant-Sinclair] still claim that the date for the close of escrow was not a
23       condition of their agreement with GMAC. (J332:4-12.)"

24   *Id.*, ¶ 19 at 8:15.5-19.

25        20.    "In December 2001, Brandon Sinclair took out a loan against Lot 1 at Fox Hollow
         (J140) and then transferred the property to an LLC (J148) that he and his father [Mr.
26       Sinclair] formed to protect him from credit damage (Testimony of Brandon Sinclair) when
         they defaulted."
27
     *Id.*, ¶ 20 at 8:20-21.5.
28

21.     "In May 2002, [Defendant-Sinclair] stopped making dues payments to the HOA."

*Id.*, ¶ 21 at 8:22.5.

22.     "In June 2002, over 10 months after the [Defendant-Sinclair] were to close escrow on Lots 11 and 18 and after GMAC had canceled the Settlement Agreement with [Defendant-Sinclair] (DI99), CEMG entered into a contract with GMAC to purchase those two lots. During trial, [Defendant-Sinclair] deleted information from an exhibit showing that Mr. Sinclair had not sent a copy of the GMAC settlement agreement until July 17, 2002. (P085 v. D368.)  This was done in an attempt to create the impression that [Defendant-Sinclair] had claimed they had a contract to purchase the properties before GMAC and CEMG completed their sale. Richard Sinclair's testimony regarding what he told Mr. Katakis before CEMG closed escrow was false."

*Id.*, ¶ 22 at 8:23.5-27.5.

23.     "On July 31, 2002, [Defendant-Sinclair] advised the Court in writing that: (a) after the Court appointed a receiver, "the Board resigned"; (b) there was "no board of directors to represent" the HOA; (c) "no direction has been provided"; and (d) elections should be held. (J309.)  [Defendant-Sinclair] failed to advise the HOA for two months after the new Board was elected that they believed they were the Board and only did so when it was apparent that the new Board was going to begin collecting dues and gather estimates for the repair work at Fox Hollow.  (P052.)

Mr. Sinclair explained why he told the Court this: "What I must have ineloquently represented to the Court was Mr. Katakis was buying us out. He had made us an offer of about $1 million. We were waiting to finalize that. And everybody wanted to get rid of this case because it had no other purpose. And so we weren't going to go to trial. We weren't going to go forward with it. And so I was telling the Court, you know, this is kind of done with." (595:27-596:6.) Thus, rather than admit that he had lied to the Court, Mr. Sinclair made up this story. First, the document he stated to the Court suggests nothing remotely like Mr. Sinclair's testimony. Second, the evidence is unequivocally clear that Mr. Katakis never offered them $1 million as Mr. Sinclair claims."

*Id.*, ¶ 23 at 9:1-10.5.

24.     "In October 2002, when the new Board and officers were elected at Fox Hollow, Fox Hollow was in a very poor condition. (D178.) It had been in the same condition when the Court was required to appoint a receiver for the homeowner's association. (J282; J286 and pictures attached to both declarations.) It had been in a deteriorating condition since as early as 1993. (D009.) Mr. Sinclair even admitted the deferred maintenance. (J285, ¶ 9, p. 4.)  Yet, Plaintiffs continue to claim that they had no role in the condition of Fox Hollow."

*Id.* , ¶ 24 at 9:11.5-14.5.

25.     "In December 2002, [Defendant-Sinclair] threatened the new Board with a number of baseless charges while claiming that the prior Board had in fact not resigned."

*Id.*, ¶ 25 at 9:15.5-16.

26.     "In March 2003, Plaintiffs doctored a Summons (J228) and prepared an Amended Complaint (J237) and served both documents on CEMG and Mr. Katakis without Court approval, without them being filed and then allowed the litigation to proceed for months."

*Id.*, ¶ 26 at 9:17-18.5

27.    "In May 2003, [Defendant-Sinclair] complained about Fox Hollow being in a state of disrepair. (D238.) Yet, [Defendant-Sinclair] still refused to pay dues. In July 2003, as the HOA attempted to move forward with a rehabilitation project, [Defendant-Sinclair] wrote to the HOA and advised that the HOA's actions were done to damage [Defendant-Sinclair]. (D259.) [Defendant-Sinclair's] claims that the HOA and other defendants were harming them by the rehabilitation project were false."

*Id.*, ¶ 27 at 9:19.5-22.

28.    "In November 2003, [Defendant-Sinclair] tendered $0 to the HOA when clearly [Defendant-Sinclair] knew that they had not paid dues since May 2002. (P019; P021.)"

*Id.*, ¶ 28 at 9:23-23.5.

The State Court expressly made the 28 above findings as part of its Statement of Decision in rendering judgment for Katakis Plaintiffs in the State Court Action. *Id.*, p. 23:19.5-22.5. These are the 28 "Unclean Hands" findings at issue. The court does not give to them any special significance to the words "Unclean Hands" as the conclusion of the State Court, but accepts the individual findings and determinations by the State Court.

In addition to the above, the State Court Decision includes the additional findings and determinations:

29.    "[Defendant-Sinclair, Mauctrst LLC, Lairtrust LLC, Capstone LLC, Capstone Trust, Stan Flake, Brandon Sinclair, and Gregory Mauchley, the plaintiffs in the State Court Action] are indistinguishable from one another for the purposes of the doctrine as Mr. Sinclair was acting for them and Mauctrst was a sham and alter ego for Mr. Sinclair and Mr. Mauchley."

*Id.*, at 23:22.5-24.5.

30.    "One of the plaintiffs, [Defendant-Sinclair], is a veteran, California attorney, residing in Stanislaus County. He is in the private practice of law and also involved in real estate development and real estate law."

*Id.* at 2:23.5-25.5.

31.    "In February 1993, [Defendant-Sinclair] applied to the City of Turlock to subdivide Fox Hollow into 19 lots and a common area in order to accomplish a planned unit development (PUD) thus invoking the legal requirements of the Davis-Stirling Common Interest Development Act (Civil Code §§ 1350, *et. seq.*). The application for the subdivision/conversion was approved by the City of Turlock in the spring of 1993, subject to various conditions, such as building code compliance for separate utility service for each individual lot, erection of firewalls and creation of a homeowners association."

*Id.* at 4:4.5-10.5.

32.    "Given [Defendant-Sinclair's and the Other State Court Plaintiffs'] knowledge of the importance of the payments of dues and assessments and their willing non-compliance in making such payments, notifying Plaintiffs of any rules and procedures in order to satisfy a claim for code compliance would have been an idle act. Plaintiffs also had far more than the statutorily contemplated notice associated with a homeowner's association foreclosure

1    and yet at no time tendered any money."

2    *Id.* at 14:11.5-15.5.

3    32.    "[Defendant-Sinclair's and the Other State Court Plaintiffs'] plan of non-payment
      of dues and assessments was systematic, continuous and long-standing."
4
     *Id.* at 14: 15.5-16.5.
5
6    33.    "Moreover, [Defendant-Debtor's and the Other State Court Plaintiffs'] claim that
      [Defendant-Sinclair], Brandon Sinclair and Gregory Mauchley were directors at the time
7    contradicts [Defendant-Sinclair's] representation to the court that at that time there was no
      board, no direction for the BOA and an election should be held. (J309, p. 2.)"

8    *Id.* at 15:13.5-16.5.

9    34.    "[Defendant-Debtor's and the Other State Court Plaintiffs']  either made a false
      statement to the Court in the Receivership action (J309), or at trial, about the Board
10   resigning."

11   *Id.* at 15:24.5-25.5.

12   35.  "Leading up to the bankruptcy filing in 1999 and thereafter, [Defendant-Sinclair], Mr.
      Mauchley and Mauctrst operated as an indistinguishable enterprise with [Defendant-Sinclair]
13   having authority to act on behalf of Mr. Mauchley and Mauctrst. [Defendant-Sinclair] has
      testified in deposition and at trial and stated in letters that he sent to tenants at Fox Hollow
14   that he was a member/manager of Mauctrst LLC, and he admitted under oath that
      member/manager means owner."
15
16   *Id.* at 18:7-12.

17   36.    "Yet, [Defendant-Sinclair, notwithstanding the above testimony] he denied
      ownership of Mauctrst LLC at trial. The court did not find Mr. Sinclair's denial of ownership
18   credible."

19   *Id.* at 18:12-13.

20   37.    "[Defendant-Debtor's and the Other State Court Plaintiffs'] claimed that the
      bankruptcy filing had nothing to do with the pending non-judicial foreclosures and "that
21   wasn't the consideration at all." (724:7-12.) However, the court did not find such testimony
      credible."

22   *Id.* at 18:15-18.

23   38.    "In July 1999, [Defendant-Debtor] filed bankruptcy for Mauctrst representing that
      it was owned 50% by Mr. Mauchley and 50% by Mrs. Mauchley. Mr. Mauchley testified at
24   trial these statements were false.  As such, basic representations were made to the
      bankruptcy court regarding ownership of Mauctrst that were untrue."
25
26   *Id.* at 18:19-22.

27   39.    "Moreover, at the time Mauctrst filed for bankruptcy, Mauctrst did not even have a
      signed operating agreement and Mr. Sinclair had filed numerous unlawful detainer actions
      for units at Fox Hollow asserting under oath he ([Defendant-Sinclair]) and Mr. Mauchley
28

ADDENDUM B
Page 6

1      as individuals were owners of the Fox Hollow property, not Mauctrst.  Plaintiffs also
2      asserted in the bankruptcy court that Mauctrst merely had the right to operate the property,
       and Mr. Mauchley owned the property."

3   *Id.* at 18:22-27.

4          40.    "The Court determines that Mauctrst LLC was a fiction designed to allow the misuse
5      of the bankruptcy court and to attempt to avoid Defendant-Debtor's and the Other State
       Court Plaintiffs'] obligations under various deeds of trust, including, but not limited, to Lots
6      3, 7, 9 and 14, and other obligations of [Defendant-Debtor's and the Other State Court
       Plaintiffs']."

7   *Id.* at 18:27-28, 19:1.5-2.5.
8          The judge in the State Court Action summarized the determination that the Doctrine of
       Unclean Hands precludes any recovery by Defendant-Sinclair (and the other alter-ego plaintiffs in
9      the State Court Action), concluding:

10            "The pattern of "unclean hands" conduct behavior of [Defendant-Sinclair]
       was pervasive as well as endemic to the entire Fox Hollow project over the entire
11     period of time involved in this case, including, but not limited to: (1) the manner of
       securing the subject promissory notes and deeds of trust; (2) refusing to make
12     payments and misrepresentation of making payments required under the subject
       promissory notes and deeds of trust; (3) misusing the bankruptcy court to improperly
13     delay and try to defeat the claims of the holders of the subject promissory notes and
       deeds of trust; (4) misusing a preliminary injunction to delay foreclosures without
14     making monthly payments; (5) failing to timely form and fund an HOA and failing
       to properly conduct the affairs of the HOA; (6) dealings and interacting with the
15     HOA and [Katakis Plaintiffs], after October 2002, related to the lots in issue; (7)
       dealings with GMAC and defendants Katakis and CEMG with respect to Lots 11 and
16     18; and (8) the other conduct further described and set forth in the incorporation by
       reference paragraphs. It is fortunate that the unclean hands doctrine is applicable to
17     both legal and equitable settings.

18            Given the nature and duration of the conduct, this court finds that the
       "unclean hands" of [Defendant-Debtor] is proximately related to
19     [Defendant-Debtor's] claims and the relief they seek, such that the court finds for
       [Katakis Plaintiffs] on their unclean hands defense against [Defendant-Debtor] on
20     all causes of action and for this separate and independent reason finds in favor of
       [Katakis Plaintiffs] on each of the causes of action in [Defendant-Debtor] Fifth
21     Amended Complaint."

22  *Id.*, p. 24:4.5-21.5.

23

24

25

26

27

28

ADDENDUM B
Page 7

# ADDENDUM "C"

## STATE BAR COURT DECISION FINDINGS AND CONCLUSIONS

A.    "In January 1994, respondent, through Sinclair Enterprises, asked to modify the condition requiring all building code revisions to be completed before the final map could be recorded. The City of Turlock denied the request a month later. Respondent wrote the City, stating "[t]here are sufficient funds within the homeowners association" to perform some of the modifications. This was a misrepresentation, as there was no homeowners association."

State Bar Court Decision, p. 4; Exhibit 18, Dckt. 73.

B.    "Even though the required modifications [to the Fox Hollow Property] were not completed, [Defendant-Sinclair], on February 20, 1998, filed a "Notice of Completion" of the subdivision project."

*Id.* at 7.

C.    "Granite Bay Funding, which made loans on lots 3, 7, 9, and 14, did not know the subdivision work had not been completed. Had it been aware of that fact, it would not have made the loans until the work was complete. The civil trial court concluded the July 1998 loans were obtained "on a false premise." This conclusion was also supported by the evidence contained in the present record."

*Id.* at 8.

D.    "In addition, [Defendant-Sinclair] failed to account [in the Mauctrst bankruptcy case] for the proceeds of two fire insurance claims, and over 50 cancelled checks and two bank statements were missing. Finally, [Defendant-Sinclair] he failed to account to the trustee for $135,000 he had received from Mauctrst between August 1998 and June 1999."

*Id.* at 9. Mauctrst was an entity formed by Defendant-Sinclair, which paid Defendant-Sinclair a monthly salary of $10,600 to manage the Fox Hollow Property. *Id.* at 8.

E.    "After Fox Hollow reverted to Mauctrst in January 2000, [Defendant-Sinclair] attempted to purchase the notes from the foreclosing lenders for his "clients." At the civil trial, [Defendant-Sinclair] could not remember which clients. [Defendant-Sinclair] offered a reduced price because many of the units securing the notes could not be resold individually since the subdivision work was not complete.   For example, in January 2000, just 18 months after Mauchley borrowed $130,000 against lot 3, respondent offered to pay the lender $80,000 for the note because the lot was not individually saleable."

*Id.* at 9-10.

F.    "After the property reverted to Mauctrst [after its bankruptcy case was closed], the lenders again pursued foreclosures. [Defendant-Sinclair] on behalf of Mauchley and

1    Mauctrst, filed 15 actions against the lenders to delay foreclosure."

2    *Id.* at 10.

3    G.    "In an action against ContiMortgage and Lonestar Mortgagee Services, LLC (Lonestar), Stanislaus Superior Court, case no. 254996, Mauchley and Mauctrst sought a restraining order and preliminary injunction barring foreclosures on lots 9 and 14. The pleading respondent prepared pertained to lots 9 and 14 only."

4

5    *Id.*

6    H.    "The order [Defendant-Sinclair] prepared [in the above ContiMortgage action] for the judge's signature after the hearing, however, states that defendants were enjoined from conducting a foreclosure sale on lots 9 and 14 "or any Lots in the Fox Hollow subdivision . . . . At the civil trial, [Defendant-Sinclair] and Mauctrst contended the preliminary injunction also applied to lots 3 and 7.

7

8

9    *Id.*

10   I.    "Despite the City of Turlock's subdivision approval condition in 1996 that required the formation of a homeowners association and similar language in the CC&R's, respondent testified at the civil trial that the Fox Hollow Owners' Association (FHOA) had to be formed only upon the sale of the first lot to a second owner. Therefore, when the first foreclosure by a lender was imminent, respondent held the first meeting of the FHOA on June 1, 2000, and prepared the minutes."

11

12

13   *Id.* at 11.

14

15   J.    "The directors [of FHOA] agreed to waive [Defendant-Sinclair's] conflict of interest as a manager of Mauctrst and employed him as the association's legal counsel at $225 per hour or approximately $50,000 for his services that year to assist with the FHOA formation."

16

17   *Id.* at 12.

18   K.    " In February 2001, Ocwen Federal Bank, F.S.B. (Ocwen Bank), a lender on four of the foreclosed lots, applied to have a receiver appointed for the FHOA because of deterioration of the buildings and common area. The court-appointed investigator reported that Fox Hollow was in very poor condition. The property was littered with garbage, discarded furniture, disabled vehicles, and abandoned shopping carts. The landscaping and pool were not maintained, and the pool had a strong sewage odor. In addition, the FHOA had shoddy bookkeeping practices and had grossly misused its funds. That misuse included paying respondent $15,266 for attorney fees while spending only $9,419 on property-related matters. Over [Defendant-Sinclair's] opposition, a receiver was appointed."

19

20

21

22

23   *Id.*

24

25   L.    "After GMAC foreclosed on lots 1, 11, 18, and 19, the Mauchley/Mauctrst lawsuit against GMAC for damages remained. In May 2001, GMAC, Mauchley, Mauctrst, and Flake (for Capstone Trust) entered into a settlement agreement . . . [Defendant-Sinclair] set up double escrows for the purchase of lots 1 and 19. [FN.8] He testified in the civil trial that Mauchley and Mauctrst owed him substantial attorney fees and wanted those fees to be paid. As payment for those fees, respondent agreed to take the lots and give one lot to his son, Brandon, because he had worked "on the

26

27

28

ADDENDUM C
Page 2

1    project."

*Id.*, 12-13.

M.    "[Defendant-Sinclair] testified in the civil and present trials that GMAC was aware of the double escrows and it did not matter to them. [FN.9] GMAC's attorney, who had approved the settlement agreement for GMAC, testified in the civil trial that she never would have agreed to the double escrows had she been aware of them. Her goal for GMAC was 'to get rid of [Defendant-Sinclair], Mauchley, et cetera, people for all time.'"

*Id.* at 13.

FN.9. "[Defendant-Sinclair's] assertion that GMAC did not care about a double escrow is unbelievable. [Defendant-Sinclair's] testimony on this subject lacks credibility."

*Id.*

N.    "On October 4, 2002, [Defendant-Sinclair] wrote Katakis asking to have the [FHOA] meeting rescheduled because he would be in trial in Fresno. He stated he represented himself; Mauctrst; Brandon; Mauchley; Capstone, LLC; Lairtrust, LLC; and Flake collectively, who owned more than 5 percent of Fox Hollow. [Defendant-Sinclair] did not assert that he, Brandon, and Mauchley were the current board of directors. And, three months earlier in July 2002, [Defendant-Sinclair] wrote in a statement filed with the court that the FHOA board members had resigned when the receiver was appointed, and it was logical to hold elections for a board of directors to carry out the work of the FHOA."

*Id.* at 15.

O.    "On December 16, 2002, [Defendant-Sinclair] sent a letter to Katakis and the FHOA claiming that the former board--himself, Mauchley and Brandon--had not resigned, and he had not been given credit for attorney fees that the FHOA owed to him while the receiver was in place."

*Id.* at 16.

The State Bar Court Decision makes the following additional specific findings with respect to the claims asserted against Defendant-Sinclair in the State Bar Court Action:

P.    Count One - § 6106 [Moral Turpitude - Scheme to Defraud]

1.    "The evidence before this court demonstrates that [Defendant-Sinclair] engaged in a fraudulent real estate scheme involving the Fox Hollow complex, including but not limited to: (1) creating the false appearance of a homeowners association and individually saleable lots; (2) seeking and obtaining loans secured by portions of Fox Hollow based on false pretenses and misrepresentations; (3) skimming off loan proceeds, dues collected in the name of the FHOA, rental income, and tenant deposits; (4) filing bankruptcies and lawsuits to try and delay foreclosures and/or keep the lots; and (5) providing false testimony and misrepresentations to the civil courts to conceal and perpetuate the scheme to defraud."

State Bar Court Decision, p. 24; Exhibit 12, Dckt. 79.

2.    "By engaging in the scheme to defraud, including perpetuation of the scheme through an alter ego, [Defendant-Sinclair] committed acts involving moral turpitude, dishonesty, and corruption, in wilful violation of Business and Professions Code, section 6106."

*Id.*

Q.    Count Three - § 6106 [Moral Turpitude - Misrepresentation]

1.    "In Count Three, the State Bar alleged that respondent committed various acts of misrepresentation constituting moral turpitude. However, this court already relied on these same facts to establish [Defendant-Sinclair's] culpability in Count One. The appropriate resolution of this matter does not depend on how many rules of professional misconduct or statutes proscribe the same misconduct. (*In the Matter of Torres* (Review Dept. 2000) 4 Cal. State Bar Ct. Rptr. 138, 148.) Count Three is therefore dismissed with prejudice, as duplicative."

*Id.* at 24.

R.    Pattern of Misconduct (Std. 1.5(c).)

1.    "In the Fox Hollow matter, the trial and appellate courts concluded that [Defendant-Debtor's and the Other State Court Plaintiffs'] conduct constituted a pattern of misconduct and deception. This court agrees, noting that Defendant-Sinclair's misconduct spanned from 1994 through the underlying civil trial."

*Id.* at 29.

2.    "During this time [1994 through the District Court Action] [Defendant-Sinclair] has consistently and repeatedly engaged in deceptive and improper conduct in an effort to procure personal financial gain. The length and extent of [Defendant-Sinclair's] pattern of misconduct warrant significant weight in aggravation."

*Id.* at 30-31.

3.    "[Defendant-Sinclair's] actions demonstrate his indifference toward rectification or atonement for the consequences of his misconduct. Despite overwhelming evidence to the contrary, [Defendant-Sinclair] maintains he did nothing wrong and sees himself as the victim. Further, [Defendant-Sinclair] has not taken any steps to rectify the harm he has caused. Consequently, [Defendant-Sinclair's] indifference toward rectification or atonement for the consequences of his misconduct warrants significant consideration in aggravation."

*Id.* at 31.

4.    "[Defendant-Sinclair's] misconduct resulted in significant harm to Katakis and the administration of justice. Fighting and unwinding [Defendant-Sinclair's] pattern of misconduct has cost Katakis over $1.3 million dollars in attorney's fees and has taken a toll on his emotional and physical

wellbeing. Further, [Defendant-Sinclair's] misconduct and stalling tactics have resulted in a waste of judicial resources."

*Id.*

5.     "Disbarment often has been imposed in those instances, such as here, where an attorney has engaged in a pattern of serious misconduct because "only the most serious instances of repeated misconduct over a prolonged period of time" are characterized as demonstrating such a pattern. (*Levin v. State Bar* (1989) 47 Cal.3d 1140, 1150, fn. 14; *Garlow v. State Bar*, 44 Cal.3d 689, 711-712 [disbarment warranted where attorney's behavior of making false statements to the courts, failing to communicate with clients, failing to competently perform, failing to return client documents and property, and inducing others to testify falsely constituted a serious pattern of misconduct involving recurring types of wrongdoing]; *In the Matter of Hindin* (Review Dept. 1997) 3 Cal. State Bar Ct. Rptr. 657, 686-687 [disbarment recommended where attorney's 10-year pattern of neglecting client matters indicated a continuous course of professional misconduct].)"

*Id.* at 33.

6.     "[Defendant-Sinclair's] numerous and repeated instances of deception and fraud relating to the Fox Hollow property demonstrate that he is unable or unwilling to conduct himself in a manner consistent with settled standards of professional responsibility in this state."

*Id.*

7.     "Based on [Defendant-Sinclair's] testimony and demeanor, there is little indication that respondent has gained any insight and understanding regarding the present misconduct."

*Id.*

ADDENDUM C
Page 5

# Instructions to Clerk of Court
### Service List - Not Part of Order/Judgment

**The Clerk of Court is instructed to** send the Order/Judgment or other court generated document transmitted herewith *to the parties below*. The Clerk of Court will send the document via the BNC or, if checked _____, via the U.S. mail.

| **Debtor**(s)/**Defendant**(s) | **Attorney for the Debtor**(s)/**Defendant**(s) (if any) |
|---|---|
| Richard Carroll Sinclair<br>P.O. Box 1628<br>Oakdale, CA 95361<br><br>Richard Carroll Sinclair<br>8212 Oak View Drive<br>Oakdale, CA 95361 | |
| **Bankruptcy Trustee** (if appointed in the case) | Office of the U.S. Trustee<br>Robert T. Matsui United States Courthouse<br>501 I Street, Room 7-500<br>Sacramento, CA 95814 |
| Aaron A. Avery<br>2150 River Plaza Drive, Ste. 450<br>Sacramento, CA 95833 | Hilton A. Ryder<br>D. Greg Durbin<br>7647 N. Fresno Street<br>Fresno, CA 93720 |